**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **MAYA PARIZER,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | **Civil No. 1:24-00724-RDA-IDD** |
| **v.** | : | |
| | : | |
| **AJP EDUCATIONAL FOUNDATION,** | : | |
| **INC.,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT WESPAC FOUNDATION, INC.'S MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

Defendant WESPAC Foundation, Inc. ("WESPAC"), by counsel, pursuant to Fed. R. Civ.

P. 12(b)(1), (b)(2), and (b)(6), in support of its Motion to Dismiss Plaintiffs' First Amended

Complaint (hereafter "Complaint") files the following Memorandum of Points and Authorities.

## INTRODUCTION

WESPAC unequivocally condemns Hamas's October 7, 2023 attack in Israel and any

person or entity advocating support for Hamas. WESPAC is a 501(c)(3) New York-based non-

profit that has been a force for progressive social change since 1974, supporting the exercise of

free speech and peaceful protests in the United States. WESPAC promotes advocacy for the equal

rights and dignity for all the inhabitants of Israel and Palestine. *See About WESPAC*, WESPAC

FOUNDATION, https://wespac.org/2013/06/11/about-wespac/.[1]

WESPAC was a past fiscal sponsor of National Students for Justice in Palestine ("NSJP"),

an organization which oversees and coordinates with the hundreds of individual and independent

SJP chapters sponsored by universities across the country, many of which organized peaceful

---

[1] (last visited Aug. 26, 2024).

demonstrations and encampments on college campuses as a form of protest against Israel's military actions in Gaza. In a blatant effort to chill WESPAC's First Amendment rights, Plaintiffs endeavor here, and in litigation across the country, to exhaust the resources of organizations they disagree with to suppress legitimate discourse rather than engage in a battle of ideas. Plaintiffs' Complaint is nothing more than a political SLAPP suit that falsely labels WESPAC as an organization that aids and abets terrorists, which is completely false.

Political motivations aside, a careful read of Plaintiffs' Complaint reveals that the purported causes of action under the Anti-Terrorism Act and Alien Tort Statute are entirely without merit. As explained in more detail below, Plaintiffs have failed to establish that this Court has jurisdiction over Defendant WESPAC and have likewise failed to sufficiently allege facts that state a plausible claim for relief. Dismissal with prejudice is warranted and further amendment will only delay the inevitable conclusion that Plaintiffs' suit fails as a matter of law.

## BACKGROUND

### I.  PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on May 1, 2024. ECF No. 1. On July 9, 2024, Plaintiffs filed their First Amended Complaint. ECF No. 24. Defendant WESPAC was served at its office in White Plains, New York on August 6, 2024.[2] WESPAC timely moved for an extension

---

[2] On August 16, 2024, Plaintiffs filed a Motion for Extension of Time. Therein, they stated that "WESPAC likely exercises sufficient control over NSJP to accept service on its behalf, but to date WESPAC has not responded to Plaintiffs' request to accept service for NSJP." ECF No. 44-1 at 3. WESPAC does not exercise control over NSJP to accept service, or otherwise. Plaintiffs' claim that WESPAC had not responded to their request to accept service for NSJP is also false. On August 13, Plaintiffs' counsel asked whether the undersigned represents NSJP and could accept service for NSJP. The undersigned advised counsel the same day (August 13) that she only represented WESPAC and did not know who will represent NSJP. Other than that, Plaintiffs never reached out to WESPAC, but still claimed there was a "failure to respond."

of time, which the Court granted, enlarging its responsive pleading deadline to September 12, 2024. ECF No. 38. This Motion to Dismiss follows.

## II.   FACTUAL ALLEGATIONS IN THE COMPLAINT

Plaintiffs' Complaint, which totals 79 pages and 207 numbered paragraphs, only mentions Defendant WESPAC 32 times—which is mostly repetition.[3] The majority of references to WESPAC begin with an allegation concerning either Defendant AJP Educational Foundation, d/b/a American Muslims for Palestine ("AMP") or Defendant NSJP, after which Plaintiffs allege that these other defendants are "funded by Defendant WESPAC." *See* Am. Compl. at 3 and ¶¶ 12, 61, 65, 66, 89, 100, 170, 174, 182-183, 186. None of the attachments to the Complaint refer to WESPAC, with the exception of Exhibit I, where WESPAC is listed among other highly regarded human rights organizations such as the Bill & Melinda Gates Foundation as part of a congressional inquiry into student protests on college campuses. *See* ECF Nos. 24-1 to 24-9.

Defendant WESPAC "is a 501(c)(3) non-profit corporation incorporated in New York with its principal place of business in White Plains, New York." Am. Compl. at ¶ 12. WESPAC receives and administers donations and grants on behalf of NSJP as its "NY-based fiscal sponsor." *Id*. at ¶¶ 53, 57. "WESPAC then keeps a percentage of the donations and remits the rest to the groups that it fiscally sponsors." *Id*. at ¶ 53. According to Plaintiffs, "the IRS stipulates that fiscal sponsors must retain 'control and discretion over use of the funds.'" *Id*. at ¶ 58. Based on the foregoing, Plaintiffs then allege in conclusory fashion that "as the fiscal sponsor of NSJP, WESPAC is responsible for how NSJP utilizes the funds it receives from WESPAC—which includes ensuring

---

[3] Plaintiffs impermissibly merge the named Defendants by collectively referring to all or some as "Defendants" in the context of specific allegations despite each being completely separate entities or individuals with different alleged roles. *See generally* Am. Compl. In most instances, the allegations attributed to "Defendants" appear to have nothing to do with WESPAC, but rather, reflect inconsistent and haphazard pleading.

that the funds are used for charitable purposes." *Id*. According to the Complaint, "WESPAC has served as NSJP's fiscal sponsor since at least 2016." *Id*. at ¶¶ 59, 182. That is the extent of WESPAC's alleged involvement. The remainder of the substantive factual allegations involve either AMP, NSJP, or individuals with no association to WESPAC. *See generally,* Am. Compl. Plaintiffs seek to improperly attach secondary liability to WESPAC based on NSJP's alleged domestic conduct in 2023 even though it was Hamas who committed the alleged harm to Plaintiffs abroad, not NSJP, AMP, or WESPAC. All WESPAC is alleged to have done was provide money to NSJP as a fiscal sponsor—behavior that is legal and Constitutionally protected.

The Complaint asserts two counts against WESPAC: one brought by seven U.S. citizen Plaintiffs under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and one brought by two Israeli citizen Plaintiffs under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. All are alleged to be victims in some capacity of the Hamas terrorist attack in Israel on October 7, 2023 and seek compensation in this Court—not from Hamas, the perpetrator of the attack—but from a U.S. nonprofit, for alleged injuries sustained abroad. Am. Compl. at ¶¶ 1-9.

None of the Plaintiffs allege any physical personal injury from the attack, with exception to Mr. Newman who appears to bring suit as a survivor on behalf of his brother who was killed in the October 7 Nova Festival attack. *See* Am. Compl. at ¶¶ 1-9, 69. Ms. Parizer, Ms. Sanandaji, Mr. Diller, Mr. Bromberg, and Mr. Bar Or all claim "mental anguish and pain and suffering" from witnessing and fleeing from the Nova Festival attack in Israel on October 7, 2023. *Id*. at ¶¶ 1, 4-7. While away from their home, Mr. Gess and Ms. Almog appear to claim property damage resulting from their unoccupied home in Israel being attacked by Hamas on October 7 and claim to suffer "mental anguish and pain and suffering" for the loss of their home. *Id*. at ¶¶ 2, 9. Lastly, Mr. Ein-

Gal claims "mental anguish and pain and suffering" after having to flee to safety from Hamas gunmen at Zikim Beach on October 7 in Israel. *Id*. at ¶ 8.

The October 7 attack was heinous, but it was carried out by Hamas, not WESPAC, and there are no allegations that WESPAC was involved. While all of the alleged injuries to Plaintiffs occurred on October 7, 2023 in Israel, the majority of the allegations detail post-October 7 activity in the United States, such as college student protests allegedly organized by NSJP. Plaintiffs allege that NSJP was founded in 2010 "to manage and control hundreds of Students for Justice in Palestine ("SJP") [university] chapters across the country." Am. Compl. at 2, ¶¶ 11, 60. Plaintiffs further allege that "AMP controls NSJP and uses it to operate a propaganda machine for Hamas and its affiliates across American college campuses." *Id*. at ¶ 11. Plaintiffs also make the wild allegation that "[t]hrough NSJP, AMP uses propaganda to intimidate, convince, and recruit uninformed, misguided, and impressionable college students who, wittingly or unwittingly, serve as foot soldiers for Hamas on campus and beyond." *Id*. at 2-3. Reducing Plaintiffs' allegations to their conclusory form, Plaintiffs claim that AMP and NSJP serve as the "propaganda and recruiting wing" of Hamas in the United States, and WESPAC, in turn, is alleged to provide assistance to Hamas by "funding" NSJP. *Id*. at 3, ¶ 186; *compare with Who Are We?*, NATIONAL SJP, https://nationalsjp.org/about (describes itself as an entity to unify over 350 SJP university chapters with its mission to empower, unify, and support student organizers as they push forward demands for Palestinian liberation, equality, and self-determination on their campuses).

Plaintiffs' Complaint alleges that on October 8, the day *after* Hamas's attack, AMP and NSJP, funded by WESPAC, disseminated the Day of Resistance "NSJP Toolkit" across more than 300 American college campuses and on the internet in an effort to organize protests.[4] Am. Compl.

---

[4] While Plaintiffs speculate that the NSJP Toolkit included materials that were created before the October 7 attack in the Complaint's conclusory introduction, there is no plausible factual support

at ¶ 78 and 3. Plaintiffs claim that the "NSJP Toolkit is not a mere rhetorical tool", but rather "an action-oriented instruction manual created by NSJP, with Hamas's instructions and mission, AMP's control and assistance, and WESPAC's funding." *Id*. at ¶ 89. The Complaint further alleges that "AMP and NSJP enacted the NSJP Toolkit as written and beset their army of agitators on American streets and college campuses." *Id*. at 3. According to Plaintiffs, starting on October 8, 2023 and afterwards, "through threats, violence, calls for 'globalizing' the Intifada, and illegally occupying college campuses across the country, AMP and NSJP have instigated a mass culture of fear, threats, violence, and overt hatred to intimidate politicians and institutions to 'force' American institutions to bend to Hamas's will." *Id*. at 3-4. Plaintiffs claim these post-October 7 actions to be substantial assistance to Hamas and despite acknowledging the members and leadership of NSJP are largely if not entirely unknown to Plaintiffs, they somehow allege that NSJP's members incited and/or engaged in purported "acts of domestic terrorism—including trespass, assault, vandalism, robbery, destruction of property, harassment, and intimidation." *Id*. at ¶¶ 95, 183. None of these allegations concern the alleged harms or causes of action and appear to be asserted for the sole purpose of chilling WESPAC's Constitutional rights.

Lastly, Plaintiffs allege that with AMP and NSJP "aided in their efforts by WESPAC's fiscal sponsorship," "it is within this complex framework of shell institutions that Defendants provide the necessary substantial and systematic assistance to Hamas's ongoing terrorist activity."

---

for this assertion which was omitted from the later numbered paragraphs discussing the Toolkit. *Compare* Am. Compl. at 3 *with* ¶¶ 78-87. Fueling Plaintiffs' speculation is the alleged fact that the NSJP Toolkit provided graphics of paragliders, which (according to the Complaint) had never been used in a terrorist attack prior to October 7. *Id*. at ¶ 86. Assuming there is a correlation between the two, Plaintiffs attempt to use this allegation to then leap to the improper and unsupported inference that NSJP must have known details of the attack beforehand because there is no way they would be able to create a basic graphic of paragliders for dissemination in just one day's time. Regardless, Plaintiffs do not allege that WESPAC had any knowledge of the Toolkit and its contents before the October 7 attack (or afterwards).

Am. Compl. at ¶ 66. To the extent Plaintiffs are inferring or speculating that WESPAC was somehow created by NSJP or AMP (or Hamas even) as a "shell institution" for the purpose of accepting and distributing donations on behalf of NSJP, the allegations in the Complaint and judicially noticeable facts provide an easy rebuttal. First, the Complaint alleges no association between AMP and WESPAC. Second, Plaintiffs allege that NSJP was founded in 2010. *Id*. at 2, ¶¶ 11, 60. WESPAC was founded in 1974,[5] 13 years before Hamas even existed, *id*. at ¶ 19, and 36 years before NSJP existed. The Complaint alleges that WESPAC has only served as NSJP's fiscal sponsor since 2016 with no prior association. *Id*. at ¶¶ 59, 182.

In short, none of Plaintiffs' allegations assert any prior knowledge of or participation by WESPAC in the October 7 attack. To that end, Plaintiffs do **not** allege that (a) WESPAC ever provided any funds to Hamas; (b) that NSJP ever provided any funds to Hamas (let alone that NSJP provided the money received from WESPAC); (c) that WESPAC provided funds to NSJP with knowledge that NSJP would then provide those same funds to Hamas; or (d) that WESPAC provided funds to NSJP with an awareness that NSJP had a closely intertwined connection with Hamas's illegal terrorist activities. *See generally* Am. Compl. All of the alleged actions of WESPAC and NSJP occurred domestically in the United States, were legal, and have no plausible connection to any terrorist activity, let alone the specific October 7 attack. The Court should not sanction Plaintiffs' attempts to intimidate and coerce WESPAC via this lawsuit.

## STANDARD FOR GRANTING MOTION TO DISMISS

### I. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

"Rule 12(b)(1) provides for the dismissal of an action if the Court lacks subject matter jurisdiction." *Alexander v. Hilton Hotels Worldwide*, 2024 U.S. Dist. LEXIS 5677, at *2 (E.D. Va.

---

[5] *See About WESPAC*, WESPAC FOUNDATION, https://wespac.org/2013/06/11/about-wespac/ (last visited Aug. 26, 2024).

Jan. 9, 2024). "In considering a Rule 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction exists." *Id*. at *2-3. A defendant can argue either "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based" (facial challenge) or "that the jurisdictional allegations of the complaint [are] not true" (factual challenge). *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When addressing a facial challenge to its jurisdiction, a court must "apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Id*. at 193. However, conclusory statements and legal conclusions in a complaint are not entitled to a presumption of truth. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). "Regardless of the particular challenge, a plaintiff bears the burden of proving that the court has jurisdiction, and a court must dismiss the action if a plaintiff fails to carry that burden." *McArthur v. Brabrand*, 610 F. Supp. 3d 822, 834 (E.D. Va. 2022).

## II.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)

Rule 12(b)(2) permits a defendant to move to dismiss the claim(s) asserted against it for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Once a defendant affirmatively raises a personal jurisdiction challenge, the plaintiff bears the burden of demonstrating that personal jurisdiction exists. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Id*. When considering whether a plaintiff has carried its burden, the court must view all evidence, disputed facts, and reasonable inferences in favor of the plaintiff. *Id.*

## III.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Rule 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon

which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, the plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must also contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss, the court must first "tak[e] note of the elements a plaintiff must plead to state [the] claim" to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 675, 678. Although the court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations as true when considering a Rule 12(b)(6) motion, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679. In other words, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678.

## ARGUMENT

### I. THE ALIEN TORT STATUTE

#### A. This Court lacks personal jurisdiction over Defendant WESPAC under the Alien Tort Statute.

The Israeli Plaintiffs' claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, brought against Defendant WESPAC must be dismissed because this Court does not have personal jurisdiction over WESPAC. "A plaintiff must establish the court's [personal] jurisdiction with respect to each claim asserted." *Sunward Elec., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004). Personal jurisdiction "requires a claim-specific analysis, as a nonresident defendant lacking

continuous and systematic contacts with the forum state could not 'reasonably anticipate being haled into court' on claims unrelated to the defendant's forum state contacts, and thus haling them into court on those unrelated claims would violate their due process rights." *Gatekeeper Inc. v. Stratech Sys.*, 718 F. Supp. 2d 664, 667-68 (E.D. Va. 2010).

In the Complaint, Plaintiffs claim, without further explanation, that this "Court has personal jurisdiction under 18 U.S.C. §§ 2333(a) and 2334." Am. Compl. at ¶ 17. However, these provisions only pertain to the Anti-Terrorism Act ("ATA") claims brought by the U.S. Plaintiffs. Any jurisdictional nationwide service provision therein is expressly limited to U.S. nationals and their ATA claims only. Plaintiff has not alleged that WESPAC has any minimum contacts with the forum state of Virginia, and assuming *arguendo* that § 2334 actually confers claim-specific personal jurisdiction over WESPAC for the U.S. Plaintiffs' ATA claims (a question of first impression in this Circuit), this Court at the very least still lacks personal jurisdiction over WESPAC for the Israeli Plaintiffs' claims brought under the ATS.

Personal jurisdiction under Fed. R. Civ. P. 4(k)(1)(c) does not apply because the ATS does not provide for nationwide service of process. *See* 28 U.S.C. § 1350; *accord Weisskopf v. Neeman*, 2013 U.S. Dist. LEXIS 201309, at *7 (W.D. Wis. Mar. 20, 2013); *Weisskopf v. United Jewish Appeal-Federation of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d 912, 920 (S.D. Tex. 2012). Likewise, personal jurisdiction under Rule 4(k)(2) does not apply because WESPAC is subject to the jurisdiction of a state's courts of general jurisdiction, *i.e.* New York State.

In short, whether personal jurisdiction is proper in this matter is a state-specific inquiry that depends on Virginia's long-arm statute and constitutional due process. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Given Virginia's long-arm statute extends personal jurisdiction to the fullest extent permitted by due process, the statutory inquiry merges

into the constitutional due process analysis. *Id.* In order for the exercise of personal jurisdiction to comport with due process, a defendant must have sufficient "minimum contacts" with the forum state so that requiring it to defend itself within the state "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

There are two types of personal jurisdiction that meet due process requirements: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Only limited affiliation with a forum will subject a corporate defendant to general jurisdiction: the place of incorporation and principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Specific jurisdiction, by contrast, requires a comparison of the defendant's contacts in the forum with the subject of the lawsuit. *Goodyear*, 564 U.S. at 919. In analyzing the due process requirements for specific jurisdiction, the Fourth Circuit has set out a three-part test: (1) the extent to which the defendant "purposefully availed itself of the privilege of conducting business under the laws of the forum State;" (2) whether "the plaintiffs' claims arise out of the activities directed at the forum" state; and (3) "whether the exercise of personal jurisdiction [would] be constitutionally reasonable." *Consulting Eng'rs Corp.*, 561 F.3d at 278-79.

Defendant WESPAC is not subject to general or specific personal jurisdiction in Virginia for the Israeli Plaintiffs' claims under the ATS. Turning first to general personal jurisdiction, WESPAC's contacts with Virginia are not so continuous and systematic as to render it essentially at home there. Indeed, WESPAC maintains no continuous or systematic business contacts with Virginia, and the Complaint fails to allege *any* connection of WESPAC to the forum state of Virginia, let alone sufficient contacts that render it "at home" there. As alleged in the Complaint, "WESPAC is a 501(c)(3) non-profit corporation incorporated in New York with its principal place of business in White Plains, New York." Am. Compl. at ¶ 12. "WESPAC, a New York-based non-

profit corporation," *id*. at 3, exclusively operates out of New York receiving and administering donations on behalf of NSJP as its "NY-based fiscal sponsor." *Id*. at ¶ 53. WESPAC was served with this lawsuit at its sole office in White Plains, New York, and has no agent for service of process in Virginia. Accordingly, the Court may not exercise general personal jurisdiction over WESPAC for the ATS claims.

Similarly, Plaintiffs have not alleged sufficient facts to conclude that WESPAC is subject to specific personal jurisdiction in Virginia for the ATS claims. The allegations related to the claims and injuries in this case do not involve any activity in Virginia, but rather certain acts of terrorism by Hamas in Israel. In other words, the alleged injuries sustained occurred abroad, not in the forum state. Even then, there is no plausible causal connection between WESPAC's alleged actions domestically (of which none are directed to Virginia) and the alleged injuries sustained abroad by the Plaintiffs. The only allegations regarding WESPAC are the allocation of charitable funds from New York to Defendant NSJP. Moreover, nowhere in the Complaint does it allege that NSJP is based in or operates out of Virginia. Rather, Plaintiffs allege that Defendant "NSJP is an unincorporated association without a formal principal place of business or publicly identified leadership structure." Am. Compl. at ¶ 11. The Complaint likewise fails to allege that WESPAC fiscally sponsors any Virginia-based organization. Thus, under no circumstances can it be said that Defendant WESPAC purposefully availed itself of the privilege of conducting activities in Virginia. Furthermore, it is uncontroverted that Plaintiffs' claims do not arise out of WESPAC's activities directed at or in the State of Virginia (of which none are alleged). Even if allegations of the foregoing nature were made, the activity in question would be so nebulous as to fail to even qualify under the expansive tests used to determine minimum contacts with Virginia. Given the foregoing, the exercise of personal jurisdiction over the ATS claims is improper.

Plaintiffs fail to demonstrate that Defendant WESPAC enjoys minimal, if any, contacts with Virginia such that it should reasonably anticipate being haled into court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *see also William v. AES Corp.*, 28 F. Supp. 3d 553, 563-65 (E.D. Va. 2014) (dismissing ATS claim brought under § 1350 against Defendant Sonel on personal jurisdiction grounds); *Asemani v. Ahmadinejad*, 2010 U.S. Dist. LEXIS 38989, at *5-6 (D. Md. Apr. 20, 2010) (in dismissing the plaintiff's ATS claim, the court noted that even if this Court possessed subject matter jurisdiction over this matter, there is no basis to exercise personal jurisdiction over the defendants as the plaintiff failed to allege or demonstrate that the defendants enjoy minimal, if any, contacts with Maryland). Plaintiffs have failed to make a *prima facie* showing that this Court has either general or specific personal jurisdiction over this Defendant, and the Israeli Plaintiffs' ATS claims must be dismissed accordingly.

**B.     This Court lacks subject matter jurisdiction over the ATS Claim.**

Setting aside personal jurisdiction pleading deficiencies, the Israeli Plaintiffs' claims under the Alien Tort Statute, 28 U.S.C. § 1350, should be dismissed because the Complaint fails to allege facts that vest this Court with subject matter jurisdiction. First, the Israeli Plaintiffs fail to plead that WESPAC violated a universal and recognized international law norm identified in federal case law as justiciable. Second, the Israeli Plaintiffs fail to plead facts to overcome the presumption against extraterritorial application.

The ATS provides a jurisdictional avenue for non-U.S. foreign citizens to bring civil lawsuits in U.S. federal court for a narrow set of international law violations committed by U.S. actors that cause tortious harm. *See* 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."). The ATS is "strictly jurisdictional and does not by its

own terms provide or delineate the definition of a cause of action for violations of international law." *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 254 (2018). "ATS claims must be subject to vigilant doorkeeping" by the courts. *Id.* at 256.

1. Violation of International Norms

The threshold jurisdictional question under the ATS is whether the international norm alleged to have been violated is "specific, universal, and obligatory." *Jesner*, 584 U.S. at 257-58. If the plaintiff establishes a specific, universal, and obligatory international norm, the plaintiff must then also demonstrate why the court "should exercise 'judicial discretion' to create a cause of action rather than defer to Congress." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 636 (2021). The cognizable international law norms have been limited by the Supreme Court historically to three torts from the 1700s: violations of safe conduct, infringement of the rights of ambassadors, and piracy. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 723-24 (2004). In *Nestle*, the Court recently reinforced the ATS's narrow scope, recognizing that its "decisions since *Sosa*, as well as congressional activity, compel the conclusion that federal courts should not recognize private rights of action for violations of international law beyond the three historical torts identified in *Sosa*." *Nestle,* 593 U.S. at 637. Additionally, "a court must not create a private right of action if it can identify even one sound reason to think Congress might doubt the efficacy or necessity of the new remedy." *Id*. Given the strict parameters of this test, the Supreme Court has yet to recognize a cause of action under the ATS. *Id*. at 635. The Israeli Plaintiffs ask this Court to do so.

A "related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 542 U.S. at 732, n.20. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120, 145 (2d Cir. 2010) (dismissing ATS claims brought against corporation

for lack of subject matter jurisdiction and holding that ATS claims for criminal customary international law violations are limited to individuals and may not be brought against corporations as corporate liability has not achieved universal recognition as an international norm).

The Israeli Plaintiffs allege that WESPAC, a nonprofit corporation, should be liable under the ATS for material support of terrorism, and/or for violating the International Convention for the Suppression of the Financing of Terrorism ("ICSFT"). Am. Compl. at ¶¶ 204-06. This alleged conduct does not establish a universal international norm, and corporate liability for such conduct is likewise not a universal international norm or established by a self-executing U.S. treaty. Thus, the Court does not have subject matter jurisdiction over the Israeli Plaintiffs' ATS claims.

Upon belief, no federal court in this Circuit or the Supreme Court has found that a claim of either materially supporting terrorism or financing terrorism reflects a customary international law norm cognizable under the ATS. The legal concept of "terrorism" in general has not been clearly defined internationally and the nations of the world are divided on the legitimacy of such (undefined) conduct, making it difficult if not impossible to find an area of consensus. Put differently, no universal definition of "terrorism" exists that establishes a "specific, universal, and obligatory" norm sufficient to confer subject matter jurisdiction on this Court. *See, e.g., Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 118, 122, 125 (2d Cir. 2013) (affirming dismissal of ATS claim because "no universal norm against 'terrorism' existed under customary international law"); *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1317 (S.D. Fla. 2011) (rejecting plaintiffs' "attempt to group this broad, ill-defined class of conduct under the umbrella of 'terrorism,' or material support thereof, and create a cause of action against it under the ATS"); *Mwani v. Bin Ladin*, 2006 U.S. Dist. LEXIS 89483, at *3 n.2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining

terrorism as a violation of the law of nations."). The lack of internationally agreed-upon definitions for terrorism, terrorism financing, or material support of terrorism renders those allegations insufficient for a new cause of action under the ATS.

Second, the ICSFT, cited by Plaintiffs in their Complaint, does not establish a cognizable international universal legal norm of terrorism financing for purposes of the ATS and an allegation of a violation of the ICSFT itself is likewise insufficient to provide jurisdiction under the ATS. *See, e.g., In re Chiquita Brands Int'l*, 792 F. Supp. 2d at 1318; *Karunamunige Chamila Krishanthi v. Rajakumara Rajaratnam*, 2010 U.S. Dist. LEXIS 88788, at *36-43 (D.N.J. Aug. 26, 2010). Although many states have ratified the ICSFT, a significant number have attached declarations and reservations indicating that they do not accept its definition of "financing terrorism." As the *Chiquita* court concluded, the "disagreements, nonconsents, and divergent interpretations of the Finance Convention demonstrate that the prohibitions of the convention are disputed and not well-established." 792 F. Supp. at 1319.

The Israeli Plaintiffs will likely argue that a universal norm is found in Article 2.1(b) of the ICSFT. Am. Compl. ¶ 198. However, Plaintiffs would have to establish that the ICSFT is self-executing and creates a private right of action against a nonprofit corporation. *Cornejo v. Cty. of San Diego*, 504 F.3d 853, 856 (9th Cir. 2007) ("For any treaty to be susceptible to judicial enforcement it must both confer individual rights and be self-executing."); *Sosa*, 542 U.S. at 734-35 (International Covenant on Civil and Political Rights are not privately enforceable—no private right of action exists in federal court—because it was not self-executing); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir. 1979) ("unless a treaty is self-executing, it must be implemented by legislation before it gives rise to a private cause of action."). By its own language, the ICSFT does not self-execute, as it requires parties to create additional legislation for

implementation. International Convention for the Suppression of the Financing of Terrorism, Arts.
4-7, Dec. 9, 1999, 2178 U.N.T.S. 197; *see also Krishanthi,* 2010 U.S. Dist. LEXIS 88788, at *42
(finding that the ICSFT is not self-executing and does not create a private right of action).

> The Supreme Court has weighed in on the ICSFT's applicability in the context of the ATS:
>
> [The ICSFT] imposes an obligation on "Each State Party" "to enable a legal entity
> located in its territory or organized under its laws to be held liable when a person
> responsible for the management or control of that legal entity has, in that capacity,"
> violated the Convention. [citation omitted]. But by its terms the Convention
> imposes its obligations only on nation-states "to enable" corporations to be held
> liable in certain circumstances under domestic law. The United States and other
> nations, including Jordan, may fulfill their obligations under the Convention by
> adopting detailed regulatory regimes governing financial institutions. See, e.g., 18
> U. S. C. §2333(a) (private right of action under the Anti-terrorism Act); 31 U. S. C.
> §5311 et seq. (Bank Secrecy Act); 31 CFR pt. 595 (2017) (Terrorism Sanctions
> Regulations); …. The Convention neither requires nor authorizes courts, without
> congressional authorization, to displace those detailed regulatory regimes by
> allowing common-law actions under the ATS. And nothing in the Convention's
> text requires signatories to hold corporations liable in common-law tort actions
> raising claims under international law.

*Jesner*, 584 U.S. at 261-62. In short, a nonprofit corporation like WESPAC cannot be sued under
the ATS when the alien plaintiff attempts to use the ICSFT as the basis for a violation of the law
of nations or treaty of the United States. The ICSFT does not constitute an enforceable "treaty"
under the ATS because it does not "confer individual rights" and is not "self-executing." *Cornejo*,
504 F.3d at 856. And Congress has not authorized this Court to displace the detailed regulatory
regimes governing the financing of terrorism, such as the ATA, by allowing common-law actions
under the ATS for alleged violations of the ICSFT.[6] The Israeli Plaintiffs therefore cannot bring a

---

[6] In the *Jesner* lawsuits, the foreign plaintiffs, who were injured by terrorist acts abroad, brought
their ATS claims with US nationals suing Arab Bank under the ATA for the same reasons: for
processing financial transactions alleged to have caused or facilitated the terrorist attack(s). The
ATA, intentionally and expressly limited by Congress in its relief to US national plaintiffs,
"suggests that there should be no common-law action under the ATS" for foreign citizens alleging
harm caused by the financing of terrorism. *Jesner*, 584 U.S. at 267-68. The Supreme Court
reasoned that, "[o]therwise, foreign plaintiffs could bypass Congress' express limitations on
liability under the Anti-Terrorism Act simply by bringing an ATS lawsuit." *Id.* at 268. The ATA,

cause of action via the ATS in reliance on a violation of the ICSFT or use it as a basis to otherwise establish a cognizable international norm for the financing of terrorism. Accordingly, this Court lacks subject matter jurisdiction over the ATS claims.

2. <u>Presumption Against Extraterritorial Application</u>

The presumption against extraterritoriality applies to claims under the ATS, and nothing in the statute rebuts the presumption. *Jesner*, 584 U.S. at 256-57. In other words, plaintiffs are barred in most situations from bringing an ATS claim regarding tortious conduct that occurred in the territory of a foreign sovereign, as is the case here.

The Israeli Plaintiffs claim members of Hamas injured them in Israel during the October 7 attack. "Even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id*. at 257. A plaintiff may overcome that presumption only where a defendant's alleged actions in the United States have a sufficient causal connection to the alleged harm. *Nestle*, 593 U.S. at 634. Thus, the Israeli Plaintiffs must overcome the presumption against extraterritorial application of the ATS by alleging that the domestic conduct of WESPAC is sufficiently connected to the actions of the Hamas terrorists that harmed Plaintiffs. *Id*. "Generic allegations" will not suffice to "draw a sufficient connection between the cause of action … and domestic conduct." *Id*.

Here, while the Israeli Plaintiffs allege domestic conduct—WESPAC's past fiscal sponsorship of NSJP (*i.e.* providing NSJP with money to support student protests and campus events in the U.S.)—none of the alleged conduct is sufficiently causally connected to the heinous

---

"part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing," reflects the careful deliberation of the political branches on when, and how, financial organizations should be held liable for financing terrorism. *Id*. Accordingly, *Jesner* concluded that "[i]t would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability in actions filed under the ATS." *Id*.

October 7 attack. Neither WESPAC nor NSJP are alleged to have committed the acts of terrorism in Israel. NSJP is alleged to have aided and abetted Hamas by distributing purported pro-Hamas propaganda in the United States after the attack. WESPAC is alleged to have aided and abetted NSJP by providing NSJP monetary funds in the United States (an even hazier form of hypothetical secondary liability). WESPAC's alleged domestic conduct is far too attenuated from the primary foreign conduct of Hamas to displace the presumption against extraterritorial application. Because the Israeli Plaintiffs fail to allege facts upon which subject-matter jurisdiction may be based, and that would overcome the presumption against extraterritorial application, this Court lacks jurisdiction over the ATS claims and must dismiss them.

### C.      The Israeli Plaintiffs fail to state a plausible ATS claim.

If this Court determines it possesses subject matter jurisdiction over the ATS claims and that it possesses personal jurisdiction over WESPAC, the ATS claims still warrant dismissal under Rule 12(b)(6). The pleading requirements for an ATS aiding-and-abetting claim are that the defendant "(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime" or alleged violation of an international norm. *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396, 401 (4th Cir. 2011). In *Aziz*, the ATS claim was rejected by the Fourth Circuit because the plaintiffs failed to plausibly plead non-conclusory facts that demonstrated that the defendant pharmaceutical company gave chemical supplies to Iraq with the purpose of facilitating genocide. *Id.* at 401-02.

Here, the Complaint fails to plausibly show that WESPAC gave money to NSJP for the purpose of facilitating the October 7 terrorist attack in Israel (or any attack by Hamas). There are certainly no facts alleged that show WESPAC's unspecified payments to NSJP had a "substantial effect" on the perpetration of the act of terror by Hamas that harmed Plaintiffs. While still

insufficient to establish liability, there are not even any facts that plausibly support that WESPAC had knowledge of any attack or was aware of NSJP's alleged role as the "propaganda arm" for Hamas in the United States. For all these reasons, Plaintiffs ATS claims fail to state a claim for relief. Moreover, the Court should not have to reach the merits of the ATS claims as there are three independent dismissal grounds for lack of jurisdiction.

## II.   THE ANTI-TERRORISM ACT

Under the ATA, 18 U.S.C. § 2333, those injured by an act of international terrorism can sue the relevant terrorists directly under §2333(a)—or they can sue anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism" under §2333(d)(2). *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 483 (2023). The U.S. Plaintiffs bring their ATA claims against WESPAC (and all defendants) pursuant to §2333(d)(2),[7] relying exclusively on the aiding and abetting provision.[8] This Court should dismiss the ATA claims brought against Defendant WESPAC as U.S. Plaintiffs have failed to plausibly state a claim for aiding and abetting liability.

ATA aiding and abetting liability is generally governed by the legal framework identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) coupled with the rules applying the ATA in *Taamneh*. *See Taamneh*, 598 U.S. at 493, 498. The three *Halberstam* elements of aiding and abetting are (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or

---

[7] Citing 18 U.S.C. § 2333(d) for their claims, Plaintiffs seek relief under the Justice Against Sponsors of Terrorism Act ("JASTA"), enacted in 2016 to create secondary "aiding and abetting" liability. For simplicity purposes, WESPAC will refer to Plaintiffs' § 2333(d) claims as the "ATA" claims in harmony with the Complaint and the previously filed motions to dismiss.

[8] Plaintiffs neither allege conspiracy in the Complaint nor otherwise invoke the conspiracy provision in § 2333(d)(2). *See* Am. Compl. at ¶¶176-194 (only referencing "aiding and abetting").

tortious activity at the time he provides assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. Aiding and abetting liability is limited to only "conscious, voluntary, and culpable participation in another's wrongdoing," meaning that "the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Taamneh*, 598 U.S. at 493, 497. Importantly, "the text requires that defendants have aided and abetted the [specific] act of international terrorism that injured the plaintiffs," which is lacking in the Complaint. *Id*. at 497.

In the Complaint, Plaintiffs allege that Hamas is an FTO that "committed, planned, or authorized various acts of international terrorism including its (a) terrorist attack on October 7th; (b) ongoing rocket attacks against non-military, civilian targets; and (c) holding innocent civilians hostage." Am. Compl. at ¶ 180. As a threshold matter, the only alleged act of international terrorism the Court can properly consider in this case is the "terrorist attack on October 7", which is the only act upon which Plaintiffs have alleged injury. *Id.* at ¶¶ 1-7.

## A.      Aiding a Wrongful Act (First Element)

First, the party whom the defendant aids must perform a wrongful act of international terrorism that causes the Plaintiffs' injuries. *Taamneh*, 598 U.S. at 486. Additionally, the "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization." *Id*. at 483-84.

Here, WESPAC is alleged to have aided NSJP, which did not commit the wrongful act of international terrorism that caused Plaintiffs injuries. To meet the definition of "international terrorism," an activity must "involve violent acts or acts dangerous to human life"; violate U.S. criminal laws; be for a terroristic purpose; and occur primarily outside of the jurisdiction of the United States. 18 U.S.C. § 2331(1). All acts alleged of WESPAC and NSJP occurred domestically:

WESPAC's unspecified payment(s) to NSJP, NSJP's purported creation and distribution of the "toolkit," and NSJP's alleged role in organizing the college student protests in universities across the country in the days and weeks after the October 7 Hamas attack in Israel. Any alleged acts related to domestic activity (or domestic terrorism even) in the U.S. are not covered acts.

While WESPAC does not dispute that the October 7 attack committed by Hamas meets the definition of terrorist acts under the ATA, Plaintiffs have not effectively pled that WESPAC "aided" Hamas in this attack. Plaintiffs contend WESPAC is liable because it accepts and provides funds to NSJP, who Plaintiffs then allege provided substantial assistance to Hamas by serving as an "American propaganda division." Am. Compl. at ¶ 186. Contrary to Plaintiffs' speculative conclusions, NSJP is not an FTO, nor has the U.S. government declared it an unofficial arm of Hamas. In other words, while theoretically the first element may be satisfied for Defendant NSJP, since it is alleged to have generally assisted Hamas in the aftermath of the October 7, 2023 attack through US-based advocacy, the same cannot be said of WESPAC who is only alleged to have aided NSJP in its domestic and legal First Amendment activity. Assuming *arguendo* that Plaintiffs have satisfied the first element as to WESPAC, the Complaint still fails to plausibly allege facts that support the remaining two.

### B.     General Awareness (Second Element)

As to the second *Halberstam* element of general awareness, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides assistance." *Taamneh*, 598 U.S. at 486. In *Siegel*, an ATA aiding and abetting case involving a bank providing financial services to an intermediary bank with alleged ties to terrorism, the Second Circuit held that to satisfy the general awareness element, the plaintiff must plead that the defendant bank was aware that, by assisting the principal, "it is itself assuming a role in terrorist

activities." *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019).[9] Relevant

here for WESPAC, at least one Circuit has imposed an even higher standard to establish general

awareness if liability is predicated on the provision of financial services to an intermediary and not

the tortious party directly. *See Bernhart v. Islamic Republic of Iran*, 47 F.4th 856, 867-68 (D.C.

Cir. 2022) ("When a plaintiff's ATA aiding and abetting claim depends on aid flowing through an

intermediary, the general awareness element requires that (1) the defendant was aware of the

intermediary's connection to the terrorist organization, and (2) the intermediary is 'so closely

intertwined' with the terrorist organization's illegal activities as to give rise to an inference that

the defendant was generally aware of its role in the organization's terrorist activities."). In

*Bernhardt*, the D.C. Circuit found that concerns of a senior bank manager that another bank might

be linked to terrorism did not show general awareness because those concerns reflected only the

*possibility* of a terrorist connection, and not knowledge or awareness of an actual one. *Id*. at 869.

Analogous to the allegations asserted against WESPAC, the case of *Kayemeth I and

Kayemeth Leisrael-Jewish National Fund v. Education for a Just Peace*, 66 F.4th 1007 (D.C. Cir.

2023) is instructive. In *Kayemeth*, the plaintiffs asserted ATA liability for a fiscal sponsor that did

not provide funds to an entity designated as an FTO, but rather provided funds to a U.S. group

alleged to be affiliated with an FTO. 66 F.4th at 1011-13. Specifically, the plaintiffs alleged the

defendant, U.S. Campaign for Palestinian Rights ("USCPR"), was a fiscal sponsor of the Boycott

National Committee, a Palestinian activist group, that was alleged to be tied to Hamas and acted

as a "coordinating framework" to assist Hamas's activities. *Id*. The D.C. Circuit dismissed the

---

[9]  In *Siegel*, the Second Circuit upheld 12(b)(6) dismissal of an ATA claim holding that the general
awareness requirement was not sufficiently pled because HSPC was only aware that the
intermediary Saudi Bank was believed by some to have links to terrorist groups. 933 F.3d at 224-
25. Thus, even providing financial services to parties that themselves might aid and abet terrorism
does not satisfy general awareness when there is no plausible factual allegation supporting that the
financial institution was aware it was taking on a role in terroristic activities. *Id*.

ATA claim pursuant to Rule 12(b)(6) because, broadly speaking, the Complaint lacked concrete, factual allegations to show a sufficient connection between USCPR and Hamas to hold USCPR liable for any acts of terrorism. *Id*. at 1011, 1016-18. Applying the *Halberstam* test, the D.C. Circuit found that the second element was not satisfied because no allegations were made to suggest a general awareness of tortious activity by USCPR. *Id*. at 1017. While the plaintiff claimed that Boycott National Committee's efforts to "economically, academically, and diplomatically" boycott Israel constituted terrorism, the D.C. Circuit determined that those actions were legal, and there were no other facts alleged to suggest USCPR was taking a role in acts of terrorism. *Id*.

Regarding WESPAC's awareness of being involved in a tortious scheme, Plaintiffs assert a bare allegation that "WESPAC knowingly provides substantial assistance to Hamas by funding its American propaganda division, particularly NSJP, with the necessary capital to service Hamas." Am. Compl. at ¶ 186; *but see Iqbal*, 556 U.S. at 678-79 (a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are by themselves insufficient to state a claim). Tellingly, Plaintiffs do not explain how it is that WESPAC was supposedly aware that NSJP – a collection of U.S. college students – is part of Hamas (even accepting that idea *arguendo*). NSJP is not an FTO, nor has the U.S. government declared it an "arm of Hamas." Indeed, Plaintiffs' allegations regarding awareness are notably weaker than those deemed insufficient in *Bernhardt*, another case involving alleged liability predicated on the payment of funds to an intermediary where the bank manager expressed actual concern about an intermediary bank's potential connections to terrorism. 47 F.4th at 869.

Plaintiffs might point to their allegation that, in the NSJP Toolkit, NSJP confirms not only that NSJP was "aware that their propaganda and incitement activities support Hamas but also that

they perceive themselves as 'PART of' Hamas's 'Unity Intifada.'" Am. Compl. at ¶ 185. However, that does not show that WESPAC was aware that NSJP purportedly perceived themselves as part of Hamas's "Unity Intifada." And any possible notice of this "self-perception" by NSJP would not have been available to WESPAC until after the October 7 attack, when the so-called "Toolkit" was released. *Id*. at 3. Thus, even if the Court accepts the wild proposition that NSJP is part of or identifies as Hamas, the Toolkit would not have alerted WESPAC to NSJP's alleged "role" until after the attack at issue, if it was even alerted at all. The facts alleged simply do not support the requisite showing that WESPAC provided funds to NSJP with an awareness that NSJP had a closely intertwined connection with Hamas's activities. As such, WESPAC was not a culpable party participating in any way in the tortious act in Israel.

Further, in *Kayemeth*, the D.C. Circuit found that the Boycott National Committee (which received funds from USPCR) engaged in <u>legal</u> advocacy activities (rejecting plaintiff's allegation that boycotting Israel was terrorism), which militated against concluding that USCPR was "'generally aware' that its role of providing funds to the Boycott National Committee was 'part of an overall illegal or tortious activity.'" 66 F.4th at 1017. Similarly, Plaintiffs allege here that public gatherings and protests against Israel's military aggression in Gaza is terrorism—an absurd argument. As stated, *supra*, NSJP describes itself as an entity to unify SJP chapters and states that its mission is to empower, unify, and support student organizers as they push forward demands for Palestinian liberation & self-determination on their campuses. *See Who Are We*?, NATIONAL SJP, https://nationalsjp.org/about. From WESPAC's perspective, it was supporting lawful pro-Palestine discourse and peaceful protests against Israel's military action in Gaza (among other human rights issues). Such activities are plainly legal – and no allegations are made to suggest WESPAC was

aware of any illegal or terroristic activities being undertaken by NSJP or Hamas. As such, Plaintiffs fail to establish the second "general awareness" element.

### C.   Knowing and Substantial Assistance (Third Element)

The third element Plaintiffs fail to plead with requisite specificity and plausibility is that "the defendant must knowingly and substantially assist the principal violation." *Taamneh*, 598 U.S. at 486. "The focus must remain on assistance to the tort for which plaintiffs seek to impose liability." *Id.* at 506. "The knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Id.* at 503-04. "The knowing part of that inquiry is therefore designed to capture the defendants' state of mind with respect to their actions and the tortious conduct." *Id*. at 504. "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance." *Id*. at 506. "But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id*. "And, if a plaintiff 's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise."[10] *Id*.

---

[10] The Ninth Circuit incorrectly framed the issue of substantial assistance as turning on defendants' assistance to ISIS activities in general. *Taamneh*, 598 U.S. at 503. Plaintiffs may ask the Court to do the same by alleging NSJP assisted Hamas by serving as its propaganda arm in the U.S. and by referencing Hamas's ongoing attacks and hostage situation. The allegations against WESPAC are nowhere near the "pervasive and systemic aid required" to ensure that WESPAC "actually aided and abetted each tort of that enterprise." *Id*. at 506. The question before the Supreme Court was "whether defendants gave substantial assistance to ISIS with respect to the Reina attack" and in this case, whether WESPAC gave substantial assistance to Hamas with respect to the October 7 attack by giving financial aid to NSJP. *Id*. at 503. With the focus on the tortious conduct that caused harm to Plaintiffs, their "failure to allege any definable nexus between the defendants' assistance and the attack therefore—at minimum—increases their burden to show that defendants consciously and culpably assisted the attack." *Id*.

The D.C. Circuit in *Kayemeth*, addressing the third element, found the allegations conclusory and insufficient because they did not suggest that funds provided by the defendant, U.S. Campaign for Palestinian Rights, to Boycott National Committee were used to "finance any terrorist attacks much less that [USCPR] was aware that it was happening." 66 F.4th at 1017. As the D.C. Circuit observed, there were no allegations that the Boycott National Committee even provided funds to Hamas (whether or not such funds had originated with USCPR). *Id.* at 1017.

The Complaint must also provide "factual allegations that permits a reasonable inference that the defendant recognized the money transferred would be received by an" FTO. *Bernhardt*, 47 F.4th at 871. Indeed, courts have consistently and similarly held that a bank's provision of capital and financial services to an alleged intermediary is not "substantial" unless the plaintiff "advances non-conclusory allegation[s]" in the Complaint that the principal violator FTO actually received the funds. *See id.* (noting the Complaint "fails to allege how much (if any) of that money indirectly flowed to al-Qaeda"); *Siegel*, 933 F.3d at 225 (although plaintiffs alleged the provision of "hundreds of millions of dollars" to an intermediary, "they did not advance any non-conclusory allegation that [al-Qaeda] received any of those funds").

This Complaint certainly does not establish knowing and substantial assistance on the part of WESPAC. Plaintiffs do not plead that any funds sent by WESPAC to NSJP ended up in the hands of Hamas. This alone is fatal to the claim. The Complaint likewise fails to provide plausible factual allegations that permit a reasonable inference that WESPAC recognized the money transferred to NSJP would be received by an FTO (Hamas). Furthermore, it is unclear how Plaintiffs would endeavor to prove that WESPAC did anything "knowingly" to aid the October 7 attack before they occurred. Even assuming arguendo that this Court were to consider Plaintiffs' allegations plausible that NSJP acts as Hamas' unofficial propaganda wing in the United States,

those allegations do not satisfy Plaintiffs' high burden. Plaintiffs cannot merely allege that NSJP somehow provided general assistance through public relations; they must instead connect WESPAC to the specific act of violent terrorism that gives rise to Plaintiffs' injuries. *Taamneh*, 598 U.S. at 497, 503. Plaintiffs' Complaint fails to do so.

When assessing knowing and substantial assistance, six factors are typically considered: (1) the nature of the act encouraged; (2) the amount of assistance given; (3) defendant's presence or absence at the location and time of the attack; (4) defendant's relation to the principal; (5) defendant's state of mind; and (6) the period of assistance. *Halberstam*, 705 F.2d at 483-84. Here, application of the *Halberstam* factors weigh in favor of a finding that WESPAC did not plausibly provide knowing and substantial assistance to the attackers. In assessing the nature and amount of alleged assistance (the first two subfactors), the question is whether the wrongful act was "heavily dependent" on the assistance provided, or whether the assistance was "indisputably important; to," or an "essential part of" the act. *Id.* at 488.

Here, the nature of the assistance is financial support to NSJP, not Hamas. The Complaint does not specify how much money WESPAC provided NSJP or what the funds were used for.[11] Given that Plaintiffs claim WESPAC provided financial support to NSJP, who allegedly published and/or distributed the "Toolkit" *after* the October 7 attack, Plaintiffs could not reasonably allege that the attack was dependent on WESPAC's actions, let alone that NSJP even used WESPAC's funds to publish and/or distribute the Toolkit. What is clear from the Complaint, however, and dispositive, is that none of WESPAC's funds ended up in Hamas's hands overseas for potential use in the October 7 attack. Additionally, even assuming for a moment the Toolkit had been

---

[11] *See Taamneh*, 598 U.S. at 505-06 (finding that plaintiffs did not plausibly allege that Google knowingly provided substantial assistance to the Reina terrorist attack (let alone every single terrorist act committed by ISIS) in part because the complaint failed to allege "the amount of money that Google supposedly shared with ISIS").

published before the October 7 attack, there would still be no reasonable basis to argue that WESPAC's provision of funds to NSJP aided the attack itself.

The third factor is strongly in favor of WESPAC, which had no presence at the October 7 attack in Israel. The fourth factor likewise favors WESPAC since there is no allegation of direct ties between WEPSAC and Hamas, but instead allegations of connections between WESPAC and NSJP, and then, in turn very attenuated if not illusory connections between NSJP and Hamas. The *Halberstam* court described the fifth factor, a defendant's state of mind, as concerning the question of whether the defendant was "one in spirit" with the perpetrator. 705 F.2d at 484. There are simply no factual allegations that plausibly support the supposition that WESPAC knew funds it sent to NSJP would end up with Hamas and be used for the October 7 attack, nor is there any fact suggesting it was WESPAC's intent or desire to see any monetary funds it sent to NSJP for peaceful political advocacy in the U.S. used by Hamas to attack civilians on October 7. The final factor (the period of alleged assistance) is of little import here. While Plaintiffs vaguely claim that WESPAC has been a fiscal sponsor to NSJP since 2016 (¶ 182), Plaintiffs do not allege the amount of money allocated to NSJP over that time period, when the money was transferred, what it was used for, or provide any facts that show NSJP gave assistance to Hamas over that time frame. Instead, Plaintiffs focus on NSJP's activity in 2023 *after* the October 7 attack.

In sum, none of Plaintiffs' allegations against WESPAC suggest that it culpably "associated [itself] with" the October 7 attack, "participate[d] in it as something that [it] wishe[d] to bring about," or sought "by [its] action to make it succeed." *See Taamneh*, 598 U.S. at 498. Here, like in *Tammneh*, *Kayemeth*, *Siegal*, and *Bernhardt*, and taking the facts as alleged, the nexus between WESPAC and the October 7 Hamas attack is so imprecise and vague as to be nonexistent. All that is alleged is that WESPAC was the fiscal sponsor of NSJP. Given the lack of any nexus

between that financial assistance and the Hamas attack; any defendant, including WESPAC, intending to directly assist Hamas; and any sort of affirmative and culpable misconduct that would aid Hamas in facilitating the attack, Plaintiffs' claims fall far short of plausibility. *See Taamneh*, 598 U.S. at 505. There is even less support in the Complaint that WESPAC so pervasively and systemically assisted Hamas as to render it liable for every Hamas attack, an incredibly high bar that has yet to be met in cases involving an intermediary. Plaintiffs accordingly have failed to state a claim in all possible respects under §2333(d)(2).

Plaintiffs contemplate a radical expansion of liability under the ATA unsupported by the case law. WESPAC respectfully asks the Court to reject the invitation and join the well-reasoned opinions which similarly dismissed such claims, under Rule 12(b)(6).

## CONCLUSION

In conclusion, this Court lacks subject matter jurisdiction over the ATS claims and personal jurisdiction over Defendant WESPAC. Plaintiffs' Complaint likewise fails to state a plausible claim for relief under both the ATS and ATA. WHEREFORE, Defendant WESPAC respectfully requests this Court grant this Motion and dismiss Plaintiffs' First Amended Complaint in its entirety with prejudice and enter such other and further relief as is appropriate.

DATE: September 12, 2024                 Respectfully submitted,

*/s/Felicity A. McGrath*
Felicity A. McGrath, VSB #41708
James Hittinger, VSB #81728
KIERNAN TREBACH LLP
1233 20th Street, N.W., Eighth Floor
Washington, D.C. 20036
(202) 712-7000
(202) 712-7100 Fax
fmcgrath@kiernantrebach.com
jhittinger@kiernantrebach.com
*Attorneys for Defendant WESPAC*