**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

MAYA PARIZER, ADIN GESS, NOACH     )
NEWMAN, NATALIE SANANDAJI, YONI   )
DILLER, DAVID BROMBERG, LIOR      )
BAR OR, ARIEL EIN-GAL, and HAGAR    )
ALMOG,                            )
                                    )
      Plaintiffs,                  )
                                    )
v.                                    )     Civil No. 1:24-cv-00724-RDA-IDD
                                    )
AJP EDUCATIONAL FOUNDATION,     )
INC. a/k/a AMERICAN MUSLIMS FOR   )
PALESTINE, NATIONAL STUDENTS    )
FOR JUSTICE IN PALESTINE, WESPAC  )
FOUNDATION, HATEM BAZIAN, OSAMA )
ABUIRSHAID, TAHER HERZALLAH, and  )
ZAREFAH BAROUD,             )
                                    )
      Defendants.                )

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO
DISMISS FILED BY DEFENDANTS AJP EDUCATIONAL FOUNDATION, INC. A/K/A
AMERICAN MUSLIMS FOR PALESTINE AND WESPAC FOUNDATION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................4

    I.      STANDARD OF REVIEW ...........................................................................4

    II.    PLAINTIFFS STATE CLAIMS UNDER THE ANTITERRORISM ACT ...........5

        A.    Legal Framework .......................................................................5

        B.    JASTA Creates Liability for Providing Propaganda Services to a
              Terrorist Organization ................................................................6

        C.    The Complaint Sufficiently Alleges General Awareness ............................9

        D.    The Complaint Sufficiently Alleges Knowing and Substantial
              Assistance ..............................................................................10

        E.    AMP's "Direct Link" Contentions Are Unavailing...................................18

        F.    WESPAC's Motion Should Be Denied For the Same Reasons.................19

    III.   PLAINTIFFS' ALIEN TORT STATUTE CLAIMS MORE THAN MEET
          THE LEGAL STANDARD .........................................................................24

        A.    Legal Framework .....................................................................24

        B.    The Court Has Personal Jurisdiction Over WESPAC ..............................26

        C.    The Complaint Alleges Sufficient Domestic Conduct................................27

        D.    The Complaint Alleges Actionable International Norms ..........................28

        E.    The Complaint Sufficiently Alleges Intent and Substantial
              Assistance ..............................................................................36

        F.    Any First Amendment Argument Is Waived and Meritless .....................37

    IV.   ALTERNATIVELY, LEAVE TO AMEND SHOULD BE GRANTED.............39

CONCLUSION................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abelesz v. Magyar Nemzeti Bank*,
   692 F.3d 661 (7th Cir. 2012) ........................................................................29, 34

*Al Shimari v. CACI Int'l, Inc.*,
   679 F.3d 205 (4th Cir. 2012) (en banc) .................................................................25

*Al Shimari v. CACI Premier Tech., Inc.*,
   263 F. Supp. 3d 595 (E.D Va. 2017) ....................................................25, 30, 33, 34

*Al Shimari v. CACI Premier Tech., Inc.*,
   684 F. Supp. 3d 481 (E.D. Va. 2023) ....................................................24, 25, 28

*Al-Quraishi v. L-3 Servs., Inc.*,
   657 F.3d 201 (4th Cir. 2011) .................................................................................30

*Al-Quraishi v. Nakhla*,
   728 F. Supp. 2d 702 (D. Md. 2010) .......................................................................30

*Al-Sabah v. World Bus. Lenders*,
   2024 WL 263579 (D. Md. Jan. 24, 2024) ..............................................................16

*Almog v. Arab Bank, PLC*,
   471 F. Supp. 2d 257 (E.D.N.Y. 2007) ..........................................................31, 33, 34

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
   808 F.3d 144 (2d Cir. 2015) ..................................................................................31

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................4

*Aziz v. Alcolac, Inc.*,
   658 F.3d 388 (4th Cir. 2011) ....................................................................... *passim*

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ..........................................................9

*Bernhardt v. Islamic Republic of Iran*,
   47 F.4th 856 (D.C. Cir. 2022) ................................................................21, 23, 24

*Boim v. Am. Muslims for Palestine*,
   2021 WL 1556085 (N.D. Ill. May 17, 2022) ..........................................................12

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) .................................................................................38

*Boncasa v. Standard Chartered PLC*,
   2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) ............................................... *passim*

*In re Chiquita Brands Int'l, Inc.*,
   792 F. Supp. 2d 1301 (S.D. Fla. 2011) ..............................................................33, 34

*Copeland v. Twitter, Inc.*,
  352 F. Supp. 3d 965 (N.D. Cal. 2018), *aff'd*, 2024 WL 1406742 (9th Cir. Apr.
  1, 2024) (unpublished) ...................................................................................19

*Cornejo v. Cnty. of San Diego*,
  504 F.3d 853 (9th Cir. 2007) .........................................................................35

*Crosby v. Twitter*,
  921 F.3d 617 (6th Cir. 2019) .........................................................................19

*D'Addario v. Geller*,
  264 F. Supp. 2d 367 (E.D. Va. 2003) .............................................................26

*Doe I v. Cisco Sys.*,
  73 F.4th 700 (9th Cir. 2023), *r'hrg and r'hrg en banc denied*, No. 15-16909
  (9th Cir. Sept. 3, 2024) ..............................................................27, 28, 29, 36

*Doe I v. Nestle USA, Inc.*,
  766 F.3d 1013 (9th Cir. 2014) .......................................................................33

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C.
  Cir. 2013) (unpublished) ...............................................................................36

*Doriety v. Sletten*,
  109 F.4th 670 (4th Cir. 2024) ...............................................................4, 12, 14

*ESAB Grp. Inc. v. Centricut, Inc.*,
  126 F.3d 617 (4th Cir. 1997) ....................................................................26, 27

*Felton v. Barnett*,
  912 F.2d 92 (4th Cir. 1990) .............................................................................9

*Flomo v. Firestone Nat. Rubber Co., LLC*,
  643 F.3d 1013 (7th Cir. 2011) (Posner, J.) ....................................................34

*Grayson O Co. v. Agadir Int'l LLC*,
  856 F.3d 307 (4th Cir. 2017) .........................................................................37

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................ *passim*

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)...........................................................................................38

*Honickman v. BLOM Bank*,
  6 F.4th 487 (2d Cir. 2021) .............................................................................21

*Jesner v. Arab Bank, PLC*,
  584 U.S. 241 (2018)..........................................................................29, 31, 35

*Johnson v. Oroweat Foods Co.*,
  785 F.2d 503 (4th Cir. 1986) .........................................................................39

*Kadic v. Karadzic*,
  70 F. 3d 232 (2d Cir. 1995)............................................................................30

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)................................................................7, 21

*Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for Just Peace in the Middle East*,
  66 F.4th 1007 (D.C. Circ. 2023) ..................................................9, 19, 24

*Kerns v. United States*,
  585 F.3d 187 (4th Cir. 2009) ....................................................................5

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013)................................................................................31

*Krishanthi v. Rajaratnam*,
  2010 WL 3429529 (D.N.J. Aug. 26, 2010) ............................................34

*Linde v. Arab Bank*,
  882 F.3d 314 (2d Cir. 2018)...............................................................12, 19

*Mannington Mills, Inc. v. Congoleum Corp.*,
  595 F.2d 1287 (3d Cir. 1979).................................................................35

*Mylan Labs., Inc. v. Akzo, N.V.*,
  2 F.3d 56 (4th Cir. 1993) ........................................................................27

*Nat'l Found. v. U.S.*,
  13 Cl. Ct. 486 (1987) ..............................................................................20

*Nestle USA v. Doe*,
  593 U.S. 628 (2021)...................................................................27, 29, 35

*Ohio Adjutant General's Dep't v. Fed. Labor Relations Auth.*,
  598 U.S. 449 (2023)................................................................................15

*In re Packaged Seafood Prods. Antitrust Litig.*,
  338 F. Supp. 3d 1118 (S.D. Cal. 2018)...................................................27

*Pennie v. Twitter, Inc.*,
  281 F. Supp. 3d 874 (N.D. Cal. 2017) ...................................................19

*Ray v. Roane*,
  948 F.3d 222 (4th Cir. 2020) ....................................................................4

*Rosemond v. United States*,
  572 U.S. 65 (2014)..................................................................................10

*Safety Equip. Inst. v. Signature Lacrosse, LLC*,
  438 F. Supp. 3d 685 (E.D. Va. 2020) .....................................................26

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)....................................................................24

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)...........................................................................25, 29

*Summit Cmty. Bank v. David*,
  629 B.R. 804 (E.D. Va. 2021).................................................................12

*In re Terrorist Attacks on Sept. 11, 2001,*
   714 F.3d 118 (2d Cir. 2013)................................................................33

*Twitter v. Taamneh,*
   598 U.S. 471 (2023) ............................................................... *passim*

*New York ex rel. TZAC, Inc. v. New Isr. Fund,*
   520 F. Supp. 3d 362 (S.D.N.Y. 2021) ...............................................20

*United States v. Osadzinski,*
   97 F.4th 484 (7th Cir. 2024) ........................................................38, 39

*United States v. Rahim,*
   860 F. App'x 47 (5th Cir. 2021) (unpublished) ................................39

*In re Xe Servs. Alien Tort Litig.,*
   665 F. Supp. 2d 569 (E.D. Va. 2009) ..................................30, 31, 39

*Zobay v. MTN Grp. Ltd.,*
   695 F. Supp. 3d 301 (E.D.N.Y. 2023) ............................................ *passim*

## Federal Statutes

18 U.S.C. § 2333(d) ....................................................................................5

18 U.S.C. § 2333(d)(1) ..........................................................................5, 23

18 U.S.C. § 2333(d)(2) ...............................................................................7

18 U.S.C. § 2334(a) ..................................................................................26

18 U.S.C. § 2339B ....................................................................................38

18 U.S.C. § 2339C(a)(1)(B) ................................................................32, 33

28 U.S.C. § 1350 ......................................................................................24

Pub. L. No. 114-222, 130 Stat. 852 (2016) .......................................5, 6, 16

## Rules

Fed. R. Civ. P. 12(b)(1)..............................................................................4

Fed. R. Civ. P. 12(b)(6)..............................................................................4

Fed. R. Civ. 12(g) .....................................................................................26

Fed. R. Civ. 12(h) .....................................................................................26

## Other Authorities

International Convention for the Suppression of Terror Financing,
   https://treaties.un.org/doc/db/terrorism/english-18-11.pdf ...................25

https://www.501c3.org/what-is-a-fiscal-sponsor/ .....................................20

https://www.councilofnonprofits.org/running-nonprofit/administration-and-
   financial-management/fiscal-sponsorship-nonprofits.............................................................20

N.Y., "U.S. Attorney Announces Terrorism Charges Against Senior Leaders of
   Hamas" (Sept. 3, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-
   announces-terrorism-charges-against-senior-leaders-hamas ....................................................35

Resolution of Ratification: Senate Consideration of Treaty Document 106-49,
   https://www.congress.gov/treaty-document/106th-congress/49/resolution-text ....................35

United Nations Treaty Collection, International Convention for the Suppression of
   the Financing of Terrorism,
   https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XV
   III-11&chapter=18&clang=_en .............................................................................................31

The Court should deny the motions to dismiss filed by Defendants AJP Educational Foundation, Inc., a/k/a American Muslims for Palestine ("AMP") and WESPAC Foundation ("WESPAC").[1] The Complaint's detailed allegations readily support liability under well-established legal principles.

## INTRODUCTION

This case is about the horrific terrorist attacks committed by Hamas against Plaintiffs and countless others in Israel on October 7, 2023, with the extensive support of AMP and WESPAC. As Hamas terrorists raged through Israel, AMP (through its campus brand) declared it is "***PART of***" Hamas and under its "***unified command***" and began pumping a torrent of pro-Hamas propaganda around America. WESPAC fiscally sponsored this self-declared arm of Hamas for more than seven years prior to the attack. When a group says they are terrorists, ***believe them***.

AMP is Hamas's propaganda arm in the United States. For almost forty years, in one form or another, AMP has supplied Hamas with invaluable support: money, propaganda services, recruiting services, and political mobilization. After courts of the United States adjudicated its predecessor firms as material supporters of Hamas's terrorism, those firms briefly went dark, only to reemerge as a purportedly new organization under the AMP name. But on October 8, as Hamas's butchery continued, AMP dropped all pretenses. Acting in its campus brand name, National Students for Justice for Palestine ("NSJP"), AMP declared that it is "PART of" Hamas and operating under its "unified command," and it unleashed a concerted propaganda and disruption campaign around the country. Plaintiffs seek to hold AMP liable for its role in furthering the

---

[1] Mem. of Law in Support of Def. AMP's Motion to Dismiss ("AMP Mem."), ECF No. 34; Def. WESPAC Foundation, Inc.'s Mem. of Points and Authorities in Support of Motion to Dismiss ("WESPAC Mem."), ECF No. 78; *see* First Amended Complaint ("Complaint" or "FAC"), ECF No. 24.

October 7 terror attacks: supplying pro-Hamas propaganda services—before, during, and afterward—to whitewash Hamas's crimes and gin up support for Hamas's evil ends.

AMP's motion is rife with grave errors. AMP disregards the pleading standards, trying to dispute facts and urging the Court to refuse to credit well-pleaded allegations. AMP ignores key allegations, including the allegation that AMP is responsible for distributing the so-called "Toolkit," a pro-Hamas propaganda piece declaring that AMP is "PART of" Hamas. It gets the law wrong in every conceivable way—right down to citing a phantom case—and it profoundly misunderstands its lead authority, *Twitter v. Taamneh*, 598 U.S. 471 (2023). Finally, in a bid to distract the Court from the vast body of law supporting Plaintiffs' claims, AMP invokes the First Amendment, claiming the mantle of free speech. But this is just a feint; AMP makes no free speech ***argument***. Even if it did, the First Amendment does not permit propagandists to aid terror attacks.

Correctly analyzed, the Complaint states claims against AMP under the Antiterrorism Act ("ATA") and the Alien Tort Statute ("ATS") and sufficiently alleges jurisdiction under the ATS. AMP's contentions to the contrary are meritless.

*First*, the Court should reject AMP's bid to dismiss Plaintiffs' claim for aiding and abetting Hamas's violation of the Antiterrorism Act. Contrary to AMP's arguments, liability under the statute extends to the provision of speech-related services that aid terrorist attacks and is not limited to tangible support like providing guns or money. Just last year, the Supreme Court forecasted that "consciously and selectively [choosing] to promote content provided by a particular terrorist group" will support liability. *Twitter*, 598 U.S. at 502. That is what AMP does.

The Complaint, moreover, sufficiently alleges that AMP provided its propaganda services knowingly and that its aid was substantial. As for knowledge, the Complaint contains detailed allegations supporting the inference that AMP knew the attack was coming, carefully planned for

it, and promptly unleashed its propaganda blitz afterward. The Complaint even includes a stark example of AMP secretly coordinating with Hamas's terrorist patron ahead of time to plan and pull off a day of economic disruption, powerfully showing that AMP answers to terrorist masters abroad. And undergirding the knowledge allegations is the fact that ***AMP is the same entity that has been adjudicated of materially supporting Hamas***. As for substantiality, AMP's support has been so systemic that it is liable for aiding ***every*** Hamas attack.

*Second*, Plaintiffs' ATS claim easily withstands AMP's motion. Relying on principles of extraterritoriality, AMP urges that the Complaint alleges insufficient domestic conduct because the attacks occurred in Israel. But in an aiding and abetting case, only the ***abettor's*** conduct need be domestic, and AMP undeniably furthered the October 7 massacre in Israel from the United States. AMP also reprises its failed contention that the Complaint insufficiently alleges the requisite mental state. The allegations are plainly sufficient at this stage.

Finally—and shockingly—AMP argues that the ATS claim fails because Hamas's atrocities do not violate established international norms. Although AMP is too faint-hearted to say it plainly, its position is that the law of nations ***condones*** Hamas's unspeakable conduct—the attack on innocents, the massacre of 1,200 people, the wanton rape and destruction—and AMP's extensive support of Hamas's crimes. The argument is as legally wrong as it is morally bankrupt. Hamas's actions violate multiple well-established international norms, and AMP is responsible for aiding the attack under both primary and secondary theories of liability.

Just as AMP's motion lacks merit, so does WESPAC's. WESPAC supports Hamas in a more traditional way: with cash. It has served as the fiscal sponsor to NSJP (AMP's campus brand) for more than seven years: it raises funds in NSJP's name, keeps a percentage, and hands over the rest. This relationship bespeaks close ideological alignment and coordination between WESPAC

3

and NSJP. Indeed, WESPAC is **required** to control how the money it raises for NSJP is spent. WESPAC's claim it had no idea it sponsored a group that is "PART of" Hamas cannot be credited on a motion to dismiss. Tellingly, even now, WESPAC cannot bring itself to say a bad word about NSJP. WESPAC largely echoes AMP's arguments, and its contentions fail for the same basic reasons: It's illegal to help terrorists commit their crimes, be it with propaganda or cash.

Cutting through the complex legal regimes here is this: NSJP, under the control of AMP, admits it is part of Hamas and works to further its evil ends. WESPAC loyally sponsored NSJP for seven years before October 7. The Court should credit these allegations, deny the motions, and allow Plaintiffs to uncover the extent of Defendants' terror support in discovery.

## ARGUMENT

### I.    STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2] "A complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). A court "is not permitted . . . to resolve contests surrounding the facts or the merits of a claim," and "generally must accept the facts as alleged as true and draw all reasonable inferences in favor of the plaintiff." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024). As Defendants agree, their Rule 12(b)(1) challenges to subject matter jurisdiction are reviewed the same way. (AMP Mem. 7; WESPAC Mem. 8.) Where, as here, a defendant "makes a facial challenge to subject matter jurisdiction," the "facts alleged in the complaint are taken as true, and the motion must be denied

---

[2] Unless otherwise indicated, all internal quotation marks, citations, alterations, brackets, and ellipses are omitted from citations herein.

if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

## II.     PLAINTIFFS STATE CLAIMS UNDER THE ANTITERRORISM ACT

The Complaint states claims against AMP and WESPAC under the Antiterrorism Act.

### A.     Legal Framework

U.S. Plaintiffs[3] assert their claim under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), which extends liability under the Antiterrorism Act to aiders and abettors. Congress intended JASTA to "provide civil litigants with the ***broadest possible basis*** . . . to seek relief against persons, entities, and foreign countries, . . . that have provided material support, ***directly or indirectly***," to terrorist organization that have attacked the United States or its citizens. JASTA, Pub. L. No. 114-222, 130 Stat. 852, § 2(b) (2016) (emphases added). A JASTA claim has three elements: (i) the plaintiff suffers an "injury arising from an act of international terrorism"; (ii) the attack is "committed, planned, or authorized" by an organization designated as a foreign terrorist organization at the time of the attack; and (iii) the defendant "aids and abets, by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(1); *see Twitter*, 598 U.S. at 483–84 (2023) (discussing JASTA's requirements).

The third JASTA element (aiding and abetting) has three components of its own: (i) the primary actor, *i.e.*, a foreign terrorist organization like Hamas, must commit a primary violation; (ii) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (iii) "the defendant must knowingly and substantially assist the principal violation." *Twitter*, 598 U.S. at 486 (quoting *Halberstam v. Welch*,

---

[3] U.S. Plaintiffs are Maya Parizer, Adin Gess, Noach Newman, Natalie Sanandaji, Yoni Diller, David Bromberg, and Lior Bar Or. (FAC ¶¶ 1–7.)

705 F.2d 472, 477 (D.C. Cir. 1983)); *see also* 130 Stat. 852, § 2(a)(5) (stating that *Halberstam*

"provides the proper legal framework" for analyzing JASTA claims). Courts often analyze whether

assistance was "substantial"—part of the third *Halberstam* component—using six factors:

> (1) "the nature of the act assisted," (2) the "amount of assistance"
> provided, (3) whether the defendant was "present at the time" of the
> principal tort, (4) the defendant's "relation to the tortious actor," (5)
> the "defendant's state of mind," and (6) the "duration of the
> assistance" given.

*Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 488). Despite the proliferation of

elements, components, and factors, the goal is straightforward: to identify "conscious, voluntary,

and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 493.[4]

AMP contests only the third JASTA element, aiding and abetting.[5] AMP argues (i) JASTA

does not create liability for propaganda services; (ii) Plaintiffs do not allege knowing assistance;

and (iii) Plaintiffs do not allege substantial assistance. AMP is wrong in each instance.

**B.      JASTA Creates Liability for Providing Propaganda Services to a Terrorist
Organization**

The Court should reject AMP's argument that *Twitter* excludes propaganda services from

JASTA. (AMP Mem. 19.) As AMP reads it, *Twitter* stands for the proposition that "[g]eneralized

assistance over time, whether through search engines and algorithms, or public advocacy that was

part of AMP's non-profit mission, is not actionable." (AMP Mem. 20; *id.* at 21 ("Plaintiffs cannot

---

[4] The Court should ignore AMP's botched recitation of the required elements. (AMP Mem. 18.)
Among other errors, AMP conflates the "general awareness" inquiry (*Halberstam* component 2)
with the "knowing" half of the knowing-and-substantial assistance inquiry (*Halberstam*
component 3) and urges that knowledge and assistance must be independently analyzed, when
they are correctly considered in tandem. *See Twitter*, 598 U.S. at 503–04, 491–92.

[5] AMP concedes or does not contest the other elements. AMP Mem. 18–19 (conceding Plaintiffs
were injured by an act of international terrorism, the first JASTA element); *see id.* at 18–25 (not
contesting that the October 7 attacks were committed by designated foreign terrorist organization
Hamas, the second JASTA element and the first *Halberstam* component).

merely allege that AMP somehow provided general assistance through public relations . . . .").)
Because AMP assertedly did not give money, guns, or "material" aid to Hamas, AMP continues,
liability cannot lie. (AMP Mem. 20.) AMP is wrong. Liability under JASTA extends to providing
propaganda services—what AMP self-servingly calls "public advocacy." (*Id.*)

Starting with the text—which AMP ignores—JASTA extends to ***all*** forms of "substantial
assistance." 18 U.S.C. § 2333(d)(2). It does not limit liability to specified types of support, and it
does not create any safe harbors for propaganda services or any other type of conduct. By the plain
terms of the text, so long as the support is "substantial," the type of support is immaterial.

Cases applying JASTA confirm that the assistance need not be tangible and can include
services. *See, e.g.*, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 849–50, 865–66 (2d
Cir. 2021) (banking services); *Boncasa v. Standard Chartered PLC*, 2023 WL 7110774, at *2–*3,
*11 (S.D.N.Y. Oct. 27, 2023) (project financing services); *Zobay v. MTN Grp. Ltd.*, 695 F. Supp.
3d 301, 314, 349–50 (E.D.N.Y. 2023) (logistical support). The JASTA decisions are consistent
with a deep body of aiding-and-abetting law. In *Halberstam*, for example, Bernard Welch (the
primary violator) was a serial burglar whose nightly forays resulted in a killing for which Linda
Hamilton (the aider and abettor) was found liable. 702 F.2d at 474–75. Hamilton did not herself
burglarize homes. Her support took the form of "secretarial work" needed to dispose of Welch's
booty, such as typing letters, record-keeping, and depositing money in her bank account. *Id.* at
475. The D.C. Circuit readily concluded that Hamilton's five years' worth of administrative
services constituted substantial assistance. *See id.* at 488–89.

And as *Twitter* itself demonstrates, speech alone can aid and abet a terrorist attack. Simply
"giving verbal encouragement"—as by "yelling 'Kill him!'"—supports liability. *Twitter*, 598 U.S.
at 492; *see id.* at 490 (noting that aiding and abetting "come[s] in many forms, including inducing,

7

encouraging, soliciting, or advising the commission of the offense, such as through words of encouragement or driving the getaway car"). *Twitter* involved a social media platform's claimed failure to stop terrorists from using the platform. The Supreme Court rejected the claim in large part because the platform had an "arm's length, passive, and largely indifferent" relationship to the terrorists and the attack at issue. *Id.* at 500. Yet even as it denied relief, it specified that liability might well lie if the platform had "***consciously and selectively chose to promote content provided by a particular terrorist group.***" *Id.* (emphasis added).

That is precisely the case here. AMP is the latest in a long line of sham non-profits Hamas created to secure financial and political support in the United States. (FAC ¶¶ 25–44.) Like its predecessors, AMP has long provided propaganda and recruitment services for Hamas. (FAC ¶¶ 62–66.) After October 7, AMP identified itself as "***PART of***" the "***Unity Intifada***" operating under Hamas's "***unified command***." (FAC ¶¶ 84, 83 (emphases added).) At the behest of Hamas and its patrons (including Iran), AMP promoted numerous pro-Hamas protests and even a day of mass infrastructure disruption. (FAC ¶¶ 95–97, 102–08.) Under *Twitter*, this is culpable conduct well within JASTA's scope.

AMP's contrary arguments lack merit. As for AMP's "[g]eneralized assistance over time" contention (AMP Mem. 20), that phrase neither appears in *Twitter* nor paraphrases anything in it. If AMP is trying to fit within the principle that providing "routine services" might not support liability, the argument fails. *Twitter*, 598 U.S. at 502. AMP's propaganda services are not routine. AMP provides tailored and dangerous services directly to Hamas, which readily supports liability. *See, e.g.*, *Boncasa*, 2023 WL 7110774, at *11 (rejecting routine services argument where bank "carefully tailored financial instruments to fund production of a known IED ingredient to be sold

to terrorist groups"). And given this highly unusual fact pattern, AMP's purported concerns about overbroad liability (AMP Mem. 20 & n. 10) cannot be credited.

Accordingly, liability under JASTA extends to providing propaganda services.[6]

### C.     The Complaint Sufficiently Alleges General Awareness

To the extent AMP contests its general awareness of its role in Hamas's illegal activity,[7] the second *Halberstam* component, its challenge fails. The standard is minimal. A plaintiff need allege only that a defendant knew it was "playing some sort of role" in the terrorist organization's enterprise. *Twitter*, 598 U.S. at 497; *accord Zobay*, 695 F. Supp. 3d at 337 (noting that "something less than full, or fully focused, recognition" is sufficient and that the "complaint is allowed to contain general allegations as to a defendant's knowledge"). Even "warning signs and red flags" of potential terrorist support can suffice. *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *9–*10 (E.D.N.Y. Nov. 25, 2020).

The Complaint easily satisfies this standard. As noted above, AMP is the current iteration of Hamas's captive propaganda firm. (FAC ¶¶ 25–34.) Its leaders and members include open Hamas sympathizers. (FAC ¶¶ 35–44.) AMP has conducted trainings supposedly designed to teach people how to avoid publicly violating the Antiterrorism Act. (FAC ¶ 45.) Like its forebears, AMP provides extensive propaganda and recruitment services for Hamas, including promoting numerous pro-Hamas protests and disruptions. (FAC ¶¶ 62–66, 101–08.) Following the October 7

---

[6] AMP also cites (AMP Mem. 20) the denial of certiorari in an out-of-circuit case discussed below. *See infra* § II.E (discussing *Keren Kayemeth LeIsrael – Jewish Nat'l Fund v. Educ. for Just Peace in the Middle East* ("*KKL-JNF*"), 66 F.4th 1007 (D.C. Circ. 2023), *cert. denied*, 144 S. Ct. 713 (2024)). But "as the bar has been told many times," a cert denial expresses no view on the merits and therefore carries no weight. *Felton v. Barnett*, 912 F.2d 92, 95 (4th Cir. 1990).

[7] AMP omits this component from its proposed legal framework. *See supra* n.4. Although AMP challenges knowledge (AMP Mem. 22–23), its contentions fit better under *Halberstam*'s third component, knowing and substantial awareness. *See infra* § II.D.

attacks, AMP identified itself as "PART of … not [just] in solidarity with" the "Unity Intifada" operating under Hamas' "unified command." (FAC ¶ 84; *see id.* ¶¶ 78–88.) AMP's efforts earned the praise of Hamas and other terrorist organizations. (FAC ¶¶ 148, 150–55.) It is, in short, an understatement to say that AMP is generally aware of its role in Hamas's criminality.

### D. The Complaint Sufficiently Alleges Knowing and Substantial Assistance

AMP next argues that the Complaint insufficiently alleges that its assistance was knowing and substantial, which AMP treats as separate elements. (AMP Mem. 21–23 (knowledge), 23–25 (substantiality), 18 (separate elements).) For good measure, AMP faults the Complaint for not alleging that it had the "intent of facilitating" the attack. (AMP Mem. 23, 10.) That is all wrong.

Starting with AMP's analytical approach, the "twin requirements" of *Halberstam*'s third component must be analyzed "in tandem," not in isolation. *Twitter*, 598 U.S. at 491. "[T]he knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Id.* at 503–04. "[A] lesser showing of one demand[s] a greater showing of the other." *Id.* at 491–92. And because there is no single level of scienter for all cases, AMP's argument that JASTA requires an intent to facilitate fails. *See Boncasa*, 2023 WL 7110774, at *9 (stating that JASTA "can be satisfied even where the defendant did not intentionally aid the specific terrorist attack itself"). Properly analyzed, the Complaint sufficiently alleges knowledge and assistance.[8]

---

[8] AMP observes that *Twitter* states that "the defendant has to take some affirmative act with the intent of facilitating the offense's commission." 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)). But that is the decision's summary of criminal aiding and abetting. *Twitter*'s relative, sliding-scale approach applies to civil claims under JASTA. *Id.* at 491–92.

1.   The Complaint Alleges a High Level of Knowledge

AMP urges dismissal because AMP lacked "foreknowledge" of the October 7 attack, as supposedly needed to allege knowing assistance. (AMP Mem. 22.) This argument fails.

*First*, JASTA does not require that the defendant have foreknowledge. Under the "near-common enterprise" theory, "a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Twitter*, 598 U.S. at 502, 496. The secondary defendant need only know that the principal actor is routinely involved in misconduct and that the specific tort at issue was a foreseeable consequence of the bad acts. *See id.* at 495–96. *Halberstam* is the classic example. There, the defendant's five years' worth of secretarial support of a burglary operation was deemed so "intentional and systemic that she assisted each and every burglary." *Twitter*, 598 U.S. at 495. Yet the defendant had no knowledge of any specific crime, nor even that the crimes were burglaries; she knew only that the primary defendant "was involved in some type of property crime at night." *Halberstam*, 705 F.2d at 488. She was nonetheless liable for a killing during a burglary because violence was a foreseeable risk of whatever crimes were afoot. *Id.*

In another near-common enterprise case, a telecom company supplied embargoed technology and "facilitat[ed] a steady flow of funds" to a front for a terrorist group, which distributed the money and technology to terrorist attackers. *Zobay*, 965 F. Supp. 3d at 346, 320. There was no allegation the telecom company knew of any single attack; rather, the court deemed it sufficient that the company knew that "significant" monies generated under the contract "would flow to the [terror group] and ultimately be used to fund terrorist operations." *Id.*

Here, the Complaint alleges the knowledge required under a near-common enterprise theory. (As discussed below, AMP's support has also been so systemic as to support liability. *See infra* § II.D.2.) Hamas's terror crimes are open and notorious. (FAC ¶¶ 19–23.) Were more needed,

11

the Complaint alleges that AMP is the reincarnation of adjudicated material support enterprises founded and controlled by senior Hamas leaders. (FAC ¶¶ 25–33.) The leaders of AMP and its defunct predecessors significantly overlap, including repeat board members. (FAC ¶¶ 34–35.) AMP's leaders and advisors have deep connections to Hamas that they maintain to this day. (FAC ¶¶ 36–44.) Indeed, the connections run so deep that a district court relied on them to sustain a claim that AMP is the alter ego of its predecessors and liable for their unpaid judgments. *See Boim v. Am. Muslims for Palestine*, 2021 WL 1556085, at *2–*3 (N.D. Ill. May 17, 2022). AMP therefore knows that Hamas is "involved in some type of [terrorist] crime." *Halberstam*, 705 F.2d at 488. And although the scope of October 7 was unprecedented, it was plainly—and appallingly— foreseeable that Hamas would once again attack and kill people in Israel.[9]

*Second*, even absent a near-common enterprise theory, the defendant need not know of any specific attack. "[A]iding and abetting does not require the defendant to have known all particulars of the primary actor's plan." *Twitter*, 598 U.S. at 495; *cf. Linde v. Arab Bank*, 882 F.3d 314, 329 (2d Cir. 2018) ("Nor does awareness require proof that Arab Bank knew of the specific attacks at issue when it provided financial services for Hamas."). In *Boncasa*, for example, the defendant bank loaned millions of dollars to a fertilizer company even after the United States warned that terrorists used the fertilizer to make explosives used to kill people in Afghanistan. 2023 WL 7110774, *8 n.11, *2–*3. Those warnings were knowledge enough; the court did not require the

---

[9] AMP's contention that the Court need not credit the allegations cited above because they relate to the *Boim* complaint is groundless. (AMP Mem. 3 n.6, 6, 9–10.) Like any others, these allegations must be accepted as true at this stage. *See Doriety*, 109 F.4th at 679. Contrary to AMP's suggestion, Plaintiffs do not request the Court to take "judicial notice" of the *Boim* allegations; rather, Plaintiffs assert these allegations in their own name as part of the Complaint. *Summit Cmty. Bank v. David* is inapposite; it addresses the propriety of judicially noticing facts at an evidentiary hearing, not on a motion to dismiss. 629 B.R. 804, 814 (E.D. Va. 2021).

bank to know of the specific attacks alleged in the complaint. *See id.* at *11; *see also id.* at *8 n.11 (not a near-common enterprise case).

The Complaint alleges a high level of knowledge under this theory as well—including whatever foreknowledge might be required. Three sets of allegations bear mention.

*First*, AMP's historic, deep ties to Hamas support an inference of knowledge. As noted, AMP is the disguised continuance of now-defunct enterprises that were adjudicated by American courts to be material supporters of Hamas. AMP's connections to Hamas persist to this day. To take one example, an AMP board member who publicly supports Hamas recently spoke at a conference where a convicted hijacker and two senior Hamas leaders also spoke. (FAC ¶¶ 40–41.)

*Second*, AMP's activities immediately following Hamas's October 7 attack—indeed, even as it continued—support an inference that AMP knew the attack was coming. On October 8, AMP (acting through its name NSJP) distributed the "Toolkit," which touts the October 7 attack as a "***historic win***" and urges the "Palestinian student movement" to "join the call for mass mobilization" issued by Hamas the previous day. (FAC ¶¶ 79 (emphasis added); *see id.* ¶¶ 78–81.) AMP's readiness and lightning response strongly imply foreknowledge. The Toolkit includes a telltale sign that all but confirms it: images of paragliders, which Hamas used on October 7—and which had never been used in ***any*** prior terrorist attack. (FAC ¶ 86.)

AMP tries to distance itself from the Toolkit (and all NSJP conduct) by arguing it was an NSJP effort. (AMP Mem. 5.) But AMP ***is*** NSJP, so NSJP conduct is AMP conduct. As the Complaint alleges, AMP created, manages, and controls NSJP as a brand name for its campus propaganda activities. (FAC ¶¶ 11, 60–61.) NSJP is not some other legal entity; it is another name

for AMP. At this stage, these allegations are credited, and AMP is responsible for the Toolkit.[10]

*Third*, the Complaint alleges a striking pattern of post-attack coordination between Hamas and AMP. After the attack, Hamas and its allies repeatedly called on its supporters abroad to engage in protests, which AMP promptly promoted.[11] (FAC ¶ 102.) The most dramatic example is the "Strike4Gaza" episode, which shows AMP secretly coordinating with terrorists abroad. In March 2024, the Iranian Revolutionary Guard Corps, itself a terror organization and a key Hamas patron, internally circulated a secret memo urging allies to create an "economic blockade" on April 15, 2024. (FAC ¶¶ 24, 103.) Within days, AMP began publicly promoting April 15 as a day of mass disruption dubbed "Strike4Gaza." (FAC ¶¶ 105.) And on April 15, protests raged around the country, disrupting bridges, airports, and the New York Stock Exchange. (FAC ¶ 107.) The secret March memo was also leaked on April 15, revealing that "Strike4Gaza" was a terrorist initiative laundered through AMP to give it a veneer of legitimacy. (FAC ¶ 104.) Contrary to AMP's assertions (AMP Mem. 22), "Strike4Gaza"—and ***all*** post-October 7 coordination—support the inference that AMP received similar advance warning before October 7.

Taken together, and with all reasonable inferences drawn in Plaintiffs' favor, these allegations strongly suggest that AMP knew that the attack was coming and certain details about the methods that would be used. This suffices at the pleading stage. *See Doriety*, 109 F.4th at 679; *Zobay*, 695 F. Supp. 3d at 337 ("A complaint is allowed to contain general allegations as to a

---

[10] Out of caution, Plaintiffs included NSJP as a separate defendant in the Complaint. Despite diligent service attempts, however, we found no concrete evidence that NSJP has a separate legal existence and were unable to serve it, further confirming that NSJP is merely a label for AMP.

[11] AMP argues that Hamas "never mention[ed] AMP by name" when communicating with supporters abroad, and that AMP's activities were merely "respond[ing] to the environment in the United States," not trying to support Hamas. (AMP Mem. 23.) But at this stage, where the Complaint's allegations are taken as true and all reasonable inferences are drawn in Plaintiffs' favor, the allegations of post-attack coordination are strongly indicative of knowledge.

defendant's knowledge . . . because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.").

### 2.  The Complaint Alleges Direct and Extraordinary Assistance

AMP's challenges to the substantial assistance allegations also fail. (AMP Mem. 23–25.)

At the outset, the Court should reject AMP's claim that JASTA demands "the defendant's substantial assistance significantly enhanced the terrorist organization's ability to carry out the attacks[.]" (AMP Mem. 23.) This is a fictional principle; so much so that AMP's citation ("*Taamneh*, 598 U.S. at 461") refers to an unrelated decision, not *Twitter*.[12] *Twitter* establishes no such rule, and the Court should disregard this assertion.

Instead, the Court should analyze substantial assistance using the six traditional factors, which AMP largely ignores. *See supra* § II.A. "The point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Twitter*, 598 U.S. at 504. As applied, the factors overwhelmingly favor Plaintiffs.

***Nature of the act assisted.*** Courts begin their analysis with this factor because "[t]he nature of the act involved dictates what aid might matter." *Halberstam*, 705 F.2d at 484. The more blameworthy the act aided, the less substantial the assistance needs to be. *See Zobay*, 695 F. Supp. 3d at 349. Here, the acts assisted are the horrific crimes Hamas committed on October 7 against Plaintiffs and many others. As Hamas's crimes are "extraordinarily blameworthy, even relatively trivial aid could count as substantial." *Id.* But AMP did far more.

***Amount and kind of assistance.*** To the extent AMP addresses any factor, it is this one. AMP claims the Complaint lacks allegations that "a single dollar went to Hamas" or that AMP

---

[12] *See Ohio Adjutant General's Dep't v. Fed. Labor Relations Auth.*, 598 U.S. 449, 461 (2023).

"assist[ed] with the October 7 attack," and argues that propaganda services are insufficient. (AMP Mem. 24.) But these assertions echo AMP's failed argument that JASTA does not apply to speech-related services (AMP Mem. 19–20) and should be rejected for the same reasons. *See supra* § II.B. Regardless, the amount and kind of assistance alleged is highly significant. The horrors inflicted by Hamas are so extreme that they necessitate extensive propaganda and whitewashing to create even a veneer of legitimacy for rallying support and recruiting abroad. AMP willingly supplied this propaganda and rallied support for Hamas before, during, and after the October 7 attacks. (*E.g.*, FAC ¶¶ 62–66, 77–122.)

AMP's unsupported suggestion that after-the-fact aid cannot assist a tort (AMP Mem. 22–23) is wrong. *Halberstam*, which provides the "proper legal framework" for analysis (130 Stat. 852, § 2(a)(5)), involved Hamilton's administrative aid to a burglary operation entirely after the fact. *Halberstam*, 705 F.2d at 474–76; *see also Al-Sabah v. World Bus. Lenders*, 2024 WL 263579, at *24 (D. Md. Jan. 24, 2024) (holding that defendant's aid to a fraud was substantial when he acted only after the fraudster "had already obtained [the victim's money] and purchased the Pikesville Property without [the victim's] knowledge"). AMP's post-attack propaganda blitz, like Hamilton's post-burglary efforts, substantially assisted the primary tort.

***AMP's presence at the time of the tort.*** This factor, originating from cases about "isolated acts of adolescents in rural society" (*Halberstam*, 705 F.2d at 489), is "not normally entitled to much weight" in JASTA cases (*Zobay*, 695 F. Supp. 3d at 350). Courts have even applied it metaphorically, as in *Zobay*, where a telecom company was found to be "transactionally present" at attacks it facilitated through technology and money it indirectly supplied. *Id.* Similarly, AMP was effectively present on October 7, boasting the next day that it is "PART of" the "Unity Intifada" operating under Hamas's "unified command." (FAC ¶¶ 84, 83.)

*AMP's relationship to Hamas*. As previously stated, AMP is the latest iteration of Hamas's propaganda arm in the United States. (FAC ¶¶ 25–34.) Its leaders and members overlap significantly with its predecessors and have enduring ties to Hamas. (FAC ¶¶ 34–44.) AMP has consistently provided propaganda services to whitewash Hamas's crimes (FAC ¶¶ 62–66), and after October 7, declared itself "PART of" Hamas (FAC ¶ 84).

*AMP's state of mind*. AMP has an extremely culpable state of mind. AMP's assistance to Hamas has been so pervasive and knowing that it "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *Halberstam*, 705 F.2d at 488; *see also Zobay*, 695 F. Supp. 3d at 350 (holding that this factor favored liability where the defendant "was an active business partner allegedly procuring goods for an IRGC front"). Like its forebears—adjudicated material supporters of Hamas—AMP is and has always been fervently pro-Hamas. Some of its leaders have expressed public support for Hamas and other terrorists that indiscriminately kill Jews. (FAC ¶¶ 41, 43.) A board member was even jailed for sheltering and arming a Hamas terrorist. (FAC ¶ 44.) That same board member chaired AMP's 2023 Palestine Convention *just last year*. (FAC ¶ 44.) No matter how heinous Hamas's crimes, AMP valorizes and whitewashes them.

*Duration of assistance.* AMP has served as Hamas's propaganda arm for almost 20 years in its own name—36 years in total—through untold terror attacks and murders. Far too long.

The Complaint therefore alleges direct and extraordinary assistance to the October 7 attack.

\* \* \*

Considered "in tandem," the Complaint's knowledge and substantial assistance allegations show that AMP has consciously, voluntarily, and culpably participated in the October 7 attacks. *Twitter*, 598 U.S. at 491. Indeed, AMP's aid is so systemic and intentional—thirty-six years of

service, through countless terror attacks, through criminal convictions and civil judgments—that it is liable for **all** of Hamas's crimes. *See id.* at 496, 502.

E.      **AMP's "Direct Link" Contentions Are Unavailing**

AMP claims that JASTA requires a "direct link" between its assistance and the attack, or the defendant must "directly" aid the attack. (*E.g.*, AMP Mem. 18, 21, 23–24.) This once again misstates the law. There is no "direct link" requirement. As *Twitter* explains, though a defendant must aid an "act of international terrorism," the aid need not have a "strict nexus" with the attack. 598 U.S. at 495–96. A "close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, but even more remote support can still constitute aiding and abetting in the right case." *Id.* at 496.

*Twitter* didn't specify how the "nexus" analysis differs from the analysis of knowing and substantial assistance, and its own analysis suggests they are effectively the same. The Supreme Court first stated that because the plaintiffs advanced an omissions theory, a "strong showing of assistance and scienter is required." *Id.* at 500. It then evaluated the "nexus," i.e., the "relationship between defendants and the [terror] attack," deeming it "highly attenuated" because the defendants had the same relationship to ISIS as they had with "their billion-plus other users: arm's length, passive, and largely different." *Id.* This nexus analysis covers three substantiality factors: the relationship between the defendant and primary wrongdoer ("arm's length"), the amount and kind of assistance ("passive"), and the defendant's state of mind ("largely indifferent"). Driving the point home, *Twitter* later discusses the substantiality factors using the same facts and phrases it used to discuss the nexus question. *See id.* at 504.

Thus, a separate nexus analysis isn't needed. *Twitter*'s nexus discussion shows that substantial assistance is generally analyzed with an eye toward aiding the tort, not the organization writ large. *See id.* at 495. The substantiality factors are correctly analyzed above and plainly

survive AMP's efforts to defeat them. In any event, "insofar as *Twitter* calls for a nexus between [AMP's] actions and Plaintiffs' injuries," the requirement is satisfied here. *Boncasa*, 2023 WL 7110774, at *11. Under a near-common enterprise theory, AMP's consistent and culpable support to Hamas has aided and abetted every one of its attacks. The Complaint also plausibly alleges that AMP was aware of the impending attack, prepared targeted propaganda to disseminate on a moment's notice, and promptly sprang into action when the events of October 7 began to unfold. That is nexus enough, and AMP's "direct link" argument fails.

AMP's main authority is distinguishable. In *KKL-JNF*, terror attack victims in Israel claimed that a non-profit violated JASTA by funding a group supporting boycotts of Israel. 66 F.4th at 1011. There, the court found no substantial assistance because the victims did not allege the group sent Hamas money and because the group had "extensive legitimate operations," with Hamas and an ally being just two of its "many members." *Id.* at 1018. AMP, however, is composed of Hamas collaborators and provides its propaganda services directly to Hamas. (FAC ¶¶ 33–50, 62–66.) And it does so to promote terror rather than any legitimate objective. (FAC ¶¶ 45–50.) AMP's other "direct link" cases, which predate *Twitter*, are even further afield.[13]

### F.    WESPAC's Motion Should Be Denied For the Same Reasons

WESPAC's challenges to the JASTA claim are equally meritless.

---

[13] *See Crosby v. Twitter*, 921 F.3d 617, 626 (6th Cir. 2019) (rejecting claim against social media platform where attacker planned and committed a terrorist act "by himself and without ISIS's help," and where ISIS did not use the platform to communicate with the attacker); *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 974–76 (N.D. Cal. 2018) (dismissing claim like the one rejected in *Twitter v. Taamneh* for similar reasons), *aff'd*, 2024 WL 1406742 (9th Cir. Apr. 1, 2024) (unpublished); *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 878–79, 886–88 (N.D. Cal. 2017) (similar to *Crosby*, except the attacker was radicalized by groups unaffiliated with Hamas); *Linde*, 882 F.3d at 325 (declining to affirm direct liability verdict under the newly enacted JASTA statute without expressing views on whether the facts satisfy JASTA).

1.   The Complaint Alleges a Primary Violation

WESPAC first contends that it did not aid an act of international terrorism because it only aided NSJP, not Hamas. (WESPAC Mem. 21–22.) But the first *Halberstam* component asks only if a terror group "committed a wrong" for the abettor to assist (*Twitter*, 598 U.S. at 497), and WESPAC concedes October 7 counts. (WESPAC Mem. at 22.) WESPAC's contentions go to whether its aid was substantial, not to whether Plaintiffs were victims of a terror attack.

2.   WESPAC Was Generally Aware of Its Role in Hamas's Crimes

The Court should also reject WESPAC's argument that it wasn't generally aware of its role in Hamas's illegal activities. (*Id.* at 22–26.) General awareness is a low threshold at the pleading stage.  *See Zobay*, 695 F. Supp. 3d at 337. And this component is satisfied here because WESPAC has served as NSJP's fiscal sponsor—raising funds, retaining a portion, and transferring the remainder—since 2016. (FAC ¶¶ 12, 53.) Fiscal sponsorship means a non-profit lends its tax-exempt status to a group without one. (FAC ¶ 57.) As matter of law and practice, sponsors and sponsored organizations have a close relationship; ideological alignment is a given,[14] and a detailed written agreement is to be expected.[15] Furthermore, as the sponsor, WESPAC must "retain[] control and discretion over use of the funds" it gives to NSJP and keep records to prove it. *New York ex rel. TZAC, Inc. v. New Isr. Fund*, 520 F. Supp. 3d 362, 388 (S.D.N.Y. 2021); *accord Nat'l Found. v. U.S.*, 13 Cl. Ct. 486, 493 (1987) (sponsor properly "controls every disbursement and ensures that the disbursement is applied to exempt purposes"). WESPAC's

---

[14] Foundation Grp., "What Is a Fiscal Sponsor?," https://www.501c3.org/what-is-a-fiscal-sponsor/ ("The project should generally be aligned with the overall mission of the sponsoring charity.").

[15] National Council of Nonprofits, "Fiscal Sponsorship for Nonprofits," https://www.councilofnonprofits.org/running-nonprofit/administration-and-financial-management/fiscal-sponsorship-nonprofits (urging the "sponsor and the sponsored organization" to "outline the responsibilities and obligations of both parties in a written agreement").

duties as NSJP's sponsor thus create a strong inference that they share the same genocidal ideology, that WESPAC knows and controls how the money it gives to NSJP is used, that NSJP is another name for AMP, and that AMP is (like its forebears) Hamas's propaganda arm. WESPAC's financial irregularities also show that it is likely doing something illegal and trying to hide it. (FAC ¶¶ 54–56.) At this stage, is reasonable to infer that WESPAC knew before October 7 what NSJP openly declared afterward: it is "PART of" Hamas and under its "unified command." (FAC ¶ 84.)

3.  <u>WESPAC Knowingly and Substantially Assisted the October 7 Attacks</u>

Finally, contrary to WESPAC's contentions, the Complaint sufficiently alleges that it knowingly and substantially assisted the October 7 attacks. (WESPAC Mem. 26–30.)

WESPAC first argues that the claim fails for lack an allegation that Hamas received any WESPAC money. (WESPAC Mem. 27.) But as WESPAC's own case states, a "plaintiff need not allege that a defendant assisted a foreign terrorist organization directly," and it is "enough to provide factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO" (*i.e.*, foreign terrorist organization). *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 871 (D.C. Cir. 2022); *accord Honickman v. BLOM Bank*, 6 F.4th 487, 500 (2d Cir. 2021) ("[I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds."); *Kaplan*, 999 F.3d at 856 ("The language and purpose of [JASTA] are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary."). Even if WESPAC properly stated the law, sending money to a self-declared "PART of" Hamas supports the reasonable inference that Hamas received the cash. (FAC ¶ 84.)

WESPAC, relying on *Bernhardt*, next argues the Complaint doesn't adequately allege that WESPAC knew the funds it raised would go to Hamas. (WESPAC Mem. 27.) The Complaint,

however, sufficiently addresses this point. It alleges that WESPAC has been in a close relationship with NSJP since 2016, and as their fiscal sponsor, WESPAC fundraises in NSJP's name and directly provides them with the cash. This relationship bespeaks a close ideological alignment and *requires* WESPAC to maintain control over the money it gives to NSJP. Incredibly, Plaintiffs have not been able to locate *any* effort by WESPAC to publicly distance itself from NSJP, even after NSJP announced that it is "PART of" Hamas. (FAC ¶ 84.) Though WESPAC's brief rightly condemns Hamas, it describes NSJP positively, claiming it is nothing more than college students who "organize[] peaceful demonstrations" and "empower, unify, and support student organizers." (WESCP Mem. 1–2, 5.) Together, these features support a strong inference that WESPAC knew of NSJP's connection to Hamas before October 7 and recognized that Hamas could receive WESPAC money. These allegations are more than adequate to proceed to discovery.

WESPAC also wrongly applies the *Halberstam* factors to argue its assistance was insufficiently substantial. (WESPAC Mem. 28–29.) The factors strongly favor Plaintiffs.

*Nature of the act assisted and amount and kind of assistance.* The October 7 attack was so "extraordinarily blameworthy" that "even relatively trivial aid" can be substantial. *Zobay*, 695 F. Supp. 3d at 349. And WESPAC's aid was far from trivial: for years leading up to the October 7 attacks, WESPAC gave cash to a group that declares itself to be "PART of" Hamas. (FAC ¶¶ 53, 59, 84.) Although discovery will reveal the precise dollar figures, the Complaint supports the reasonable inference that it was in the millions of dollars. In 2022 alone, WESPAC reported $2.4 million in revenue, but claims have spent nearly $1.5 million on "office expenses," zero on fundraising, and only $100,000 in salary. (FAC ¶¶ 54–56.) These irregularities suggest that WESPAC is trying to hide the extent of its support for NSJP. Given its close ideological connection

22

to NSJP, it is reasonable to infer that NSJP is the beneficiary of the vast majority of its revenues.[16]

*WESPAC's presence at the time of the tort.* Like the telecom company that gave cash to a terrorist front in *Zobay*, *see* 695 F. Supp. 3d at 350, WESPAC was transactionally present on October 7 because it indirectly supplied Hamas with cash. (FAC ¶¶ 53–63.) WESPAC's own cited case recognize this mode of analysis. *See Bernhardt*, 47 F.4th at 872 ("[E]ntities cannot be physically present for an act of international terrorism, and so presence may be understood in a transactional sense, such as a bank's business relations with a terrorist organization.").

*WESPAC's relationship to Hamas, state of mind, and duration of assistance.* These three factors also strongly favor Plaintiffs. Contrary to WESPAC's argument, the Complaint alleges a close relationship to Hamas. For 7 years leading up to the attack, WESPAC gave money to a group that declared itself to be "PART of" Hamas. (FAC ¶¶ 53, 59, 84.) Its role as NSJP's fiscal sponsor creates a strong inference that WESPAC was aware of NSJP's role in Hamas's terror network and deeply committed to the same genocidal causes. WESPAC's contention that NSJP has only a "very attenuated if not illusory" connection to Hamas should be rejected outright. (WESPAC Mem. 29.) NSJP ***admitted in writing*** it was part of a terrorist group, something WESPAC appears to be perfectly comfortable with. All Plaintiffs ask is that the Court believe them—as the Court must on a motion to dismiss. With that allegation credited, WESPAC's own connection to Hamas comes into sharp focus: for seven years, it funded those who viewed themselves as part of Hamas and who unleashed a torrent of pro-Hamas propaganda immediately after the October 7 attack. For much the same reasons, the Complaint alleges WESPAC has a highly culpable state of mind.

---

[16] Relying on *Halberstam*, WESPAC argues that the October 7 attack must have been "heavily dependent" on its aid and that its cash must have been an "essential part of" Hamas's crimes. (WESPAC Mem. 28.) But JASTA requires only "substantial" assistance, 18 U.S.C. § 2333(d)(1), and *Halberstam* requires no more. *See* 705 F.2d at 477. The phrases WESPAC quotes only describe Linda Hamilton's aid and do not create any general standard. *See id.* at 488.

Finally, WESPAC's "nexus" argument must be rejected for all the same reasons that AMP's "direct link" argument fails. *See supra* § II.D.E. Even if there is a separate nexus requirement—which Plaintiffs contend there is not (*id.*)—it is met here. With all reasonable inferences taken in Plaintiffs' favor, the Complaint alleges that for at least seven years prior to the October 7 attack, WESPAC gave NSJP money knowing that NSJP viewed itself as "PART of" Hamas, and in complete alignment with NSJP's and Hamas's genocidal goals. WESPAC does not even profess surprise or regret that it funded NSJP for all these years. That is a sufficient nexus.

Viewed "in tandem," *Twitter*, 598 U.S. at 491, these allegations of knowing and substantial support are sufficient.[17]

## III. PLAINTIFFS' ALIEN TORT STATUTE CLAIMS MORE THAN MEET THE LEGAL STANDARD

Plaintiffs' Alien Tort Statute claims similarly withstand dismissal.

### A. Legal Framework

Israeli Plaintiffs, Ariel Ein-Gal and Hagar Almog, assert a claim under the ATS for aiding and abetting the October 7 attacks. (FAC ¶¶ 8–9; *see id.* at 1.) The ATS provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. And though the ATS only grants jurisdiction, courts are authorized to "recognize a cause of action for violations of the 'present-day law of nations' that are defined with specificity and 'rest on a norm of international character accepted by the civilized world.'" *Al Shimari v. CACI Premier Tech., Inc.*

---

[17] WESPAC's cases are distinguishable. In *KKL-JNF*, the defendant sponsored an organization that had "extensive legitimate operations" and that counted Hamas as one of its "many members." Here, WESPAC sponsors a group that is part of Hamas itself. 66 F.4th at 1018. WESPAC's banking cases are also inapposite because WESPAC has a closer and more controlling and ideologically aligned relationship to NSJP than a bank to its customers. *See Bernhardt*, 47 F.4th at 862–63; *Siegel v. HSBC N. Am. Holdings, Inc*., 933 F.3d 217, 220–21 (2d Cir. 2019).

("*Al Shimari III*"), 684 F. Supp. 3d 481, 488 (E.D. Va. 2023) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).[18] Four international norms are implicated in this case.

First, Hamas's crimes violate three distinct norms: genocide, war crimes, and harming civilians in terror attacks. Under established ATS principles, Defendants are secondarily liable for aiding and abetting Hamas's crimes. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 396 (4th Cir. 2011) (recognizing a cause of action under the ATS for aiding and abetting). The elements of aiding and abetting are (i) a primary violation, (ii) the defendant "must provide substantial assistance," and (iii) the defendant must have "the purpose of facilitating" the primary violation. *Id.* at 401.

Defendants' support of Hamas's attacks also independently violates an international norm against supporting terror attacks. Put differently, aiding and abetting a terrorist attack is itself a violation of customary international law, a norm that is evidenced by the International Convention for the Suppression of the Financing of Terrorism ("ICSFT").[19] Under this norm, the terrorist supporter may be held liable without independently satisfying the *Aziz* test. As relevant here, there is one important distinction between the two theories: the international norm against supporting terrorism requires only "knowledge" of Hamas's unlawful purposes, whereas *Aziz* states that the required mental state to aid and abet a primary violation is a purpose to facilitate those goals.

Defendants argue that (i) under principles of extraterritoriality, the Court lacks jurisdiction because Plaintiffs do not allege domestic conduct; (ii) Hamas's attack and Defendants' assistance

---

[18] This brief cites three of the many decisions from the long-running *Al Shimari* litigation. *See Al Shimari v. CACI Int'l, Inc.* ("*Al Shimari I*"), 679 F.3d 205 (4th Cir. 2012) (en banc) (dismissing for lack of appellate jurisdiction); *Al Shimari v. CACI Premier Tech., Inc.* ("*Al Shimari II*"), 263 F. Supp. 3d 595 (E.D Va. 2017) (recognizing claims under the ATS); *Al Shimari III*, 684 F. Supp. 3d 481 (rejecting extraterritoriality arguments).

[19] ICSFT, art. 2.1(b), Dec. 9, 1999, 16 U.S. 49, 2178 U.N.T.S. 197, available at https://treaties.un.org/doc/db/terrorism/english-18-11.pdf.

do not violate international norms; and (iii) the Complaint insufficiently alleges intent and substantial assistance. WESPAC also contests personal jurisdiction. These arguments lack merit.

### B. The Court Has Personal Jurisdiction Over WESPAC

Contrary to its contentions, the Court has personal jurisdiction over WESPAC as to the ATS claims. (WESPAC Mem. 9–13.) Through "pendent personal jurisdiction," a district court with jurisdiction over a defendant as to one claim also has jurisdiction as to any claim "aris[ing] from a common nucleus of operative fact." *ESAB Grp. Inc. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997); *see also D'Addario v. Geller*, 264 F. Supp. 2d 367, 387–89 (E.D. Va. 2003).

Here, the Court has personal jurisdiction over WESPAC as to the U.S. Plaintiffs' ATA claim. Indeed, WESPAC has consented to jurisdiction as to the ATA claim by challenging the claim on the merits without contesting jurisdiction. *See Safety Equip. Inst. v. Signature Lacrosse, LLC*, 438 F. Supp. 3d 685, 687 (E.D. Va. 2020) (citing Fed. R. Civ. 12(g), (h)). Any challenge would fail. Under Rule 4(k)(1)(C), "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by federal statute." The ATA provides that "[p]rocess in such civil action may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). That provision "clearly confers nationwide service of process and therefore jurisdiction under Rule 4(k)(1)(C)." *Zobay*, 695 F. Supp. 3d at 322. In this context, "the proper 'forum' for assessing minimum contacts . . . is the United States as a whole, not the local district." *Id.* at 323. WESPAC was served in its home state of New York. As a New York entity plainly has sufficient contacts with the United States, the Court has jurisdiction as to the ATA claim.

That leaves the issue WESPAC actually raises: whether the Court has jurisdiction as to the ATS claim. It plainly does. The ATS claim arises out of the same facts as the ATA claim – WESPAC's fiscal support of Hamas's crimes. WESPAC "will have to adjudicate the facts" of the ATA claim, so it "could impose only a minimal burden" to also defend the closely related ATS

claim. *ESAB*, 126 F.3d at 628. It is irrelevant that Israeli Plaintiffs do not themselves assert the ATA claim. The doctrine turns on the closeness of the claims, not the parties asserting them. *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1173 (S.D. Cal. 2018) (exercising pendent jurisdiction over state law claims closely related to other plaintiffs' federal claims over which the court had jurisdiction). The Court thus has jurisdiction over the ATS claim.

Even if this Court could not exercise personal jurisdiction over WESPAC under the ATA's nationwide service provision (which it can), WESPAC still has sufficient minimum contacts with the Commonwealth of Virginia to confer jurisdiction. The Complaint alleges that over a period of seven years, WESPAC raised and controlled the use of contributions for AMP's—a corporation domiciled in Virginia—campus brand, NSJP. (FAC ¶¶ 10, 53–59.) Such systematic and ongoing business transactions directed at Virginia are sufficient for this Court to exercise personal jurisdiction over WESPAC. Nevertheless, should the Court deem it necessary to further explore WESPAC's contacts with Virginia, Plaintiffs respectfully request the Court permit jurisdictional discovery under Rule 26. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993).

## C.   The Complaint Alleges Sufficient Domestic Conduct

Defendants argue that this case lacks sufficient domestic conduct to support jurisdiction and that their conduct is too "attenuated" from or inadequately "tie[d]" to Hamas's crimes abroad. (WESPAC Mem. 19; AMP Mem. 14.) These extraterritoriality arguments fail.

Although the ATS does not apply extraterritorially, only the abettor's conduct need be domestic in an aiding and abetting case. *See Doe I v. Cisco Sys.*, 73 F.4th 700, 737 (9th Cir. 2023) ("[C]onduct within the United States that constitutes aiding and abetting a violation of international law, even if other conduct [i.e., the principal's acts] occurred abroad, is a violation of the law of nations that falls within the focus of the ATS." (alteration in original)), *r'hrg and r'hrg en banc denied*, No. 15-16909 (9th Cir. Sept. 3, 2024); *cf. Nestle USA v. Doe*, 593 U.S. 628, 633–34 (2021)

(reserving the issue). In *Cisco*, the primary violations were human rights abuses committed in China using Cisco's surveillance technology. *See id.* at 708–09. Cisco's conduct was deemed domestic because it designed and developed the technology in California and its domestic employees were heavily involved in maintenance and training. *See id.* at 737–38. In *Al Shimari*, where the primary violation was torture committed in Iraq, the court found sufficient domestic conduct where the defendant was a U.S. company, its employees were U.S. citizens, the company's contract to perform services in Iraq was issued in the United States, and Iraq was effectively under U.S. control. *See Al Shimari III*, 684 F. Supp. 3d at 497.

Here, the Complaint alleges extensive domestic conduct. AMP is a United States organization that has acted as Hamas's domestic propaganda arm for thirty-six forty years. (FAC ¶¶ 25–44, 64–66.) AMP has been extensively involved in distributing pro-Hamas propaganda and promoting pro-Hamas disruption across the country. (FAC ¶¶ 77–122.) It readied in advance for the attacks and sprang into action after October 7, all within the United States. (FAC ¶¶ 78–88.) It has domestically coordinated with Hamas and its allies abroad ever since. (*E.g.*, FAC ¶¶ 102–08.)

Like AMP, WESPAC's conduct is entirely domestic. A New York non-profit, WESPAC has fiscally sponsored NSJP since 2016. (FAC ¶¶ 12, 53, 57.) For seven years leading up to the October 7 attack, WESPAC raised money for NSJP—which declared it is "PART of" Hamas immediately after the attack—with knowledge of NSJP's terrorist sympathies and with sharing NSJP's and Hamas's genocidal goals. (FAC ¶¶ 53–59.) So far as Plaintiffs can discern, WESPAC has never so much as tried to distance itself from NSJP since its breathtaking announcement.

Accordingly, the Complaint alleges sufficient domestic conduct to support jurisdiction.

### D.     The Complaint Alleges Actionable International Norms

Defendants also challenge subject matter jurisdiction on the ground that the Complaint does not allege an actionable international norm. (AMP Mem. 16–17; WESPAC Mem. 14–18.)

Although Defendants are too shy to spell it out, they believe the law of nations **condones** Hamas's butchery and their extensive support of Hamas's crimes. This argument cannot be accepted.

The ATS "enables federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Aziz*, 658 F.3d at 395 (quoting *Sosa*, 542 U.S. at 712). *Sosa* "announce[s] a two-step test for recognizing the availability of a cause of action under the ATS." *Nestle*, 593 U.S. at 648 (Sotomayor, J., concurring in part and concurring in the judgment). "Courts first ask whether a plaintiff can demonstrate that the alleged violation is 'of a norm that is specific, universal, and obligatory.'" *Id.* (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 258 (2018)). "If so, then it must be determined further whether allowing a case to proceed under the ATS is a proper exercise of judicial discretion." *Id.*[20]

1.   The Complaint Alleges Violations of Four International Norms

The Complaint alleges violations of four actionable international norms: genocide, war crimes, terrorism, and supporting terrorism. Defendants are secondarily liable for the violations of the first three norms and primarily liable for their violation of the fourth.

*Genocide*. "All U.S. courts to consider the issue recognize genocide as a violation of customary international law." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 675 (7th Cir. 2012) (collecting cases). Genocide includes "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole

---

[20] Relying on a plurality opinion, Defendants argue that courts cannot recognize new ATS claims. (AMP Mem. 16 and WESPAC Mem. 14 (both citing *Nestle*, 539 U.S. at 637 (opinion of Thomas, J., joined by Gorsuch and Kavanagh, JJ.)).) But the majority opinion holds only that the claim at issue was improperly extraterritorial, *see Nestle*, 539 U.S. at 632–34, and courts have continued to apply *Sosa* to recognize novel claims since then. *E.g.*, *Cisco*, 73 F.4th at 717 (aiding and abetting).

or in part . . . ." *Kadic v. Karadzic*, 70 F. 3d 232, 241 (2d Cir. 1995). Hamas's founding principle is its intent to destroy Israel and the Jewish people, and it attacked Israel on October 7 to further that goal. (FAC ¶¶ 19, 67–71; *see id.* at 1.) Hamas terrorists attacked Ms. Almog's home, murdering her friends and community members, depriving her of home, belongings, community, and way of life. (FAC ¶¶ 9, 69(a).). Hamas terrorists repeatedly shot at Mr. Ein-Gal, forcing him to flee and hide. (FAC ¶¶ 8, 69(b).) Both suffered mental anguish, pain, and suffering. (FAC ¶¶ 8–9.) Thus, with the intent to destroy Israel, Hamas caused serious mental harm to Plaintiffs and deliberately inflicted conditions of life calculated to bring about their physical destruction in whole or in part. Defendants, in turn, aided and abetted Hamas's primary violation—a secondary violation that the Fourth Circuit has recognized. *See Aziz*, 658 F.3d at 396.

*War crimes.* Claims for war crimes have also been widely recognized. *See, e.g.*, *Kadic*, 70 F.3d at 243; *Al Shimari II*, 263 F. Supp. 3d at 605; *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 744 (D. Md. 2010)[21]; *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 582 (E.D. Va. 2009). Judge Ellis's decision in *In re Xe Services* is particularly instructive. The court first considered whether there was a "precise, universally accepted definition of war crimes" and found one in the Geneva Convention. 665 F. Supp. 2d at 582. Second, because "when Congress has defined the relevant international legal norms, federal courts must follow Congress's lead," the court considered whether Congress had implemented the treaty with legislation. *Id.* at 582. Because Congress had enacted a statute "incorporat[ing] the Geneva conventions into . . . domestic criminal law," its definitions "govern[] the definition of war crimes in federal courts" for ATS purposes.

---

[21] *Al-Quraishi* was initially reversed by a panel decision of the Fourth Circuit, but that ruling was vacated by the court sitting en banc. *See Al-Quraishi v. L-3 Servs., Inc.*, 657 F.3d 201 (4th Cir. 2011), *vacated by Al Shimari I*, 679 F.3d 205. It thus remains persuasive authority.

*Id.* at 583. Together, the treaty and the legislation create jurisdiction over war crimes claims. *Id.* For the same reasons, this Court should also recognize war crimes claims.

The elements of a war crimes claim are "acts against protected persons consisting of willful killing, torture or inhuman treatment, . . . or willfully causing great suffering or serious injury to body or health." *Id.* at 582 n.14. Some courts have stated that "[t]o state a valid ATS claim for murder or infliction of bodily injury as a war crime, plaintiffs must plead that the alleged conduct was perpetrated in the context of, and in association with, the armed conflict." *Id.* at 587. Here, by attacking Mr. Ein-Gal and Ms. Almog's home and community members, Hamas willfully caused great suffering to their health. These crimes occurred in the context of an armed conflict: Hamas terrorists invaded Israel on October 7, killing over 1,200 people and injuring more than 6,900. (FAC ¶ 67.) Under *Aziz*, Defendants are liable for abetting Hamas's primary violation.

*Terrorism.* The Court should recognize an ATS claim for terror attacks, joining at least one other court to have done so. *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 259 (E.D.N.Y. 2007) (holding that "organized, systematic suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population" violates an international norm).[22] The norm against terrorism has grown even stronger since *Almog*, as evidenced by the International Convention for the Suppression of the Financing of Terrorism. The ICSFT has now been joined by 190 of the United Nations' 193 members—nearly every country in the world.[23]

---

[22] Though the higher courts rejected the ATS claims in *Almog*, it remains persuasive authority. After the Supreme Court held the ATS only applies domestically (*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013)), the district court in *Almog* dismissed the ATS claims for extraterritoriality, and the Second Circuit affirmed. *See In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144 (2d Cir. 2015). That ruling was later upheld in a narrow opinion based on the second *Sosa* inquiry. *See Jesner*, 584 U.S. at 270–72.

[23] United Nations Treaty Collection, International Convention for the Suppression of the Financing of Terrorism, https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-11&chapter=18&clang=_en.

Under the ICSFT, a person commits an offense

> if that person by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out . . .
>
>> (b) [a]ny . . . act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimate a population, or to compel a government or an international organization to do or to abstain from doing any act.[24]

Congress implemented the treaty with legislation criminalizing this conduct in the same terms.[25] Although the treaty focuses on the terrorism financier, its precise definition of terrorism powerfully evidences a norm against terrorism itself. Under the approach set forth in *In re Xe Services*, this is sufficient to recognize a claim for committing those acts.

Here, Hamas terrorists intended to kill or seriously injure Mr. Ein-Gal and Ms. Almog. (FAC ¶¶ 8–9, 69(a), (b).) Although they survived, Hamas terrorists murdered more than 1,200 others, including Ms. Almog's friends and community members. (FAC ¶¶ 67, 9.) And Hamas's stated purposes were to preclude the normalization of relations between Israel and its Arab neighbors, *i.e.*, compel or prevent specific government actions. (FAC ¶ 71.) The Complaint thus alleges a terrorism violation, and Defendants are liable for aiding and abetting under *Aziz*.

*Supporting terrorism*. The Court should also recognize a cause of action for supporting terrorism, a norm also evidenced by the ICSFT. Two other courts have expressed support for this

---

[24] ICSFT, art. 2.1.

[25] *See* 18 U.S.C. § 2339C(a)(1)(B) (prohibiting the financing of terrorism, defined as "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act").

position. *See Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014) (expressing approval for "permit[ing] plaintiffs to pursue ATS claims based on a broad range of misconduct, including . . . supporting terrorism."); *Al Shimari II*, 263 F. Supp. 3d at 600 (same). The provisions of the ICSFT quoted above plainly evidence the norm as to financial support and closely capture WESPAC's conduct: deliberately raising cash for a group that is "PART of" Hamas, knowing the funds would be used at least in part for a terror attack.

The ICSFT also independently condemns "[c]ontribut[ing]" to primary violations with knowledge of the primary violator's intent.[26] As noted above, Congress has implemented this proscription.[27] And although the treaty focuses on financial support, the universal condemnation of terrorism and terrorism financing signals an international consensus against contributing to terrorism in other ways. It would make little sense for the norm to extend to giving Hamas a dollar, but not a gun—and not invaluable propaganda support. AMP's conduct therefore also violates the norm against supporting terrorism.

Defendants' contrary arguments should be rejected. They urge that terrorism and terror support are too vaguely defined and thinly accepted to support an actionable norm. But unlike cases where the plaintiff brought ATS claims "for terrorism in general," *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1316 (S.D. Fla. 2011), or just "terrorism," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013), Plaintiffs here properly identify a specific norm that "essentially track[s] the conduct specifically condemned" by an international treaty. *Almog*, 471 F. Supp. 2d at 284. And the consensus against terror attacks has grown far stronger since the events of those cases. Only 58% of world nations had ratified the ICSFT at the relevant

---

[26] ICSFT, art. 2.5(c).

[27] *See* 18 U.S.C. § 2339C(a)(1)(B).

time in *Chiquita*, *see* 792 F. Supp. 2d at 1319, which involved the most recent conduct of Defendants' cases. The ICSFT has now been joined by **over 98%** of countries worldwide.[28]

Defendants also argue that the ICSFT cannot evidence a norm because it is not "self-executing" and does not "create[] a private right of action." (AMP Mem. 16; WESPAC Mem. 16.) Defendants are wrong. "It is not necessary that the treaties, charters, or conventions cited be self-executing or provide a private right of action." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 685 (7th Cir. 2012). That is because "[t]he United States has enacted legislation making violations of customary international law actionable in U.S. courts: it is the Alien Tort Statute." *Flomo*, 643 F.3d at 1022; *accord Al Shimari II*, 263 F. Supp. 3d at 600 ("[W]hether these statutes create a cause of action is beside the point because courts have recognized that torture is a common law cause of action under the ATS."); *id.* at 606 (rejecting the argument because it "demonstrates a fundamental failure to understand that common law provides the cause of action for all actionable ATS claims"); *cf. Almog*, 471 F. Supp. 2d at 279 (observing that even non-binding international resolutions "are informative as to what the current state of international law is"). The question remains whether the treaties or other sources of international law show that the norm is specific, universal, and obligatory. The ICSFT satisfies that test.[29]

---

[28] Although WESPAC notes in passing that some signatories joined with reservations, it makes no attempt to show that a meaningful number of countries disagree with the core definitions of terrorism, terror financing, and contributing to terrorism quoted above. *See Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1021 (7th Cir. 2011) (Posner, J.) ("[C]onventions that not all nations ratify can still be evidence of customary international law. Otherwise every nation (or at least every 'civilized' nation) would have veto power over customary international law.").

[29] The Court should not follow WESPAC's single decision holding to the contrary. *See Krishanthi v. Rajaratnam*, 2010 WL 3429529, at *11–*13 (D.N.J. Aug. 26, 2010). That decision incorrectly relies on non-ATS decisions to require that a treaty must be self-executing to evidence an actionable norm. Properly understood, the law creates no such requirement.

Defendants' cases are inapposite. Although *Sosa* found no enforceable norm where a treaty was not self-executing, it involved the unusual situation where the United States had expressly ratified the treaty on the understanding that it "did not itself create obligations enforceable in the federal courts." 542 U.S. at 735. No similar express carve-out exists for the ICSFT.[30] The plurality opinion in *Jesner* cited by WESCAP states only that the ICSFT is insufficiently specific to evidence a norm of foreign corporate liability; it does not remotely suggest that the treaty's highly specific ban on terror support is insufficient. *See* 584 U.S. at 261–62. Defendants' other cases do not involve ATS claims and say nothing about whether the ICSFT evidences an actionable norm.[31]

## 2. Allowing the ATS Claims to Proceed Is Proper

Defendants do not argue that it would be an improper "exercise of judicial discretion" to allow the ATS claims to proceed. *Nestle*, 593 U.S. at 648 (Sotomayor, J., concurring in part and concurring in the judgment). Nor could they. The classic reason for caution is the risk of creating "significant diplomatic tensions" between the United States and its allies. *Jesner*, 584 U.S. at. 271. That concern is absent here. This case is about extending civil liability to close allies of Hamas, an enemy of all mankind if ever there was one: its domestic propaganda arm and a fiscal sponsor of a group that considers itself part of Hamas. Just weeks ago, the Department of Justice announced charges against the Hamas officials who masterminded the October 7 attacks.[32] Courts of the

---

[30] See Resolution of Ratification: Senate Consideration of Treaty Document 106-49, https://www.congress.gov/treaty-document/106th-congress/49/resolution-text.

[31] *See Cornejo v. Cnty. of San Diego*, 504 F.3d 853, 863 (9th Cir. 2007) (holding that the Vienna Convention on Consular Relations is not enforceable in a Section 1983 lawsuit); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir. 1979) (refusing to recognize a private claim for patent fraud directly under two treaties).

[32] U.S. Attorney's Office for the Southern District of N.Y., "U.S. Attorney Announces Terrorism Charges Against Senior Leaders of Hamas" (Sept. 3, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-terrorism-charges-against-senior-leaders-hamas.

United States have civilly and criminally adjudicated AMP's predecessor firms as material supporters of Hamas's terrorism. (FAC ¶¶ 29–32.) Plaintiffs' claims here are similar, and the Court should exercise its discretion to recognize their claims.

### E.     The Complaint Sufficiently Alleges Intent and Substantial Assistance

The Court should reject Defendants' challenges to the merits of the ATS claims. (AMP Mem. 15–16; WESPAC Mem. 19–20.) AMP and WESPAC each challenge intent; WESPAC also argues its assistance was insubstantial. Defendants are wrong.

At the outset, Defendants mistake the intent requirement. Intent is not required under the supporting terrorism norm evidenced by the ICSFT, and it should not be required to show aiding and abetting primary violations of genocide, war crimes, and terror attacks under *Aziz*. As evidenced by the ICSFT, a terror financier is liable if it has "knowledge that [funds collected] are to be used, in whole or in part" to carry out a terror attack as defined by the treaty.[33] Other terror supporters are liable if they have "knowledge of the intention of the group" to commit a terror attack.[34] And although *Aziz* states that the defendant must have "the purpose of facilitating" a primary violation, this narrow aspect of *Aziz* is wrong. 658 F.3d at 401. As the Ninth Circuit recently held in a thorough, persuasive decision, "customary international law imposes aiding and abetting liability for knowing assistance." *Cisco*, 73 F.4th at 734; *accord Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 39 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) (unpublished). Although Plaintiffs recognize that *Aziz*'s intent holding is binding on the Court, the error requires correction by a higher tribunal. As discussed above, the Complaint amply alleges that Defendants knowingly assisted the October 7 attacks. *See supra* §§ II.D.1, II.F.3.

---

[33] ICSFT art. 2.1.

[34] ICSFT art. 2.5(c)(ii).

In any event, the allegations of knowledge discussed above readily support the inference that Defendants had the purpose of facilitating the attack as well. As recounted above, AMP's purpose is reasonably inferred from its historic, deep ties to Hamas; its rapid and extensive reaction to the October 7 attack; its distribution of a document declaring it is "PART of" Hamas; and the striking pattern of post-attack coordination between Hamas and AMP. WESPAC's purpose is shown by its long-term role as NSJP's fiscal sponsor, a relationship that requires close coordination and ideological agreement, and by its refusal even now to distance itself from NSJP.

Defendants' main authority is inapposite. In *Aziz*, the plaintiff claimed that a manufacturer abetted mustard gas attacks in Iraq by selling products used to make the gas. 658 F.3d at 391. The single allegation of intent was rejected as conclusory, *see id.* at 401, and the knowledge allegations were so thin that *Aziz* had no need to adopt a higher standard. The defendant's products had many lawful uses; its buyers were based in the United States and Germany; and the products were routed through a third country before reaching Iraq. *Id.* at 390–91. Here, allegations support far stronger inferences of knowledge and purpose.

Finally, WESPAC's assistance to Hamas's ATS violations was substantial for the same reasons it substantially assisted the ATA violations. *See supra* § II.F.3. AMP does not appear to contest this element, but any argument fails for the same reasons. *See supra* § II.D.2.

### F.   Any First Amendment Argument Is Waived and Meritless

Although Defendants invoke the rhetoric of free speech, their motions raise no First Amendment issues. Defendants' "arguments," such as they are, should be rejected.

*First*, each Defendant has waived any First Amendment argument "by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Despite Defendants' rhetoric (AMP Mem. 1–2, 14–15, 26; WESPAC Mem. 1–2, 4, 6, 22), they develop

no *legal* argument sounding in free speech. The single case cited in AMP's First Amendment "section" (AMP Mem. 14) is *Aziz*, a statutory decision recognizing secondary liability under the ATS. *See* 658 F.3d at 396. WESPAC does not even get that far. Thus, any argument is waived.

*Second*, any First Amendment challenge is meritless. The Constitution does not protect knowingly giving cash to terrorists. *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008) ("If the financier knew that the organization to which it was giving money engaged in terrorism, penalizing him would not violate the First Amendment."). And although the Constitution protects wholly independent speech in favor of terrorists, abhorrent as that is, it does not protect providing terrorists with propaganda and recruiting services. In *Holder v. Humanitarian Law Project*, the Supreme Court considered a challenge to a statute barring people from providing "material support" in the form of "training," "expert advice or assistance," "service," and "personnel" to terrorist groups. 561 U.S. 1, 14 (2010) (citing 18 U.S.C. § 2339B). Petitioners claimed it would violate the First Amendment to apply the statute to speech that would "advance only the legitimate activities of the designated terrorist organizations, not the terrorism." *Id.* at 29. The Supreme Court rejected the argument, as any support to a terrorist organization can advance terrorism by "free[ing] up other resources within the organization that may be put to violent ends." *Id.* at 30; *see id.* at 32 n.6 (explaining that speech-related services "facilitate[] the group's ability to attract 'funds,' 'financing,' and 'goods' that will further its terrorist acts").

Under *Holder*, the First Amendment does not protect "expressive activity that amounts to the provision of material support to a foreign terrorist organization where the support is either addressed to, directed by, or coordinated with that organization." *United States v. Osadzinski*, 97 F.4th 484, 492 (7th Cir. 2024). In *Osadzinski*, the Seventh Circuit rejected a First Amendment challenge to a conviction for sharing a propaganda-duplicating computer program because the

defendant believed he was giving it to ISIS affiliates. *See id.* at 486, 492; *see also United States.*
*v. Rahim*, 860 F. App'x 47, 52–53 (5th Cir. 2021) (unpublished) (rejecting challenge where
defendant's "devotion to carrying out ISIS propaganda and its recruiting agenda was not that of a
mere sympathizer" and "permitted the growth of a community of ISIS followers, allowing them to
mobilize and make the leap from talk to action").

These principles doom any hypothetical First Amendment challenge (again, none is
asserted). As shown, AMP's propaganda services were "addressed to, directed by, or coordinated
by" Hamas in service of the October 7 attacks and its genocidal agenda. The First Amendment
does not protect that conduct or WESPAC's knowing contribution of cash to "PART of" Hamas.

## IV.    ALTERNATIVELY, LEAVE TO AMEND SHOULD BE GRANTED

For the reasons stated, the Complaint easily withstands Defendants' arguments, and the
Court should deny the motions and allow the case to proceed into discovery. In the alternative,
Plaintiffs respectfully request leave to amend the Complaint. Always "freely given," leave to
amend would be especially warranted here because this case is in its infancy and because the
amendment would be Plaintiffs' first opportunity to address any alleged pleading defect. *Johnson*
*v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). There has been no delay or bad faith,
Defendants cannot claim prejudice, and an amendment would not be futile because it is clearly "at
least possible" to cure any perceived defect. *In re Xe Servs.*, 665 F. Supp. at 592.

## <u>CONCLUSION</u>

The Complaint thoroughly details AMP's and WESPAC's deliberate aid to the horrific
terror attacks on October 7, 2023. Under well-established legal principles, they are liable to
Plaintiffs for supporting Hamas's crimes. The motions to dismiss should therefore be denied.

Date: September 19, 2024

Respectfully submitted,

*Counsel for Plaintiffs Maya Parizer, Ariel Ein-Gal, Hagar Almog, Adin Gess, Noach Newman, Natalie Sanandaji, Yoni Diller, David Bromberg, and Lior Bar Or*

By:  */s/ Jason Torchinsky*
     Jason Torchinsky

**GREENBERG TRAURIG, LLP**
SCOTT BORNSTEIN*
bornsteins@gtlaw.com
RICHARD EDLIN*
edlinr@gtlaw.com
RICHARD ROSENBAUM*
rosenbaumr@gtlaw.com
HAL SHAFTEL*
shaftelh@gtlaw.com
One Vanderbilt Avenue
New York, New York 10017
T. 212.801.9200

**GREENBERG TRAURIG, P.A.**
BRADFORD KAUFMAN*
kaufmanb@gtlaw.com
777 South Flagler Drive
Suite 300
East West Palm Beach,
Florida 33401
T. 561.650.7900
ZACHARY NEEDELL*
zachary.needell@gtlaw.com
401 East Las Olas Boulevard,
Suite 2000
Fort Lauderdale, Florida
33301
T. 954.765.0500

**LAW OFFICES OF
DAVID SCHOEN**
DAVID SCHOEN*
schoenlawfirm@gmail.com 2800
Zelda Road, Suite 100-6
Montgomery, Alabama 36106
T. 334.395.6611

**HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC**
JASON TORCHINSKY
Va. Bar No. 47481
jtorchinsky@holtzmanvogel.com
JONATHAN FAHEY
Va. Bar No. 44854
jfahey@holtzmanvogel.com
ERIELLE DAVIDSON*
edavidson@holtzmanvogel.com
2300 N. Street NW, Suite 643
Washington D.C. 20037
PHILLIP GORDON
Va. Bar No. 95621
pgordon@holtzmanvogel.com
JOHN CYCON
Va. Bar No. 100104
jcycon@holtzmanvogel.com
DANIEL BRUCE
Va. Bar No. 98120
dbruce@holtzmanvogel.com
15405 John Marshall Hwy
Haymarket, VA 20169
T. 202.737.8808

**NATIONAL JEWISH ADVOCACY
CENTER**
MARK GOLDFEDER*
mark@jewishadvocacycenter.org
BEN SCHLAGER*
ben@jewishadvocacycenter.org
ANAT BECK*
Anat@jewishadvocacycenter.org
National Jewish Advocacy Center, Inc.
International Legal Forum
1718 General George Patton Drive
Brentwood, TN 37027
T. (800) 269-9895

*Admitted Pro Hac Vice*

## <u>Certificate of Service</u>

I hereby certify that on September 19, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>*/s/ Jason Torchinsky*</u>
JASON TORCHINSKY
Va. Bar No. 47481
**HOLTZMAN VOGEL BARAN**
**TORCHINSKY & JOSEFIAK, PLLC**
2300 N. Street NW, Suite 643
Washington D.C. 20037
T. 202.737.8808
jtorchinsky@holtzmanvogel.com
*Counsel for Plaintiffs*
