**EXHIBIT A**


Neutral
As of: March 13, 2025 8:17 PM Z

# *Jan v. People Media Project*

United States District Court for the Western District of Washington

January 31, 2025, Decided; January 31, 2025, Filed

Case No. 3:24-cv-05553-TMC

**Reporter**
2025 U.S. Dist. LEXIS 18021 *; 2025 WL 359009

ALMOG MEIR JAN, Plaintiff, v. PEOPLE MEDIA PROJECT ET AL, Defendant.

## Core Terms

aiding and abetting, allegations, articles, international law, propaganda, terrorism, imprisonment, hostage, publish, courts, extraterritoriality, violations, accomplice liability, cause of action, kidnapping, compensating, caution, motion to dismiss, foreign policy, federal court, actus reus, terrorist, advocacy, matter of public concern, substantial assistance, substantial effect, actual knowledge, relations, civilian, culpable

**Counsel:** [*1] For Almog Meir Jan, Plaintiff: David I Schoen, LEAD ATTORNEY, PRO HAC VICE, DAVID I SCHOEN ATTORNEY AT LAW, MONTGOMERY, AL; Erielle Davidson, John J Cycon, LEAD ATTORNEYS, PRO HAC VICE, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC (VA), HAYMARKET, VA; Jason Brett Torchinsky, LEAD ATTORNEY, PRO HAC VICE, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC, WASHINGTON, DC; Mark Goldfeder, LEAD ATTORNEY, PRO HAC VICE, NATIONAL JEWISH ADVOCACY CENTER INC, WEST HEMPSTEAD, NY; Phillip M Gordon, LEAD ATTORNEY, PRO HAC VICE, NAMAN HOWELL SMITH & LEE PLLC, WACO, TX; Blair Michael Russ, Aric S Bomsztyk, TOMLINSON BOMSZTYK RUSS, SEATTLE, WA.

For People Media Project, a Washington Non-Profit Corporation, doing business as, Palestine Chronicle, Ramzy Baroud, John Harvey, Defendants: Daniel M Kovalik, LEAD ATTORNEY, PRO HAC VICE, DANIEL M KOVALIK, PITTSBURGH, PA; Ralph Hurvitz, SEATTLE, WA.

**Judges:** Tiffany M. Cartwright, United States District Judge.

**Opinion by:** Tiffany M. Cartwright

## Opinion

ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

### I. INTRODUCTION

On October 7, 2023, Hamas carried out a terrorist attack in Israel, killing an estimated 1,200 people and taking 254 individuals hostage. Plaintiff Almog Meir Jan is an Israeli [*2] citizen who

was kidnapped on October 7 and held hostage by Hamas operative Abdallah Aljamal before being rescued by the Israel Defense Forces. Defendants are People Media Project, its individual officers Ramzy Baroud and John Harvey, and unnamed Doe Defendants 1 through 10.

Jan alleges that Defendants employed and compensated Aljamal as a journalist and provided him a U.S.-based platform to publish articles supporting Hamas. Jan asserts that through these actions, Defendants aided and abetted his kidnapping and imprisonment as well as aided and abetted terrorism in violation of the *Alien Tort Statute (ATS), 28 U.S.C. § 1350*.

Defendants moved to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, arguing that Jan's allegations are insufficient to state a plausible claim that Defendants aided and abetted his kidnapping and Hamas's acts of terrorism. Defendants also assert that their decision to publish Aljamal's articles is protected by the *First Amendment*, and that Jan's claims do not overcome the ATS's presumption against extraterritoriality because the conduct relevant to the ATS's focus—kidnapping and imprisoning a civilian hostage—occurred outside the United States. In response, Jan argues that the ATS recognizes aiding and abetting as a cause of action, and that aiding and **[*3]** abetting illegal conduct is not protected speech. By compensating Aljamal and providing him a U.S.-based platform to publish articles justifying Hamas's actions, Jan argues that Defendants materially supported terrorism. Jan asserts that this domestic conduct is the gravamen of his ATS claims and is sufficient to overcome the presumption against extraterritoriality.

Based on the Ninth Circuit's standard for ATS accomplice liability, Jan's allegations that Defendants paid Aljamal while he held Jan captive in his home could support a claim for aiding and abetting—but only if Defendants knew they were paying a Hamas operative. Because Jan's complaint does not allege actual knowledge, his claims based on compensating Aljamal as a journalist must be dismissed. Because Jan's claims based on the contents of Defendants' articles are shielded by the *First Amendment's* protection of speech on matters of public concern, those claims must be dismissed as well.

The Court therefore GRANTS the Defendants' motion to dismiss. But because the deficiencies in Jan's complaint could conceivably be cured through the allegation of other facts, the Court also GRANTS Jan leave to amend. If Jan chooses to amend his complaint, **[*4]** he must do so no later than February 21, 2025.

## II. BACKGROUND

The following facts are those alleged in the complaint. Dkt. 1. Because the Court is considering a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, Jan's factual allegations must be taken as true and construed in the light most favorable to him. *See Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014)*.

Jan was kidnapped from the Nova Music Festival and held hostage in Gaza by Abdallah Aljamal. Dkt. 1 ¶¶ 46-48. He was held for 246 days before being rescued on June 8, 2024 by the Israel Defense Forces. *Id.* ¶ 58. Jan asserts that since May 2019, Defendant People Media Project, doing business as the Palestine Chronicle, "provided Hamas Operative Aljamal with

support and a U.S.-based platform to publish Hamas propaganda under the guise of independent journalism and compensated [him] for his contributions." *Id.* ¶¶ 10, 37. Jan alleges "Hamas Operative Aljamal's publications follow[ed] Hamas's well-known 'war-by-propaganda' strategy by attempting to exploit the international community's response to civilian casualties and blaming Israel for its reasonable response to Hamas's atrocities on October 7." *Id.* ¶ 50. For example, Jan asserts that the Palestine Chronicle published "a propaganda piece by Hamas Operative [*5] Aljamal calling October 7 a 'daring attack' and accusing Israel of starting a 'war on the Gaza population' in order to 'forcefully displace Palestinians from their homeland.'" *Id.* ¶ 51.

Defendant Ramzy Baroud is the Editor-in-Chief of the Palestine Chronicle and is responsible "for editorial, content, and management decisions." *Id.* ¶ 11. Defendant John Harvey is a Governor of People Media Project and "responsible for management and financial decisions of the Palestine Chronicle." *Id.* ¶ 12. Jan also alleges that political advocacy by Defendants Baroud and Harvey shows they have "close ties" with Hamas. *Id.* ¶¶ 22-29. In December 2020, Defendant Baroud participated in a webinar hosted by the American Muslims for Palestine where he "espoused familiar Hamas propaganda, including accusing Israel of ethnically cleansing Palestinians and calling for the defeat of Zionism." *Id.* ¶ 26. Defendant Harvey "organized a campaign in 2007 to establish the Gaza Strip's Rafah neighborhood—a Hamas stronghold—as Olympia, Washington's sister city." *Id.* ¶ 28. Jan alleges that, as Governors of the Palestine Chronicle, Defendants Baroud and Harvey "aligned the Palestine Chronicle's mission and content with Hamas" [*6] and "disseminated Hamas propaganda to the Palestine Chronicle's readers in the United States." *Id.* ¶¶ 29-30.

Jan brings two claims under the ATS, 28 U.S.C. § 1350. *Id.* ¶¶ 67-90. First, Jan alleges that, by compensating Aljamal as an employee and providing a platform to publish his articles, "Defendants aided and abetted Hamas Operative Aljamal in cooperating in the kidnapping of Plaintiff and imprisoning Plaintiff as a hostage in his home[.]" *Id.* ¶ 76. Second, Jan alleges that, in doing so, "Defendants aided and abetted Hamas's acts of terrorism on October 7 and after" and "materially supported Hamas, a designated foreign terrorist organization, in violation of international law." *Id.* ¶ 89.

On September 12, 2024, Defendants filed a motion to dismiss. Dkt. 27. Jan responded, Dkt. 33, and Defendants replied, Dkt. 36. Defendants then filed a motion to stay discovery. Dkt. 34. The Court granted the motion to stay discovery pending the Court's ruling on the motion to dismiss. Dkt. 39.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which [*7] relief can be granted." Rule 12(b)(6) motions may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs. Inc., 622 F.3d 1035, 1041 (9th Cir. 2010)* (citation omitted). To survive a Rule 12(b)(6) motion, the complaint "does not need detailed

Case 1:24-cv-00724-RDA-IDD   Document 148-1   Filed 03/21/25   Page 4 of 15 PageID# 1271

Page 4 of 15
2025 U.S. Dist. LEXIS 18021, *7

factual allegations," *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Boquist v. Courtney, 32 F.4th 764, 773 (9th Cir. 2022)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal, 556 U.S. at 678*).

The Court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party," *Retail Prop. Tr., 768 F.3d at 945*, but need not "accept as true a legal conclusion couched as a factual allegation," *Twombly, 550 U.S. at 555*. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555* (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678*.

## IV. [*8] DISCUSSION

### A. Aiding and Abetting Liability Under the ATS

The entirety of the ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of the nations or a treaty of the United States." *28 U.S.C. § 1350*. After its enactment by the First Congress in 1789, the ATS lay mostly dormant for nearly two hundred years. But in 1980, the Second Circuit in *Filartiga v. Pena-Irala* allowed two citizens of Paraguay to pursue a claim that the defendant had tortured and killed their family member in retaliation for their political beliefs, in violation of international law. *630 F.2d 876 (2d Cir. 1980)*. *Filartiga* led to a wave of litigation seeking to hold corporations liable "for alleged human rights violations in other nations." *Jesner v. Arab Bank, PLC, 584 U.S. 241, 256, 138 S. Ct. 1386, 200 L. Ed. 2d 612 (2018)*.

The Supreme Court first interpreted the ATS in *Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)*. In *Sosa*, the Supreme Court sought to clarify whether the ATS is only a jurisdictional statute or whether it creates a cause of action for a violation of the law of nations. *Id. at 699*. The Supreme Court concluded that while "the statute is in terms only jurisdictional . . . at the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by **[*9]** the law of nations and recognized at common law." *Id. at 712*. In 1789, the Court explained, "the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations," particularly "those torts corresponding to Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id. at 724*. District courts may thus hear claims under the ATS "based on the present-day law of nations," so long as they "rest on a norm of international character accepted by the civilized world and defined with a specificity

comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized." *Id. at 725*.

The holding in *Sosa* has since been described as "prescribing a two-part test for determining whether a new cause of action may be recognized under the ATS." *Doe I v. Cisco Sys., Inc., 73 F.4th 700, 714 (9th Cir. 2023)*; *see Sosa, 542 U.S. at 732-33*. First, the alleged violation must be of an international norm that is "specific, universal, and obligatory." *Sosa, 542 U.S. at 732* (quoting *In re Est. of Ferdinand Marcos, Hum. Rts. Litig., 25 F.3d 1467, 1475 (9th Cir. 1994)*). Second, federal courts must evaluate "whether allowing this case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific **[*10]** authority before [a new form of liability] can be imposed." *Jesner, 584 U.S. at 258* (plurality op.) (citing *Sosa, 542 U.S. at 732-33*).

As an initial matter, Defendants do not contest that the underlying torts committed against Jan by Aljamal and Hamas—the kidnapping and imprisonment of a civilian hostage—are international human rights violations that are actionable under the ATS. *See generally* Dkt. 27; Dkt. 33; Dkt. 36. The Court thus turns to whether Jan may pursue claims against Defendants for allegedly aiding and abetting those torts.

*1. Sosa's First Step*

In *Doe I v. Cisco*, the Ninth Circuit held that "aiding and abetting liability is a norm of customary international law with sufficient definition and universality to establish liability under the ATS." *73 F.4th 700, 717 (9th Cir. 2023)*.

The Ninth Circuit noted that it had recognized aiding and abetting liability in previous ATS cases. *Id. at 716-17*; *see Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1023 (9th Cir. 2014)* (*Nestle I*); *Doe I v. Unocal Corp., 395 F.3d 932, 947-51 (9th Cir. 2002)*. The court also explained that authoritative sources of international law have identified forms of accomplice liability for international law violations. *Id. at 718*; *see Khulumani v. Barclay Nat. Bank Ltd., 504 F.3d 254, 268-76 (2d Cir. 2007)*, aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza, 553 U.S. 1028, 128 S. Ct. 2424, 171 L. Ed. 2d 225 (2008) (Katzmann, R., concurring) (reviewing numerous treaties and conventions, decisions of criminal international tribunals, actions of the U.N. Security Council, and the Rome Statute of the International **[*11]** Criminal Court and concluding that aiding and abetting liability is sufficiently well-established and universally recognized).

The Ninth Circuit observed that since the Second Circuit's decision in *Khulumani*, the Fourth and Eleventh Circuits have also recognized accomplice liability under the ATS, and no circuit has held otherwise. *Cisco Sys., Inc., 73 F.4th at 718*. Given the consensus among circuit courts and the universality of aiding and abetting liability in international law, the Ninth Circuit concluded that "aiding and abetting liability is sufficiently definite and universal to be a viable form of liability under the ATS." *Id.* Accordingly, Jan's aiding and abetting claims satisfy *Sosa*'s first requirement. *See* Dkt. 1 at 16-20.

*2. Sosa's Second Step*

Case 1:24-cv-00724-RDA-IDD   Document 148-1   Filed 03/21/25   Page 6 of 15 PageID# 1273

Page 6 of 15
2025 U.S. Dist. LEXIS 18021, *11

But even when an international law norm is sufficiently definite and universal, federal courts must exercise caution before allowing a case to proceed under the ATS. *Cisco, 73 F.4th at 718-19*. The second step of the analysis requires courts to consider "two broad categories of inquiry: foreign policy consequences and deference to Congress." *Id. at 719* (first citing *Sosa, 542 U.S. at 732-33*; then citing *Jesner, 584 U.S. at 264-65* (plurality op.)).

First, courts must assess the "practical consequences of making [a] cause available to litigants in federal courts" and [*12] its foreign policy implications. *Sosa, 542 U.S. at 732-33*; *Cisco, 73 F.4th at 719*. "Of gravest concern in *Sosa* was the risk of U.S. courts interfering with the sovereign actions of another government." *Cisco, 73 F.4th at 719*. To mitigate these concerns, courts must adhere to the original purpose of the statute and consider whether a cause of action under the ATS will "promote harmony in international relations by ensuring foreign plaintiffs a remedy for international-law violations in circumstances where the absence of such a remedy might provoke foreign nations to hold the United States accountable." *Jesner, 584 U.S. at 270* (plurality op.); *see Cisco, 73 F.4th at 719*.

For example, in *Jesner v. Arab Bank, PLC*, the petitioners brought claims under the ATS against a foreign bank on behalf of individuals who had been "injured or killed by terrorist acts committed abroad." *584 U.S. at 248*. They alleged that Arab Bank's officials "allowed the bank to be used to transfer funds to terrorist groups in the Middle East, which in turn enabled or facilitated criminal acts of terrorism." *Id.* In holding that it lacked the authority to recognize an ATS cause of action against foreign corporations without further direction from Congress, the Supreme Court concluded that claims against foreign corporations failed step two of the *Sosa* analysis.

The Court explained [*13] that the case against Arab Bank "well illustrates the perils of extending the scope of ATS liability to foreign multinational corporations." *Id. at 271*. It noted that for thirteen years, the litigation had "caused significant diplomatic tension with Jordan," referencing the U.S. State Department's amicus brief describing Jordan as "a critical ally in one of the world's most sensitive regions." *Id. at 271*. Furthermore, the Hashemite Kingdom of Jordan had filed an amicus brief objecting to the litigation and calling it a "grave affront" to its sovereignty that "threatens to destabilize Jordan's economy and undermine its cooperation with the United States." *Id.* Because such lawsuits against foreign corporate defendants "create unique problems" with potential to trigger "the very foreign-relations tensions the First Congress sought to avoid," the Supreme Court concluded that only Congress could extend liability to foreign corporations in ATS suits. *Id. at 272*.

Second, federal courts must consider "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." *Id. at 264* (quoting *Ziglar v. Abbasi, 582 U.S. 120, 136, 137 S. Ct. 1843, 198 L. Ed. 2d 290 (2017)*); *see Cisco, 73 F.4th at 720*. *Sosa* cautioned courts against interfering with the discretion of the executive and legislative branches [*14] in managing foreign policy, pointing out that the ATS may raise separation-of-powers issues. *542 U.S. at 728*.

In this case, potential foreign relations consequences and traditional deference to Congress should not preclude Jan from pursuing his claims of accomplice liability under the ATS. Permitting his claims to proceed does not "trigger *Sosa*'s principal foreign policy concern" that

Case 1:24-cv-00724-RDA-IDD   Document 148-1   Filed 03/21/25   Page 7 of 15 PageID# 1274

Page 7 of 15
2025 U.S. Dist. LEXIS 18021, *14

"ATS claims could impose liability on sovereign nations for behavior with respect to their own citizens." *Cisco, 73 F.4th at 720* (citing *Sosa, 542 U.S. at 727*). Jan's ATS suit is against private U.S. defendants. It does not "raise the same international comity and sovereignty issues" that a suit against a sovereign nation would. *Id.* Additionally, unlike in *Jesner*, there have been no objections or attempts to weigh in on the case by any government. *See generally* Dkt. 27; Dkt. 33; Dkt. 36; *Jesner, 584 U.S. at 271-72*. The absence of statements by the U.S. or a foreign government suggests that this case will not create significant diplomatic tensions. *See Jesner, 584 U.S. at 271*; *see also Cisco, 73 F.4th at 722* ("The State Department's passive approach in cases such as the one before us, in which no foreign government actor or head of state is directly party to the suit, offers support for the conclusion that the State Department views such cases [*15] as less likely to harm foreign relations.").

Furthermore, recognizing accomplice liability in cases such as this may better serve the original purpose of the ATS by providing "a forum for violations of international law that, if lacking, could cause foreign relations strife or 'embarrass[ment]' to the United States." *Cisco, 73 F.4th at 720* (quoting *Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 123, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013)*). Jan alleges that two individuals and a corporation based in the United States aided and abetted the kidnapping and imprisonment of an Israeli citizen. In those circumstances, a plaintiff's foreign government would likely support the provision of "a forum in which U.S. citizens and corporations can be held accountable for violating well-defined and universal international norms." *See id. at 721*.

*3. Political Question*

Defendants also argue that the political question doctrine[1] bars Jan's claims from being heard because the case improperly interferes with the separation of powers. Dkt. 27 at 13, 21 (citing *Def. for Children International-Palestine v. Biden, 714 F. Supp. 3d 1160, 1164 (N.D. Cal.)*, aff'd, *107 F.4th 926 (9th Cir. 2024)*. Defendants argue that Jan's claims raise similar non-justiciable political questions. *Id.* at 21. This argument is unpersuasive. In *Defense for Children*, the plaintiffs sought a preliminary injunction against the Biden administration to prevent military and financial support to Israel [*16] for its attacks on Gaza in response to October 7. *714 F. Supp. 3d at 1162*. The district court reasoned, "[w]hether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations," and when Congress and the President have determined such assistance is necessary it is "inappropriate for judicial resolution." *Id. at 1166* (citing *Corrie v. Caterpillar, Inc., 503 F.3d 974, 983 (9th Cir. 2007)*) (internal quotations omitted). Jan is not challenging foreign policy decisions that are committed to the political branches. He is asserting an individual aiding and abetting tort claim against private U.S. Defendants. *See* Dkt. 1 ¶¶ 9-13; *Def. for Child. Int'l-Palestine, 714 F. Supp. 3d at 1165*. While Defendants point to the United States' role in brokering negotiations between

---

[1] Defendants also assert that "[u]nder the [ATS], plaintiffs are generally required to exhaust remedies in their home country before seeking relief in U.S. courts." Dkt. 27 at 12. Since Jan has not exhausted remedies available in the Israeli legal system, Defendants argue that his claims should be dismissed. *Id.* at 13. Though the Supreme Court in *Sosa* acknowledged the European Commission's argument as amicus curiae that international law principles require exhaustion of remedies in the plaintiff's home country, it did not adopt exhaustion as a requirement. *Sosa, 542 U.S. at 733 n.21*.

Israel and Hamas on a cease-fire agreement, Dkt. 27 at 13, they do not identify an ATS-specific caution that is pertinent to this case. *See Cisco, 73 F.4th at 722* ("To be sure, under *Sosa*'s step two, caution from Congress against recognizing a particular form of international law liability under the ATS would be relevant. But, again, there is no ATS-specific caution pertinent here.").

There are no foreign policy concerns that caution against recognizing Jan's claims under the ATS that a U.S. corporation and U.S. individuals aided **[*17]** and abetted his imprisonment. Nor is there evidence that Congress would oppose recognizing this kind of ATS action. *See id. at 724*. The Court thus concludes that Jan has satisfied *Sosa*'s second step and—if his factual allegations meet the Ninth Circuit's standard for accomplice liability—he may pursue his aiding and abetting claims under the ATS.

### B. Aiding and Abetting Standard

In *Cisco*, the Ninth Circuit explained that customary international law supplies the standard for accomplice liability. *73 F.4th at 724*. The plaintiff must plausibly allege that the defendant engaged in a sufficient *actus reus* and had the requisite *mens rea. Id.* The Ninth Circuit adopted the "global consensus" that the "*actus reus* of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation." *Id.* (collecting cases). And the Ninth Circuit joined the Eleventh Circuit in holding that the "*mens rea* for aiding and abetting liability under customary international law is knowing assistance." *Id.* (citations omitted). Because this standard is analogous to the aiding-and-abetting provision of the Justice Against Sponsors of Terrorism Act (JASTA), which imposes civil liability on anyone "who **[*18]** aids and abets, by knowingly providing substantial assistance" to an "act of international terrorism," *18 U.S.C. § 2333(d)(2)*, this Court also looks for guidance to the Supreme Court's recent decision interpreting JASTA in *Twitter v. Taamneh, 598 U.S. 471, 143 S. Ct. 1206, 215 L. Ed. 2d 444 (2023)*.

In *Twitter*, the Supreme Court explained that frameworks for analyzing accomplice liability are meant "to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *598 U.S. at 504*. "Importantly, the concept of 'helping' in the commission of a crime—or a tort—has never been boundless. That is because, if it were, aiding-and-abetting liability could sweep in innocent bystanders as well as those who gave only tangential assistance." *Id. at 488*. But "[t]he point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue." *Id. at 506*.

Thus, when assessing whether a defendant has "given knowing and substantial assistance to the primary tortfeasor," courts have often "viewed those twin requirements as working in tandem, with a lesser showing of one demanding a greater showing of the other." *Id. at 491-92*. This flexible analysis is meant **[*19]** "to ensure that liability fell only on those who had abetted the underlying tort through conscious, culpable conduct." *Id. at 492* (internal quotation marks and citation omitted).

In the context of JASTA, the Court in *Twitter* clarified that "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating

above all the actionable wrongs that constitute it." *Id. at 495*. "Rather, a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism." *Id.* In *Twitter*, because the plaintiffs were victims of the 2017 ISIS attack on the Reina nightclub in Istanbul, Turkey, they had to "plausibly allege that defendants aided and abetted ISIS in carrying out that attack." *Id. at 497*. Similarly, the Ninth Circuit in *Cisco* explained that in evaluating the *actus reus* requirement for aiding-and-abetting liability under the ATS, "courts consider the cumulative contribution a defendant makes to *the* alleged violation" of international law. *Cisco, 73 F.4th at 725* (emphasis added).

Here, then, Jan must plausibly allege that Defendants aided and abetted the tort for which he seeks to hold them **[*20]** liable—his kidnapping on October 7 and imprisonment as a hostage. Jan's allegations of how Defendants did so fall into two categories: (1) allegations based on Defendants paying money to Aljamal for his articles ("the compensation allegations"), and (2) allegations based on the content of Aljamal's articles that Defendants chose to publish ("the propaganda allegations"). The Court analyzes each category in turn.

*1. The Compensation Allegations*

In the compensation allegations, Jan alleges that Defendants "employed" Aljamal. Dkt. 1 ¶ 4. He alleges that the Palestine Chronicle began publishing articles from Aljamal in May 2019 and "compensated [him] for his contributions." *Id.* ¶¶ 32, 37. After the events of October 7, 2023, the Palestine Chronicle continued to publish pieces by Aljamal, "often publishing two to three pieces per day." *Id.* ¶ 49. Jan alleges that during the time he was held captive in Aljamal's home, Defendants continued to pay Aljamal for his articles. *Id.* ¶ 56. Jan incorporates screenshots from the Palestine Chronicle's website that, shortly before Jan's rescue, described Aljamal as a "correspondent for The Palestine Chronicle"—before changing his description to a "freelance **[*21]** contributor" after Jan was rescued and Aljamal was identified as one of his captors. *Id.* ¶¶ 61-62. Jan alleges that "the compensation Defendants paid Hamas Operative Aljamal for his propaganda directly enabled him to imprison Plaintiff in his home." *Id.* ¶ 65.

Under the Ninth Circuit's standard in *Cisco*, these allegations meet the *actus reus* requirement for ATS liability. This requirement is met if "a defendant provides assistance, of any kind, with substantial effect on the perpetration of an international law violation." *Cisco, 73 F.4th at 725*. Courts assess the effect of a defendant's actions not by determining whether each individual action had a substantial effect, but by considering the "cumulative contribution" a defendant made to the alleged international law violation. *Id. at 725-26*. Assistance does not "need to be used for exclusively criminal purposes to be actionable." *Id. at 728-29*.

As an example, the Ninth Circuit cited a proceeding before the Sierra Leone Tribunal Appeals Chamber in which an act of substantial assistance was "the provision of a guesthouse" that was used both for "ongoing peace negotiations" and "to facilitate the transfer of arms, ammunition, and funds" used to commit war crimes. *Id. at 729* (internal quotation marks **[*22]** and citation omitted). The Ninth Circuit also pointed to a "canonical post-World War II tribunal case in which the defendant was convicted of contributing money to a criminal organization," in which the tribunal noted that it was "immaterial whether the money was spent on salaries or lethal gas." *Id.*

(cleaned up). The timing of a defendant's alleged contributions is also relevant to whether they had a substantial effect. *Id. at 728* (timing of Cisco's technological assistance showed it had substantial effect on human rights violations against Falun Gong practitioners).

Here, Jan alleges that Defendants enabled Jan's imprisonment by employing Aljamal and paying him for articles, as many as two or three pieces a day, during the time that Aljamal kept Jan as a hostage inside his home. *See* Dkt. 1 ¶¶ 32, 37, 49. Although Jan does not allege specific amounts of money, the timing and extent of Aljamal's employment support the conclusion that these payments provided assistance with substantial effect on Jan's captivity. *See Cisco, 73 F.4th at 728*. This meets the *actus reus* requirement for ATS liability.

But for his claims to proceed, Jan's allegations must also satisfy the *mens rea* requirement—that the assistance was "knowing." **[*23]** *Id. at 729-30*. Jan's current complaint does not meet this standard. Jan does not allege that Defendants knew Aljamal was holding Israeli civilians hostage; that he had participated in any acts of terrorism, related to October 7 or otherwise; or even, critically, that Aljamal was a Hamas operative in the months following the October 7 attacks. *See generally* Dkt. 1. Jan alleges only that, because Aljamal had served at some point as a spokesperson for the Hamas-run Ministry of Labor in Gaza, and he and Defendant Baroud were from the same Gaza town, "Defendants knew or should have known that Hamas operative Aljamal was an operative and official spokesperson for Hamas." *Id.* ¶¶ 33-36.

"Knew or should have known" is a negligence standard. *Ratha v. Phatthana Seafood Co., 35 F.4th 1159, 1177 (9th Cir. 2022)*. "And negligence is a less culpable mental state than actual knowledge or recklessness." *Id.* (cleaned up). Jan relies primarily on two statements from the Ninth Circuit in *Cisco*: first, that an aider or abettor need not "know the precise crime that was intended and was in fact committed," so long as they are "aware that one of a number of crimes will probably be committed, and one of those crimes is committed"; and second, that "when ongoing abuses are common knowledge, knowing **[*24]** action may be imputed to the defendant." *73 F.4th at 734* (cleaned up); *see* Dkt. 37 at 6-7. This language could help Jan if his complaint alleged that Defendants had actual knowledge that Aljamal was a Hamas operative on or after October 7, when it was commonly known that Hamas was holding Israeli hostages in Gaza. But because the current complaint alleges only that Defendants *should* have known Aljamal's affiliation with Hamas, it does not meet the Ninth Circuit's *mens rea* standard for liability under the ATS.

This result is also consistent with the Supreme Court's guidance in *Twitter* on aiding and abetting liability. As discussed above, the Court in *Twitter* repeatedly cautioned that "[t]he point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue," and that accomplice liability must be applied in a way to avoid "sweep[ing] in innocent bystanders as well as those who gave only tangential assistance." *598 U.S. at 488, 506*. Nowhere in Jan's complaint does he allege that Defendants gave Aljamal money for the purpose of committing terrorism or aiding Hamas. Instead, he seeks to hold them liable for compensating Aljamal for writing articles, because Aljamal used that money **[*25]** to enable Jan's imprisonment.

This context underscores the importance of the actual knowledge requirement. Without that boundary, organizations working in international conflict zones could be "swept in" to ATS

liability for unwittingly employing residents to carry out legitimate tasks—reporting, taking photographs, distributing food and medical supplies—if those individuals turned out to have used their legitimate salaries to participate in human rights violations. The actual knowledge requirement guards against this expansion and ensures that "courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id. at 504*. Because Jan's complaint does not allege actual knowledge, his compensation allegations must be dismissed.

2. The Propaganda Allegations

Jan's remaining claims arise not from Defendants paying Aljamal for his articles, but from their decision to publish the articles' contents. Jan alleges that by publishing Aljamal's articles, Defendants gave him a "platform to write and disseminate Hamas propaganda," aiding and abetting Hamas by garnering [*26] sympathy and attracting support for its cause. Dkt. 1 ¶¶ 4-6, 19-21, 49-56.

For the same reasons discussed above, even if some form of propaganda could satisfy the *actus reus* requirement, Jan's allegations would fail because he does not allege knowing assistance in the tort at issue—Jan's kidnapping and imprisonment. *See Twitter, 598 U.S. at 495* ("[I]t is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it. Rather, a defendant must have aided and abetted . . . another person in the commission of the actionable wrong[.]") But Defendants argue that the propaganda allegations also must be dismissed for another reason—the contents of the articles are core political speech and Defendants' decision to publish them is protected by the *First Amendment*. *See* Dkt. 27 at 20-24.

"The *Free Speech Clause of the First Amendment*—'Congress shall make no law . . . abridging the freedom of speech'—can serve as a defense in . . . tort suits." *Snyder v. Phelps, 562 U.S. 443, 451, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)*. In *Snyder*, members of the Westboro Baptist Church picketed the funeral of Marine Lance Corporal Matthew Snyder, who had been killed in Iraq in the line of duty. *Id. at 448*. The picketers held signs with messages such as: "Thank God for [*27] 9/11," "God Hates the USA," and "Thank God for IEDs." *Id.* Lance Corporal Snyder's father sued the picketers for intentional infliction of emotional distress, and a jury awarded him over $10 million in compensatory and punitive damages. *Id. at 449-50*. On appeal, the Supreme Court overturned the verdict, concluding that the *First Amendment* shielded the picketers from tort liability because they were speaking on matters of public concern. *Id. at 454*.

The *First Amendment's* protection for the freedom of speech applies to both the individual and corporate defendants here. *Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 342, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)*. *First Amendment* protection for the speech of corporations "has been extended by explicit holdings to the context of political speech." *Id.* Here, as in *Snyder*, whether the *First Amendment* prohibits holding Defendants liable for their articles turns largely on (1) whether their speech is of public concern, and (2) whether their speech is limited to theoretical political advocacy, rather than speech meant to incite or produce unlawful activity.

See Snyder, 562 U.S. at 451; Brandenburg v. Ohio, 395 U.S. 444, 447-48, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969).

It is true, as Jan argues, that "speech that constitutes criminal aiding and abetting is not protected by the First Amendment." Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 329 (D. Mass. 2013); see United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982) ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes, including that [*28] of aiding and abetting, frequently involve the use of speech as part of the criminal transaction."). To determine when speech that relates to political advocacy loses its protection, the Supreme Court has distinguished between theoretical advocacy and "speech that is meant to induce or precipitate illegal activity." Sexual Minorities Uganda, 960 F. Supp. 2d at 329; see United States v. Williams, 553 U.S. 285, 298-99, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ("[T]here remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality.").

Brandenburg provides one of the most famous examples. The defendant in Brandenburg was "a leader of a Ku Klux Klan group," who was convicted under an Ohio statute that criminalized "advocating . . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." 395 U.S. at 444-45. The defendant invited reporters to film a KKK rally, where the participants (some carrying weapons) burned a cross and Brandenburg spoke. Id. at 445-47. Brandenburg used racial slurs to advocate that Black Americans should be "returned to Africa" and Jewish Americans "returned to Israel," and stated that "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible [*29] that there might have to be some revengeance taken." Id. at 446-47.

Reversing Brandenburg's conviction, the Supreme Court held "that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447. The Court explained that "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." Id. at 448 (quoting Noto v. United States, 367 U.S. 290, 297-98, 81 S. Ct. 1517, 6 L. Ed. 2d 836 (1961)). The Constitution distinguishes between supporting the political goals of an organization—even a violent one—and either inciting imminent unlawful conduct or using speech for "management of actual crimes." Sexual Minorities Uganda, 960 F. Supp. 2d at 329.

This Court, then, must examine the speech that Jan alleges served to aid and abet Hamas and decide into which category it falls. Jan's complaint alleges that Defendants published articles written by Aljamal with the following content:

- "[O]n October 23, 2023, Defendants published a propaganda piece by Hamas Operative Aljamal calling October 7 [*30] a 'daring attack' and accusing Israel of starting a 'war on the Gaza population' in order 'to forcefully displace Palestinians from their homeland.'" Dkt. 1 ¶ 51.

- "Other pieces highlighted Palestinians killed or injured in Israel's targeted responses to Hamas's attack . . . ." *Id.* ¶ 52.

- "[W]hen Hamas falsely claimed that it captured Israeli soldiers in Jabaliya, Hamas Operative Aljamal wrote an article repeating that false claim on Defendants' platform." *Id.* ¶ 53.

- "Aljamal even eulogized known Hamas terrorists. . . . Aljamal accused Israel of assassinating Iyad Maghari, the mayor of Nuseirat. . . . Aljamal's propaganda piece painted Maghari as a hero and martyr . . . Aljamal failed to mention that, according to the IDF, Maghari was a terrorist 'with an extensive history in Hamas.'" *Id.* ¶ 54.

- "Aljamal was instrumental in spreading misinformation about an Israeli airstrike that targeted a school run by the United Nations Relief and Works Agency . . . Aljamal called the attack a 'gruesome massacre' and accused Israel of 'targeting displaced civilians.'" *Id.* ¶ 55.

There is no question that, as in *Snyder*, this is core political speech addressing matters of public concern. "Speech deals with **[*31]** matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder, 562 U.S. at 453* (internal quotation marks and citations omitted). "Speech on matters of public concern is at the heart of First Amendment protection," *id. at 451-52*, because "[t]he First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id. at 452* (quoting *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*). The terrorist attacks on October 7, and Israel's military response, are subjects of extensive news interest and political concern to the global community. The articles Defendants publish in the Palestine Chronicle are intended to convey their "position on those issues, in a manner designed . . . to reach as broad a public audience as possible." *Id. at 454*. Many of the positions taken by the Chronicle, such as highlighting the deaths of Palestinian civilians and criticizing Israeli airstrikes, have been echoed by countless news organizations, protesters, and political leaders around the world.

These articles do not cross the line from protected **[*32]** speech to inciting or preparing for unlawful activity. Nothing in the complaint alleges that Defendants advocated for, incited, or planned specific human rights violations. Even taken as true, Jan's allegations that the articles unfairly characterize or falsely report Israel's military actions do not change the protected nature of political speech. The Supreme Court has long recognized that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the breathing space they need to survive." *New York Times Co., 376 U.S. at 271-72* (cleaned up). And even if Aljamal's description of October 7 as a "daring attack" and his eulogy for the mayor of Nuseirat are read as praise for Hamas and its acts of terrorism, *see* Dkt. 1 ¶¶ 51, 54, *Brandenburg* holds that this is not enough to defeat the protection of the First Amendment. Like the ugly celebration of the deaths of American soldiers on the picket signs from the Westboro Baptist Church, even articles sympathizing with Hamas remain protected when they speak on matters of public concern. *See Snyder, 562 U.S. at 458*. Because Defendants' articles are

shielded from tort liability by the *First Amendment*, Jan's claims that those articles aided and abetted Hamas must be dismissed.

### C. Extraterritorial [*33] Application of the ATS

Finally, Defendants argue that Jan's allegations cannot overcome the presumption against extraterritorial application of the ATS. Dkt. 27 at 9-12. In *Kiobel v. Royal Dutch Petroleum Co.*, the Supreme Court held that the presumption against extraterritoriality applies to ATS suits. *569 U.S. 108, 117, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013)*. For an ATS claim to survive a motion to dismiss, the claim must "touch and concern" activities that occur in the United States. *Id. at 124-25*. Reiterating concerns of judicial interference in foreign policy articulated in *Sosa*, the Supreme Court explained that the purpose of the presumption is to "protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id. at 115* (cleaned up). Because the allegations in *Kiobel* involved conduct that occurred entirely outside the United States, the Supreme Court dismissed the suit. *Id. at 124-25*. The Court left open, however, whether federal courts could exercise jurisdiction over claims that arose partially overseas but had some connection to the United States. *See id.* ("And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application.").

In *Nestle* **[*34]** *USA, Inc. v. Doe* (*Nestle II*), the Court revisited the issue of extraterritoriality and established "a two-step framework" for analyzing whether a court could exercise jurisdiction over an ATS claim. *593 U.S. 628, 632, 141 S. Ct. 1931, 210 L. Ed. 2d 207 (2021)*. First, federal courts must consider whether the statute gives clear indication that it applies extraterritorially. *Id.* The ATS does not. *Id.* (citing *Kiobel, 569 U.S. at 124*). Second, if the statute does not apply extraterritorially, "plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'" *Id. at 633* (quoting *RJR Nabisco, Inc. v. European Community, 579 U.S. 325, 337, 136 S. Ct. 2090, 195 L. Ed. 2d 476 (2016)*).

In *Nestle II*, the plaintiffs were six individuals from Mali who alleged that they were trafficked as child slaves to produce cocoa in the Ivory Coast. *Id. at 631*. They sued Nestle and other corporations that purchased and sold cocoa, alleging that they aided and abetted child slavery. *Id.* The plaintiffs argued that the relevant conduct was operational decision-making which occurred in the United States. *Id. at 632*. The Supreme Court rejected this argument, holding that "plaintiffs did not plead facts sufficient to support domestic application of the ATS simply by alleging a 'mere corporate presence of a defendant.'" *Id. at 634*. The Supreme Court reasoned, "[n]early all the conduct that they **[*35]** say aided and abetted forced labor—providing training, fertilizer, tools, and cash to overseas farms—occurred in Ivory Coast." *Id.* And because "making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek—aiding and abetting forced labor overseas—and domestic conduct." *Id.*

In the current complaint, Jan similarly does not establish that the conduct relevant to the ATS's focus occurred in the United States. *See id. at 633*. It is undisputed that the underlying torts—kidnapping, hostage taking, and other violations of international law—occurred abroad. *See* Dkt. 27; Dkt. 33; Dkt. 36. The relevant domestic conduct is compensating Aljamal as a journalist of

the Palestine Chronicle and publishing his articles. *See* Dkt. 1 ¶¶ 76, 89. For the reasons discussed above, *see supra* Sec. IV.B.2, Defendants' decisions to publish Aljamal's articles are protected by the First Amendment. With respect to paying Aljamal for his articles, because Jan does not allege that Defendants knew that Aljamal was a Hamas operative or involved in acts of terrorism, their domestic decision to pay him does not have a **[*36]** sufficient nexus to "the conduct relevant to the statute's focus." Nestle II, 593 U.S. at 633. Jan, therefore, has not alleged any domestic conduct that could overcome the presumption against extraterritoriality and dismissal is also granted on this basis.

### D. Leave to Amend is Granted

The Ninth Circuit has long held that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (cleaned up). The Court's dismissal of the complaint turns on the specific facts alleged, and Jan could conceivably plead additional facts to show Defendants' conduct satisfies the *actus reus* and *mens rea* elements of accomplice liability, particularly with respect to the compensation allegations. The Court therefore grants Jan leaves to amend his complaint.

### V. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss (Dkt. 27) is GRANTED and Jan's complaint is DISMISSED without prejudice. Jan is GRANTED leave to amend. If Jan wishes to amend his complaint, he must do so no later than February 21, 2025.

Dated this 31st day of January, 2025.

/s/ Tiffany M. Cartwright

Tiffany M. Cartwright **[*37]**

United States District Judge

End of Document