IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAYA PARIZER, *et al.*,       )
                              )
    Plaintiffs,            )
                              )
v.                            )    Civil Action No. 1:24-cv-724 (RDA/IDD)
                              )
AJP EDUCATIONAL FOUNDATION,    )
INC. a/k/a AMERICAN MUSLIMS FOR )
PALESTINE, *et al.*,          )
                              )
    Defendants.            )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant AJP Educational Foundation, Inc., d/b/a American Muslims for Palestine's ("AMP") Motion to Dismiss (Dkt. 33), Defendant Hatem Bazian's Motion to Dismiss (Dkt. 70), Defendant WESPAC Foundation, Inc.'s ("WESPAC") Motion to Dismiss (Dkt. 77), Defendant Osama Abuirshaid's Motion to Dismiss (Dkt. 105), Defendants Taher Herzallah and Zarefah Baroud's Motion to Dismiss (Dkt. 109), and Defendant National Students for Justice in Palestine's ("NSJP") Motion to Strike and Motion to Dismiss (Dkt. 118). This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). These matters have been fully briefed and are now ripe for disposition.

Considering the Motions together with the Memoranda in Support (Dkts. 34, 71, 78, 106, 110); Plaintiffs' Opposition briefs, (Dkts. 85, 92, 112, 116, 124); Defendants' Replies (Dkts. 100, 102, 104, 113, 119, 128); and the parties' supplemental filings (Dkts. 147, 148, 149, 150, 151, 152, 154, 159, 160), this Court GRANTS the Motions for the reasons that follow.

## I.  BACKGROUND

### A.  Factual Background[1]

Plaintiffs Maya Parizer, Adin Gess, Noach Newman, Natalie Sanandaji, Yoni Diller, David Bromberg, and Lior Bar Or (collectively, the "U.S. Plaintiffs"), together with Ariel Ein-Gal and Hagar Almog (collectively, the "Israeli Plaintiffs" and with the U.S. Plaintiffs, "Plaintiffs"), bring this two-count action against Defendants alleging that they have aided and abetted Hamas, a terrorist organization, in violation of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d), and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  Dkt. 24.

The Amended Complaint alleges a history of material support provided to Hamas by various interconnected organizations and individuals, including Defendants, as well as a series of events that occurred following the October 7, 2023 terrorist attack in Israel that injured the Plaintiffs.  The Court sets out those allegations below.

#### 1.  The Original Material Support Enterprise

On October 8, 1997, the U.S. Department of State designated Hamas as a foreign terrorist organization ("FTO"), and it reaffirmed that status in 1999 and 2001.  *Id.* ¶ 20.  Hamas "engages in terrorism—'jihad'—to destroy the State of Israel and implement an Islamist state controlled by Sharia law 'from the [Jordan] River to the [Mediterranean] Sea.'"  *Id.* ¶ 19.  It "relies on terrorism, propaganda, and falsehoods to demonize Israel and cast itself as opposing a mythical 'settler-colonial' oppressor image of Israel."  *Id.* ¶ 22.  Hamas receives billions in aid from supporters around the world.  *Id.* ¶ 24.

---

[1] For purposes of considering the Motions to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In 1988, Hamas and the Muslim Brotherhood founded the Palestine Committee, a small network of organizations to serve as Hamas's funding and support enterprise in the United States. *Id.* ¶ 25. In 1993, the FBI wiretapped a meeting between the Palestine Committee and Hamas operatives in the United States. *Id.* The meeting revealed that the Palestine Committee directly coordinated with Hamas to help it achieve its goals in the United States, as meeting participants discussed "how to improve activities in support of Hamas within the U.S. and how to shield them from the designation of Hamas as a terrorist organization." *Id.*

The organizations that made up the Palestine Committee included, as relevant here, the Holy Land Foundation for Relief and Development ("HLF"), the Islamic Association for Palestine ("IAP"), and IAP's various alter egos, including the American Muslim Society ("AMS"). *Id.* ¶ 27. HLF was a fundraising arm for Hamas in the United States and IAP was the public voice of Hamas in the United States. *Id.* Both HLF and IAP were founded and controlled by members of Hamas's senior leadership. *Id.* ¶ 28. For instance, Khaled Mashal, the former head of Hamas's Political Bureau and current leader of Hamas's diaspora office, founded IAP. *Id.*

HLF and IAP's fundraising for and collaboration with Hamas on public relations strategies was eventually discovered, and HLF and IAP, as well as related individuals, were found criminally and civilly liable for providing material support to Hamas. *Id.* ¶ 29. In 2001, HLF was designated a "Specially Designated Global Terrorist," and, in 2008, HLF and five of its leaders were convicted of providing material support to Hamas. *Id.* ¶ 30. In 2004, IAP and AMS were found civilly liable for providing material support to Hamas. *Id.* ¶ 31; *see also Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701 (7th Cir. 2008). IAP and AMS subsequently dissolved. Dkt. 24 ¶ 31.

The Amended Complaint asserts that the creation and dissolution of organizations founded by Hamas and the Muslim Brotherhood in this manner has become a pattern. *Id.* ¶ 32. For

instance, the Amended Complaint asserts that KindHearts for Charitable Humanitarian Development, Inc. ("KindHearts") was founded by Hamas and the Muslim Brotherhood and subsequently dissolved following a settlement agreement with the U.S. Department of Treasury because it provided material support to Hamas.  *Id.* ¶ 32.

### 2.  The Alleged Rebranded Material Support Enterprise

The Amended Complaint further alleges that the architects[2] of this material support enterprise for Hamas have worked to resurrect it in a manner that would hide such support more effectively.  *Id.* ¶ 33.  Plaintiffs allege that, in 2006, several of the original enterprise's key members founded Defendant American Muslims for Palestine's ("AMP")  to fulfill the purpose of IAP—"[t]hat is, to []once again[] provide Hamas with an effective propaganda and recruiting arm in the United States."  *Id.*  The Amended Complaint alleges that there is a "significant overlap" between the individuals who work for AMP and the individuals "who worked for or on behalf of organizations that were designated, dissolved, or held civilly liable by federal authorities for supporting Hamas."  *Id.* ¶ 34.  For instance, "six members of AMP's core leadership were IAP board members or active in HLF and/or IAP, two are family members of IAP board members, and one was a frequent collaborator and fundraiser for IAP and KindHearts."   Dkt. 24 ¶¶ 34-35 (displaying table listing AMP Core Founding Leadership and their prior relationships to the Palestine Committee).

More specifically, Rafeeq Jaber, the former president of IAP, now serves as AMP's financial advisor and tax preparer.  *Id.* ¶ 36.  Abdelbasset Hamayel, who previously served as IAP's secretary general and worked for KindHearts following IAP's dissolution, began working for AMP in 2008 and is referred to as the director of operations.  *Id.* ¶ 37.  Defendant Abuirshaid,

---

[2] At this point in the Amended Complaint, Plaintiffs do not identify the alleged "architects."

4

who previously served on the board of IAP and as the editor of IAP's bi-weekly newspaper, is now the Executive Director of AMP and a member of AMP's National Board.  *Id.* ¶ 38.  Further, Abuirshaid "has interviewed Hamas leadership and been featured on the website of al-Qassam Brigades, the self-declared military wing of Hamas."  *Id.* ¶ 39.  Abuirshaid allegedly travels to Turkey regularly to meet with Sami Al-Arian, who was convicted in 2006 for providing material support to another terrorist group operating in Gaza.  *Id.*  Al-Arian's daughter previously worked for AMP as its Media and Communications Coordinator, a role now filled by Defendant Baroud. *Id.*  Defendant Bazian, AMP's Founder and current Chairman of AMP's National Board, was previously a member of two Muslim Brotherhood-affiliated organizations and, as a professor at the University of California Berkeley, founded the first chapter of Students for Justice in Palestine ("SJP").  *Id.* ¶ 42.  In the past, Bazian frequently "collaborated" with IAP and fundraised for KindHearts.  *Id.*  He has previously stated that "[i]t is about time we have an intifada in [the United States]."  *Id.* ¶ 43 (quoting Hamas on Campus, *Radical Hatem Bazian calls for Intifada (armed uprising) in the USA!!*, YOUTUBE (Mar. 23, 2015), https://www.youtube.com/watch?v=Mfv5yaKxNgo.).  Finally, Salah Sarsour, a former active member of IAP, chaired the convention where AMP was formed and currently sits on AMP's National Board.  Dkt. 24 ¶ 44.  Sarsour, who chaired AMP's 2023 Palestine Convention, was arrested and imprisoned in Israel in 1994 for sheltering and providing a weapon to a Hamas terrorist.  *Id.*

Plaintiffs allege that AMP is effectively "a reincarnation of IAP and AMS," continuing "to operate with the same core people, taking ultimate orders and directions from the same FTOs and nation-state proxies, and endeavor[ing] to achieve the same goal: materially support Hamas and its allies by acting as their propaganda and recruiting division in the United States."  *Id.* ¶ 48.

Unlike its predecessors, however, AMP has become "more cunning and purposeful" in its efforts to adhere to corporate formalities and "navigate the fine line between legal activism and material support for terrorism." *Id.* ¶ 45.

Plaintiffs further allege that Defendants provide "ongoing, continuous, systematic, and material support for Hamas and its affiliates in precisely the same way that HLF and IAP used to: by operating and managing Hamas's mouthpiece for North America." *Id.* ¶ 64. They assert that AMP and NSJP execute this operation, while WESPAC collects donations for it. *Id.* ¶ 65. AMP allegedly provides propaganda services for Hamas through its college campus brand, NSJP, an entity with no formal corporate structure of its own. *Id.* ¶¶ 46, 61. Plaintiffs allege that AMP maintains organizational management and control of NSJP, which is "designed to control the management, financing, and messaging of SJP chapters across the country." *Id.* ¶¶ 60-61. Through NSJP, AMP allegedly promotes messaging asserting that "violent attacks are a justified response to Zionism as an idea, to Israel as an entity, and to Jews as a people." *Id.* ¶ 63. The purpose of the messaging is to "normalize Hamas's terrorism within Western academia and society," "recruit college students to join and support Hamas's terrorist aims," and to establish campus environments where violence against Jews "is accepted, justified, and even lionized." *Id.*

The Amended Complaint alleges that under the leadership of Defendants Abuirshaid and Bazian, Defendant Baroud manages AMP's social media activity and assists NSJP in the same. *Id.* ¶ 47. It further alleges that Defendant Herzallah acts as a liaison between AMP and NSJP, ensuring that "the propaganda is properly utilized by the various SJP chapters." *Id.* Defendant WESPAC is the fiscal sponsor of NSJP, receiving and administering tax-exempt donations and grants on NSJP's behalf, as NSJP itself lacks tax-exempt status. *Id.* ¶¶ 53, 57. WESPAC keeps a percentage of donations and remits the rest to the groups it fiscally sponsors. *Id.* According to

6

Plaintiffs, this arrangement enables NSJP to collect and distribute funds among "anti-Israel and pro-Hamas clientele" out of public view. *Id.* The IRS requires fiscal sponsors like WESPAC to retain control of and discretion over use of the funds, ensuring that the funds are used for charitable purposes. *Id.* ¶ 58. In 2022, WESPAC reported $2.4 million in revenue, but spent approximately $1.5 million solely on "office expenses." *Id.* ¶ 54. In contrast, WESPAC did not report any fundraising expenses, travel, information technology, legal services, insurance, rent, or mortgage payments. *Id.* ¶ 55. Nor did WESPAC report a salary for its board members or executive leadership in 2022. *Id.* Thus, Plaintiffs allege that WESPAC "obfuscates the true nature of its finances and where they ultimately go." *Id.* ¶ 59.

Plaintiffs assert that Hamas's strategy regarding Israel and the United States "relies on propaganda and lies to influence public opinion and justify its horrendous actions." *Id.* ¶ 72. Article 29 of Hamas's Charter instructs its supporters to provide Hamas "with strategic depth in all human material and informative spheres," including by "convening solidarity conferences" publishing "favourable [sic] articles and booklets," and "enlightening the masses regarding the Palestinian issue." *Id.* The Charter calls for ideological, educational, and cultural mobilization to equip people to "perform their role in the decisive battle of liberation." *Id.* Further, Hamas has issued express guidelines on how its supporters should "play their part in strengthening the home front and in properly conveying information worldwide." *Id.*

The Amended Complaint alleges that NSJP, through its leadership and supporters, has regularly

> (1) identified itself as a supporter of, and sometimes even part of, Hamas and its affiliates' movement; (2) disseminated instructions from Hamas and other FTOs; (3) hosted speakers that are Specially Designated Global Terrorists or affiliated with them; and (4) provided direct aid to the same.

*Id.* ¶ 62.

### 3. Hamas's Terrorist Attack

On October 7, 2023, "the deadliest single day for the Jewish people since the Holocaust," Hamas terrorists crossed the border between Gaza and southern Israel, killed approximately 1,200 Israelis, Americans, and others from many different countries, and took over 200 people as hostages into Gaza. *Id.* ¶¶ 67, 69. The terrorists "tortured, butchered, raped, and murdered innocent men, women, and children—including dozens of U.S. citizens—at a music festival, as well as in their homes." *Id.* During the attack, over 2,200 missiles were shot from Gaza into Israel. *Id.* In total, approximately 6,900 people were injured during the terrorist attack. *Id.* Hamas's attack did not end on October 7, 2023, as Hamas has continued to hold civilian hostages—including friends and family members of Plaintiffs—and to launch rockets at civilian targets, forcing many, including Plaintiffs, to "fear for their lives, evacuate their homes, and seek the safety of bomb shelters." *Id.* ¶ 68.

Plaintiffs were among the victims of the initial Hamas terrorist attack on October 7, 2023. *Id.* ¶ 69. Plaintiffs Gess and Almog lived in Kibbutz Holit and witnessed the murders of their friends and community members. *Id.* They were forced to evacuate their homes and cannot return, as "[t]hey have lost their homes, belongings, community, and way of life." *Id.* Plaintiff Ein-Gal and his friends were ambushed on a beach and had to flee under heavy fire. *Id.* Plaintiffs Parizer and Sanandaji attended the Nova Festival and witnessed the massacre of hundreds of attendees. *Id.* They fled from the terrorists on foot and by car under gunfire from Hamas. *Id.* Plaintiffs Diller, Bar Or, and Bromberg also attended the Nova Festival and witnessed the murder of their friends and other attendees. *Id.* Plaintiffs Diller and Bar Or survived by hiding from the terrorists for several hours. *Id.* As of the filing of the Amended Complaint, Hamas still held one of Plaintiff Bromberg's friends as a hostage. *Id.*

8

### 4.  Hamas's Propaganda Strategy

Within hours of the attack on October 7, 2023, the leader of Hamas, Ismail Haniyeh, called for Hamas's "resistance abroad" to "join this battle in any way they can . . . .  Let us be partners in creating this great victory, inshallah." *Id.* ¶ 77.  Three days later, Mashal, the founder of IAP and leader of Hamas's diaspora office, called for global supporters of Hamas to be "part of this battle." *Id.*  Plaintiffs assert that, through a "terror-by-propaganda" strategy, Hamas aimed "to exploit the international community's response to civilian casualties, generate global condemnation of Israel, hamstring the IDF's operations, and protect Hamas's military capabilities under the guise of civilian safety." *Id.* ¶ 74.  This strategy was employed to "sway global institutions to behave in Hamas's favor." *Id.* ¶ 76.  Hamas did so through the deployment of tens of thousands of fake disinformation bots online within hours of the terrorist attack to push the narrative, in different languages, that the attack was justified. *Id.*  Hamas conducted this "first wave" of propaganda through servers based in Pakistan, Qatar, and Iran. *Id.* ¶ 75.

Plaintiffs assert that the "second wave" of propaganda was to be conducted by "Hamas's PR foot soldiers in the West: AMP, NSJP, WESPAC, and their allies." *Id.*  Within hours of the attack on October 7, 2023, the language of the Hamas disinformation campaign appeared in NSJP propaganda on social media and across college campuses. *Id.* ¶ 78.  On October 8, 2023, the day after the initial attack, Defendant NSJP released its Day of Resistance Toolkit ("NSJP Toolkit") on the internet and across more than 300 American college campuses. *Id.*; *see also* Dkt. 24-1, Ex. A (the NSJP Toolkit).  The Amended Complaint asserts that the NSJP toolkit refers to Hamas and other terror organizations using the euphemism "the resistance.  Dkt. 24 ¶ 79.  For instance, in reference to the October 7, 2023 attack, the NSJP Toolkit states:

> Referred to as Operation *Towfan Al-Aqsa* (Al-Aqsa Flood), the resistance has taken occupation soldiers hostage, fired thousands of rockets, taken over Israeli military

vehicles, and gained control over illegal Israeli settlements. . . .  Today, we witness a historic win for the Palestinian resistance: across land, air, and sea, our people have broken down the artificial barriers of the Zionist entity . . . .  As the Palestinian student movement, we have an unshakable responsibility to join the call for mass mobilization.

Dkt. 24-1 at 2.  The NSJP calls for its members and allies to "not only support, but struggle alongside our people back home . . . and above all normalize and support our fearless resistance."

*Id.* at 4.  It further explains that:

> *Liberation is not an abstract concept.* . . .  Rather, liberating colonized land is a real process that requires confrontation by any means necessary.  In essence, decolonization is a call to action . . . .  It calls upon us to engage in meaningful actions that go beyond symbolism and rhetoric.  Resistance comes in all forms— armed struggle, general strikes, and popular demonstrations.  All of it is legitimate, and all of it is necessary.

*Id.* at 5.  As such, Plaintiffs claim that the NSJP Toolkit urges "AMP, NSJP, their members, and their allies to provide 'real' support to Hamas not only through their arguments and rhetoric, but also through 'confrontation' that includes, among other things, 'armed struggle' and violence."  *Id.* ¶ 82.  The NSJP Toolkit further explains that:

> the resistance fighters are still launching new attacks into 48 . . .  The revolution is being waged across historic Palestine—not just cross-factional, but unifying our people in the name of resistance.  All Palestinian factions in Gaza appear to be participating under unified command.  *This is the first time since 1949 that a large-scale battle has been fought within '48 Palestine.*

Dkt. 24-1 at 2, 4 (emphasis original).  NSJP further confirms in the NSJP Toolkit that it is "PART of this movement, not in solidarity with this movement."  *Id.* at 4.  Plaintiffs allege that the NSJP Toolkit was distributed to organize a "Day of Resistance" in support of Hamas's terrorist activities. Dkt. 24 ¶ 85.  The NSJP Toolkit contains graphics and advertisements that include images of paragliders, which Plaintiffs allege reference the manner in which Hamas terrorists infiltrated the Nova Festival.  *Id.* ¶ 86; *see* Dkt. 24-1 at 5.  Plaintiffs note that neither Hamas, nor any other

terrorist organization, had ever used paragliders to commit a terrorist attack until October 7, 2023. *Id.* ¶ 86.

The NSJP Toolkit further requests member organizations endorse the "Towfan Al-Aqsa Statement" from "Bears for Palestine"—NSJP's University of California at Berkeley chapter. *Id.* ¶ 87. The statement, as represented in Exhibit B to the Amended Complaint, "unequivocally denounces the occupation and its military rule" and declares "unwavering support of the resistance in Gaza and the broader occupied Palestinian lands." Dkt. 24-2 at 2. Many chapters of Students for Justice in Palestine, as well as other student groups, signed the Towfan Al-Aqsa Statement, which declares "[w]e honor Palestinians who 'are working on the ground on several axes of the so-called 'Gaza envelope' alongside our comrades in blood and arms, and what is coming is greater. Victory or martyrdom.'" *Id.* Plaintiffs allege that these "comrades in blood and arms" are FTOs operating as part of the "Unity Intifada" under Hamas's "united command." Dkt. 24 ¶ 88. In fact, Plaintiffs allege that the "comrades in blood in arms" language is lifted directly from an FTO-affiliated Telegram chat called Resistance News Network, which they represent in Exhibit C to the Amended Complaint. *Id.* Plaintiffs allege that the phrase was first used by the Martyr Abu Ali Mustafa Brigade of the Popular Front for the Liberation of Palestine ("PFLP") on October 7, 2023, *id.*, and that the full statement is as follows:

> The Al-Aqsa Flood battle is the battle of the Palestinian and all the resistance forces. In light of the heroic scenes drawn by the heroes of resistance on our occupied lands, and the moments of pride and dignity they inaugurate, and the heroic epic they are waging, we in the Martyr Abu Ali Mustafa Brigades, affirm the following:
>
> 1. This heroic battle marks the beginning of the defeat of this enemy and its departure from our land and will not be erased from the consciousness and sentiment of the Arab nation.
> 2. We declare a state of maximum alert among our fighters, and we work on the ground in several axes alongside our comrades in blood and arms.
> 3. We stand with our brothers in the Al-Qassam Brigades and with all the resistance forces, and we merge with them in this battle that will be recorded in history.

4. We call on all resistance forces inside and outside Palestine to take their positions in the confrontation trench that now extends throughout the region.

Glory to the martyrs and victory to the resistance.
What is coming is greater.

Dkt. 24-3 at 2.

The Amended Complaint alleges that the NSJP Toolkit is an "action-oriented instruction manual created by NSJP, with Hamas's instructions and mission, AMP's control and assistance, and WESPAC's funding." Dkt. 24 ¶ 89. The NSJP Toolkit urged Defendants' members and allies "to engage in meaningful actions that go beyond symbolism and rhetoric" to include even "armed struggle" and other violence. *Id.* ¶ 90. Hamas has echoed those calls, with senior Hamas officials urging its allies in the United States to engage in domestic terrorism in support of Hamas. *Id.* ¶ 91. The NSJP Toolkit urges Defendants' members and allies to treat "liberation" as something "beyond symbolism and rhetoric" that is secured through "confrontation by any means necessary." *Id.* ¶ 95.

### 5. Alleged Post-October 7, 2023 Public Relations Services

Plaintiffs claim that the "chaotic images emerging from American campuses are the intended result of Defendants' endeavors." *Id.* ¶ 92. The crux of Plaintiffs' Amended Complaint is that

Defendants fund and act as Hamas's public relations division, recruiting domestic foot soldiers to disseminate Hamas's propaganda and to incite and engage in violence directed at creating chaos and fear across the United States, intimidating American citizens and policymakers, and forcing American policy to shift in Hamas's favor. These activities are instrumental to Hamas's short and long-term goals and help Hamas continue its ongoing international terrorist activities with less resistance.

*Id.* ¶ 93.  Plaintiffs allege that Defendants' members and allies "responded to this command by engaging in illegal acts of domestic terrorism—including trespass, assault, vandalism, robbery, destruction of property, harassment, and intimidation—to further 'resistance' efforts." *Id.* ¶ 95.

Plaintiffs allege that Defendants organized "Day of Resistance" protests for SJP chapters across the country on October 12, 2023, "to coincide with Hamas's proclaimed 'Day of Rage' for its supporters in Gaza and the West Bank on October 13, 2023 (which would be late in the evening on October 12, 2023, in many parts of the United States)." *Id.* ¶ 96.  Plaintiffs assert that, in the days, weeks, and months following October 7, 2023, "many SJP events were violent affairs aimed at normalizing Hamas's rhetoric, terrorizing students, and forwarding the 'resistance.'" *Id.* ¶ 97 (describing events at the University of North Carolina, Harvard University, the Cooper Union for the Advancement of Science and Art, Brandeis University, the University of Chicago, Columbia University, Arizona State University, the University of Michigan, Temple University, Rutgers University, the University of California at Berkeley, Emory University, California State Polytechnic University-Humbolt, Yale University, Baruch College, the University of California-Los Angeles, Brooklyn College, and City University-New York); *see also id.* ¶¶ 109-133 (describing "Chaos at Columbia and the 'Popular University'").

Plaintiffs allege that "Defendants continue to provide crucial ongoing public relations services to Hamas to generate support for its ongoing terrorism." *Id.* ¶ 99.  Plaintiffs state that, "by October 2023, Hamas's Political Bureau, in English, expressly adopted NSJP's position that not only hostage taking, but 'everything we do, it is justified.'" *Id.* ¶ 101.  And that, "[b]y November, Hamas had also begun mirroring NSJP's message that 'settlers are not civilians,' stating, 'any person occupying [our] land is a combatant, not a civilian. . . . All the settlers in the Gaza Envelope are armed, so they are all combatants.'" *Id.*  "In January 2024, Hamas issued a

document in English bearing the title 'Our Narrative—Operation Al-Aqsa Flood.'"  *Id.*  Plaintiffs note that the document "echoes the NSJP toolkit in a number of significant ways—particularly the repeated usage of the term 'resistance'" and that "the cover of the propaganda book features an image very similar to one of the images provided by NSJP in the NSJP Toolkit for use by its chapters and affiliates."  *Id.*

Plaintiffs further allege several instances in which Hamas, the PFLP, and other FTOs called for "the free people of the world to continue their movements to stop the American-Zionist aggression," or extended "thanks and appreciation" for demonstrations, and NSJP shortly thereafter advertised events.  *Id.* ¶ 102.  Plaintiffs highlight the "Strike4Gaza" as an example of Defendants being "responsive to Hamas's puppet masters, the IRGC [Islamic Revolutionary Guard Corps]."  *Id.* ¶ 103.  Plaintiffs allege that, "[i]n March 2024, the IRGC internally disseminated a secret memorandum titled 'Supporting and Encouraging Palestinian Movements towards the Political Isolation of Zionism' that called for 'an economic blockade across four continents in solidarity with Palestinians' to take place on April 15, 2024."  *Id.*  While the memorandum leaked on the day of the planned blockade, "metadata confirms that websites dedicated to organizing and supporting the IRGC's terrorist blockade were purchased and created weeks prior to the blockade," *Id.* ¶¶ 104-105.  "Local AMP and SJP chapters across the United States parroted the 'Strike4Gaza' materials and made identical calls for mass disruption of American infrastructure on April 15, 2024."  *Id.* ¶ 106.  "On April 15, 2024, 'Strike4Gaza' protests erupted across American cities and, just as the IRGC called for, created an 'economic blockade' disrupting American economic and transportation centers, such as the Golden Gate Bridge, the Brooklyn Bridge, Chicago-O'Hare International Airport, and the New York Stock Exchange."  *Id.* ¶ 107.

Plaintiffs further allege that, "[f]rom May 24 to 26, 2024, NSJP served as one of the 'convening organizations' or 'steering committee' members for the People's Conference for Palestine (the 'Conference')." *Id.* ¶ 134. "The Conference hosted multiple speakers from PFLP, including Sana Daqqah, the Conference's keynote speaker and the wife of Walid Daqqah, a PFLP terrorist convicted of the kidnapping, torture, and murder of Israeli Moshe Tamam." *Id.* ¶ 135.

Plaintiffs highlight several quotes from the Palestinian Youth Movement's ("PYM") organizers at the Conference. For example, one of the PYM organizers stated: "In the past eight months, we've seen incredible images of victory—from witnessing the families of political prisoners reunite with, and embrace their loved ones for the first time in years—to scenes of our heroic people breaking down the siege that has suffocated the Gaza Strip for 17 years." *Id.* ¶ 137. She continued, "[t]his is a protracted people's war of liberation" and the "only one that is capable of sustaining it is the Palestinian resistance, which will continue to fight until liberation from the river to the sea." *Id.* A different PYM organizer "led attendees in a chant of 'There is only one solution, intifada revolution!' and stated at the opening ceremony on Friday, 'We also want to take a moment to honor our brave and noble resistance that defends our people from beneath the ground,' a reference to the Hamas tunnels where Israeli hostages, including women and children, are currently being held captive." *Id.* ¶ 138. Another "acknowledged that the purpose of the Conference was to 'build relationships that allow for higher coordination across the movement,'" *id.* ¶ 141, and stated "We have made the situation untenable for the empire's ruling classes and the political establishment. Not allowing Biden a minute of peace. Making it so that he cannot visit a single city, not to campaign, not to fundraise, without being disrupted," *id.* ¶ 142. A fourth PYM member stated: "We in the Palestinian Youth Movement see that a really important part of our role in the diaspora is internationalizing the popular cradle, that is, mirroring the popular support for

Palestinian resistance that we see in Palestine across our organizing efforts in the diaspora." *Id.* ¶ 143.

Plaintiffs point to the statements of one organizer with an SJP chapter, who stated, "[w]e have worked to agitate our campuses" and "students have brought the war home." *Id.* ¶ 144. And she stated: "It is our people that guide us. Our people have made the ultimate sacrifice. And we know that nothing—no arrest, no repression, no suspension, no nothing—will ever, ever, ever even come close to that. . . . Our people in Gaza as a guide of our movement, as a guide of our actions, is not just something that we as the student movement say abstractly. Right? It is something that we use to guide us. It is something that is not only in our messaging, but is in our strategy, in our tactics—in every part of our organizing." *Id.* ¶ 145. Plaintiffs argue that "our people" refers to Hamas because they "control[] all messaging in Gaza" and they are the only organization in Gaza that has "publicly . . . signaled approval and support *repeatedly* for the widespread riots in the United States." *Id.* ¶¶ 145-146 (emphasis original).

Plaintiffs also allege that, "[d]uring the Conference, Hamas ally and sponsor Iranian Supreme Leader Ali Khamenei published a letter declaring that NSJP-led and Student Intifada its controls [sic] has 'now formed a branch of the Resistance Front . . . . The greater Resistance Front which shares the same understandings and feelings that you have today, has been engaged in the same struggle for many years in a place far from you . . . and the establishment of the government of the Islamic Republic of Iran expanded and fortified it.'" *Id.* ¶ 148.

### 6. Recognition by Hamas and its Allies

Plaintiffs allege that, "[o]n October 29, 2023, Hamas applauded and celebrated 'the masses who demonstrated in American cities and Western capitals in solidarity with Gaza,'" and "called on its followers to 'continue their movement in solidarity with the Gaza Strip and in support of the

justice of our national cause, and to escalate all forms of popular pressure.'" *Id.* ¶ 150.  At an event at Columbia University, a PFLP leader, "told the group that when he speaks with his 'friends and brothers in Hamas, the PIJ [Palestinian Islamic Jihad], the PFLP' and other terrorist organizations operating in Gaza, he learns that the terrorists care more about the support they receive from American students protesting on their behalf than they do about what the President or Vice President of the United States says or does." *Id.* ¶ 152(b) (emphasis omitted).  He continued that, "per his 'friends and brothers' in Hamas, the PFLP, and others—that every demonstration American students do matters and that their 'work' is more important than ever." *Id.*  Plaintiffs also allege Barakat gave a later TV interview, in which he "explained that the protesters in the West, with their chants to 'Free Palestine from the River to the Sea,' are providing popular, political, and media support for the armed resistance." *Id.* ¶ 153.  Plaintiffs further assert that, "[o]n May 31, 2024, Hassan Nasrallah, the Secretary General of Hezbollah (an Iranian-funded and supported terrorist organization based in southern Lebanon), echoed the same sentiment, recognizing and lauding American students for their membership in the 'resistance axis.'" *Id.* ¶ 155.  Finally, Plaintiffs state that, "[o]n June 11, Hezbollah MP Mohammad Raad, the leader of Hezbollah's Loyalty to the Resistance parliamentary bloc, said that Hezbollah should 'invest' in these students." *Id.*

### 7.  Alleged Concern over Defendants' Actions

Plaintiffs also allege that various investigations into AMP and/or NSJP have been opened. *See id.* ¶ 156 (Virginia Office of the Attorney General's Consumer Protection Section investigation for potential violations of Virginia's charitable solicitation laws); *id.* ¶ 159 (House Ways & Means Committee's *Hearing on the Nexus Between Terror Financing, Tax-Exempt Charities, & Antisemitism*); *id.* ¶¶ 162-167 (House Committee on Oversight and Accountability investigation

into "the funding sources of groups supporting illegal activities across the country, including at institutions of higher education, by individuals spouting pro-Hamas propaganda and engaged in antisemitic harassment and violations of the civil rights of Jewish students").

## B.   Procedural Background

Plaintiffs initiated the instant suit on May 1, 2024.  Dkt. 1.  Plaintiffs filed the operative First Amended Complaint on July 9, 2024.  Dkt. 24.  Defendants AMP, Bazian, WESPAC, Abuirshaid, Baroud, Herzallah, and NSJP subsequently filed the instant motions to dismiss, Dkts. 33, 70, 77, 105, 109, 118, and accompanying memoranda in support, Dkts. 34, 71, 78, 106, 110. Plaintiffs filed oppositions in response to the motions to dismiss, Dkts. 85, 92, 112, 116, 124, and Defendants filed their replies, Dkts. 100, 102, 104, 113, 119, 128.  Both Plaintiffs and Defendants have since filed various notices of supplemental authority, Dkts. 132, 147, 148, 151, 152, responses to the notices of supplemental authority, Dkts. 133, 149, 153, and 160, and replies in support of the notices of supplemental authority, Dkts. 141, 150.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the Court lacks jurisdiction over the subject matter of the action.  A district court must dismiss an action over which it lacks subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1), (h)(3).  In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is proper.  *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

There are two ways in which a defendant may prevail on a 12(b)(1) motion.  First, a

defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based." *Adams*, 697 F.2d at 1219.  Under this method of attack, all facts as alleged by the plaintiff are assumed to be true.  *Id.*  Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings.  *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).  In such a case, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims."  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.3d 884, 891 (3d Cir. 1977).

### B.  Rule 12(b)(2) Standard

Federal Rule of Civil Procedure 12(b)(2) provides that a court may dismiss a case for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  When resolving a Rule 12(b)(2) motion, a court undertakes a two-step analysis.  First, a court looks to whether personal jurisdiction is authorized by state law.  *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004).  Second, a court determines whether the exercise of personal jurisdiction comports with the constitutional requirements of due process.  *Id.*  Virginia's long-arm statute extends personal jurisdiction to the constitutionally permissible limits of the Due Process Clause of the Fourteenth Amendment.  *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 176 (4th Cir. 2002).  Accordingly, "the statutory inquiry merges with the constitutional inquiry."  *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).

As to each defendant, a court must find sufficient "minimum contacts [with the state] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Walden v.*

19

*Fiore*, 571 U.S. 277, 286 (2014) ("The requirements of *International Shoe*, however, must be met as to each defendant over whom a state court exercises jurisdiction."). That inquiry involves exploring whether general or specific personal jurisdiction exists over any non-resident defendant. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). General personal jurisdiction exists when a defendant maintains "continuous and systematic contacts with the forum state, such that [the] defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). On the other hand, a court may exercise specific personal jurisdiction if a defendant's minimum contacts with the forum state form the basis for the claims in question. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004).

When determining whether there is personal jurisdiction over a case, a district court "must accept as true the uncontroverted factual allegations in the plaintiff's complaint." *Mattiaccio v. Cantu Apiaries of Fla., LLC*, 2022 WL 1597826, at *3 (E.D. Va. May 19, 2022) (quoting *Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013)). When a court does not conduct an evidentiary hearing on personal jurisdiction, a case may be dismissed for lack of personal jurisdiction if the plaintiff has failed to make a *prima facie* showing. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). If a *prima facie* showing is made, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction [so] unreasonable," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985), as to "offend traditional notions of fair play and substantial justice," *Int'l Shoe*, 326 U.S. at 316. In evaluating the parties' requisite burdens, a court may rely on "motion papers, supporting legal memoranda, . . . the allegations in the complaint," *Consulting Eng'rs*, 561 F.3d at 276, and "the contents of affidavits and any other relevant matter submitted by the parties to assist it in

determining the jurisdictional facts," 5B Alan Wright & Arthur Miller, Fed. P. & Proc. § 1351, at 305 (3d ed. 2004); *see also In re Polyester Staple Antitrust Litig.*, 2008 WL 906331, at *7 (W.D.N.C. Apr. 1, 2008) (explaining that, in determining whether a plaintiff has made a *prima facie* showing, "the court 'may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts'" (quoting *Reese Bros. v. U.S. Postal Serv.*, 477 F. Supp. 2d 31, 36-37 (D.D.C. 2007))).

### C.  Rule 12(b)(6) Standard

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to

the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### III.  ANALYSIS

As an initial matter, the Court recognizes that what happened to Plaintiffs in the October 7th attacks was horrific.  That should be undisputed.  Yet, that is not the question before the Court.  The Court must address whether Plaintiffs have alleged sufficient facts and legal bases on which to hold *these* Defendants liable for the acts of terrorism that occurred on October 7, 2023.  At this stage, the Court cannot find that Plaintiffs have met their burden in that regard and so will dismiss the Amended Complaint.  But it may be that Plaintiffs can further amend their pleading to assert additional particularized facts, not conjecture or speculation, on which they could state a claim.  Accordingly, although the Court dismisses the Amended Complaint as it currently stands, the Court will permit Plaintiffs to file a Second Amended Complaint.  A full discussion of the arguments and claims asserted as well as the Court's analysis of each is included below.

### A.  Jurisdiction

The Court has pending before it seven motions advancing various jurisdictional and merits challenges to the Amended Complaint.  "Generally, a court must resolve jurisdictional issues before considering the merits of a claim, because '[w]ithout jurisdiction the court cannot proceed at all in any cause.'"  *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)).  Thus, the Court will first consider Defendants' jurisdictional arguments before addressing the arguments on the merits.

Defendants Bazian, WESPAC, Herzallah, Baroud, and NSJP argue that this Court lacks personal jurisdiction over them.  All Defendants argue that this Court lacks subject matter jurisdiction under the ATS.  Additionally, Defendant NSJP further argues that Plaintiffs lack

Article III standing to sue. The Court addresses each argument in turn.

## 1. Personal Jurisdiction

Traditionally, federal courts establish personal jurisdiction over defendants based on their "minimum contacts" with the forum state. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Federal Rule of Civil Procedure 4(k)(1) recognizes, however, that exceptions to this rule exist. Most relevant here, Rule 4(k)(1)(C) states that "serving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by statute." Fed. R. Civ. P. 4(k)(1)(C). Here, Defendants challenge personal jurisdiction with respect to the claims raised by both sets of Plaintiffs.

### a.    Personal Jurisdiction Pursuant to ATA

The U.S. Plaintiffs assert their claims under the ATA, which has a nationwide-service-of-process provision authorizing the exercise of such jurisdiction. The ATA provides:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a). Defendants correctly note that whether the ATA confers nationwide service of process and therefore personal jurisdiction under Rule 4(k)(1)(C) is a matter of first impression in this Circuit. Nonetheless, various courts have found that Section 2334(a) is a nationwide-service-of-process provision that "provides personal jurisdiction over defendants who are properly served anywhere in the United States." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 152 (E.D.N.Y. 2017) (finding that the ATA provided statutory grounds for extending personal jurisdiction over a domestic corporation in case where plaintiffs were victims of attacks by Hamas in Israel); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 n.8 (2d

Cir. 2012) (acknowledging the ATA's "nationwide service of process provision" as a possible statutory basis for personal jurisdiction); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *3 (M.D. Fla. Mar. 31, 2011) (explaining that "[t]he ATA authorizes nationwide service of process to establish jurisdiction" and "Rule 4(k)(1) provides an adequate basis for personal jurisdiction over" domestic corporations not domiciled in the forum state); *Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76, 86-91 (D.R.I. 2001) (finding that personal jurisdiction over defendants was "established through the nationwide service provision found [in the ATA] and [Rule] 4(k)(1)(C)); *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 26-27 (E.D.N.Y. 2016) (explaining that "the ATA expressly authorizes nationwide service of process, thereby establishing personal jurisdiction over a defendant properly served under the statute"). Those decisions are well-founded and the Court adopts their reasoning.

While the ATA can provide a statutory basis for personal jurisdiction through service of process under Rule 4(k)(1)(C), the Court must still determine whether its exercise of personal jurisdiction here comports with due process. *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1003 (E.D. Va. 2021). "Unlike the assertion of jurisdiction under the state long-arm statute, where due process concerns are addressed under the Fourteenth Amendment's due process clause, assertion of jurisdiction under a federal statute pursuant to Federal Rule of Civil Procedure 4(k)(1)(C) requires application of the due process clause of the Fifth Amendment." *Noble Sec., Inc. v. MIZ Eng'g, Ltd.*, 611 F. Supp. 2d 513, 552 (E.D. Va. 2009) (citing *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626-27 (4th Cir. 1997)). "Where Fifth Amendment due process principles govern the jurisdictional inquiry and a federal statute authorizes nationwide service of process, courts in this Circuit apply a less restrictive 'national contacts' test rather than conducting a traditional 'minimum contacts' analysis." *Lyons v. BAIC Inc.*, 2018 WL 1305754, at *1 (D.S.C. Mar. 13,

2018) (quoting *Weese v. Savicorp, Inc.*, 2013 WL 6007499, at *3 (N.D.W. Va. Nov. 13, 2013));
*see also In re Sanctuary Belize Litigation*, 409 F. Supp. 3d. 380, 394 (D. Md. 2019) (explaining
that "a statute providing for nationwide service . . . converts the minimum contacts test from one
focused on a particular forum state to one focused on a defendant's contacts with the entire
country"); *Nunes*, 531 F. Supp. 3d at 1003 ("Congress crafted a statute that authorizes nationwide
service of process when it enacted the [ATA] statute. When a federal statute sanctions this
departure from the usual standard, 'a national contacts standard applies.'"). As such, Plaintiffs can
make a *prima facie* showing of personal jurisdiction over Defendants with respect to the ATA
claims if (1) they have minimum contacts with the United States as a whole, and (2) they were
properly served.

To begin, each Defendant challenging personal jurisdiction has minimum contacts with the
United States as a whole. WESPAC is a New York corporation with its principal place of business
in White Plains, New York. Dkt. 24 ¶ 12. NSJP is an unincorporated association without a formal
principal place of business; however, it provides on-campus management of "hundreds" of SJP
chapters across colleges and universities in the United States. *Id.* ¶ 11. Bazian, who founded both
AMP and NSJP, "lives and works in California," Dkt. 71 at 12, and is currently the Principal
Officer of AMP and Chairman of AMP's National Board, Dkt. 24 ¶ 13. Baroud lives and works
in Bothell, Washington, Dkt. 110 at 7, and works as the Digital Media Associate of AMP, Dkt. 24
¶ 15. Herzallah lives and works in Columbia Heights, Minnesota, Dkt. 110 at 7, and works as a
liaison between AMP and NSJP, Dkt. 24 ¶ 47. Thus, each of these Defendants has the requisite
minimum contacts with the United States to satisfy the due process requirements of the Fifth
Amendment.

The Court now must determine whether the Defendants challenging personal jurisdiction

25

were properly served pursuant to Section 2334(a) of the ATA—that is, whether Defendants were served "in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). Defendants WESPAC, NSJP, Baroud, and Herzallah do not argue that service was defective.[3] The Court will therefore consider the argument waived by those Defendants. *See* Fed. R. Civ. P. 12(h)(1) (stating that a party waives any defense listed in Rule 12(b)(2)-(5) by omitting it from a motion); *see also Pusey v. Dallas Corp.*, 938 F.2d 498, 501 n.4 (4th Cir.1991) ("[A] party's waiver operates not only to cut off his right to raise the defense, but the court's power to invoke it."). Defendant Bazian, however, argues that Plaintiffs served a defective summons on him and that the summons and complaint were improperly left with his wife. Dkt. 71 at 11.

Bazian first argues that the summons was defective because it lists the address of AMP and not the California address at which service of process was attempted.[4] *Id.* But "where [] a mere technical error has had no effect whatsoever on the effectiveness of service, such an oversight is immaterial." *Hackworth v. Bryan*, 2012 WL 112909, at *3 (E.D. Va. Jan. 12, 2012). Here, Plaintiffs' listing of the incorrect address on the summons did not affect the efficacy of service, as the process server was still able to serve the summons and complaint on Bazian via his wife at his California address. Moreover, as Plaintiffs correctly assert, Federal Rule of Civil Procedure 4(a) does not require a summons to include a defendant's address. Fed. R. Civ. P. 4(a)(1). Thus, given that Bazian received notice and has appeared, the fact that his summons listed an incorrect address

---

[3]Plaintiffs also affirmatively assert that WESPAC, Baroud, and Herzallah were properly served in a district in which they resided, were found, or had an agent. *See* Dkts. 85 at 26; 116 at 7. Plaintiffs did not address whether NSJP was properly served.

[4] Plaintiffs have clarified that they included AMP's Virginia address because they believed Bazian could be served there because he founded it and serves as its Principal Officer and Chairman. Dkt. 92 at 7. After being informed that Bazian did not work at the Virginia office, Plaintiffs served Bazian at his residential address in California. *Id.*

did not prejudice him and does not render the service of process defective here. *See* Dkt. 30; *see also Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984) ("When there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process.").

Bazian next argues that leaving the summons and complaint with his wife was insufficient because he lives in California, and California law requires personal delivery of a copy of the summons and complaint to the person to be served. Dkt. 71 at 11. Federal Rule of Civil Procedure 4(e) allows an individual to be served by following the state law for serving a summons of the state where the district court is located or where service is made. Fed. R. Civ. P. 4(e)(1). It further allows an individual to be served by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Fed. R. Civ. P. 4(e)(2)(B). Plaintiffs correctly argue that service is proper under both Virginia law, the venue of this Court and the application of Rule 4(e)(2)(B). Dkt. 92 at 5-6. In Virginia, service is proper "[i]f the party to be served is not found at his usual place of abode, by delivering a copy of such process and giving information of its purport to any person found there, who is a member of his family, . . . and who is of the age of 16 years or older." Va. Code § 8.01-296(2)(a). Here, Bazian was properly served pursuant to Virginia law and Rule 4(e)(2)(B) when the summons and complaint were left with his wife at his California residence. As such, Bazian was also properly served pursuant to Section 2334(a) of the ATA.

Accordingly, with respect to the U.S. Plaintiffs' claims under the ATA, this Court has personal jurisdiction over Defendants Bazian, WESPAC, Herzallah, Baroud, and NSJP pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(C), and the exercise of personal jurisdiction is consistent with the Due Process Clause of the Fifth

Amendment.[5]

> b.    Pendant Personal Jurisdiction

With respect to the Israeli Plaintiffs' ATS claims, Defendants Bazian, WESPAC, Herzallah, Baroud, and NSJP argue that the ATA's nationwide service-of-process provision does not apply (as their claims do not arise under that statute), and that, as a result, this Court lacks personal jurisdiction with respect to the Israeli Plaintiffs' ATS claims. *See* Dkt. 78 at 10. Plaintiffs counter that this Court has pendent personal jurisdiction with respect to the ATS claims because they arise out of the same facts as the ATA claims. Dkt. 85 at 26. The Court agrees with Plaintiff.

The doctrine of pendent personal jurisdiction permits a court "to assert personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction if that claim arises out of a common nucleus of operative fact with a claim in the same suit over which the court does have personal jurisdiction." *Combe Inc. v. Dr. Aug. Wolff GmbH & Co. KG Arzneimittel*, 283 F. Supp. 3d 519, 521 (E.D. Va. 2017). The Fourth Circuit has permitted the application of pendent personal jurisdiction "to adjudicate state claims properly within the court's subject matter jurisdiction, even though that state's long-arm statute could not authorize service over the defendants with respect to the state claims." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997) (recognizing pendent personal jurisdiction where the court obtained personal jurisdiction over a defendant by reason of a federal claim with a nationwide service of process provision). As Defendants observe, however, the Fourth Circuit has not expressly addressed whether pendent personal jurisdiction can be applied to adjudicate additional

---

[5] Defendants AMP and Abuirshaid did not challenge personal jurisdiction. The Court notes that it can exercise general personal jurisdiction over Defendant AMP because its principal place of business is in Falls Church, Virginia. Dkt. 24 ¶ 10. The Court can also exercise personal jurisdiction over Abuirshaid because, as the Executive Director of AMP and member of AMP's National Board, he has minimum contacts with the United States. *Id.* ¶ 14.

*federal* claims that lack an independent basis for personal jurisdiction.  It is important to consider that a district judge in this District has previously found that pendent personal jurisdiction may be exercised over a defendant for related federal claims.  *See Noble Sec., Inc.*, 611 F. Supp. 2d at 553-56 (discussing whether the Fourth Circuit's *ESAB* holding extends to federal claims and concluding that "the Fourth Circuit has approved the exercise of pendent personal jurisdiction over claims arising from a common nucleus of operative fact, whether the additional claim is a state claim or a federal claim").[6]  Other district judges in this Circuit have followed suit.  *See, e.g.*, *Kadow v. First Federal Bank*, 2020 WL 5230560, at *11 (D. Md. Sept. 2, 2020) (following *Noble* to find pendent personal jurisdiction over federal claims).  Accordingly, this Court finds it can exercise pendent personal jurisdiction over the Israeli Plaintiffs' ATS claims if they arise from a common nucleus of operative fact.

Here, it is clear that the ATA and ATS claims arise from a common nucleus of operative fact because the Amended Complaint alleges the same facts in support of both claims.  *See generally* Dkt. 24 (alleging that Defendants' conduct amounts to material support provided to the Hamas terrorists that injured both the U.S. and Israeli Plaintiffs during the October 7, 2023 attack).

---

[6] The *Noble* Court observed that despite the Fourth Circuit only concluding that the district court had pendent personal jurisdiction over related state claims, it did not limit its initial question in that manner.  *Id.*  The Fourth Circuit began by asking: "If a case includes a claim brought under a federal statute authorizing a nationwide service of process and another claim *under a statute* or under state law for which nationwide service of process is not available, does the court have personal jurisdiction over the defendant to adjudicate the entire case?"  *ESAB Group, Inc.*, 126 F.3d at 628 (emphasis added).  By referring to "under a statute or under state law," the Fourth Circuit left open the possibility of applying the doctrine to federal claims as well.  *Noble*, 611 F. Supp. 2d at 556.  The *Noble* Court further observed that "the Fourth Circuit's rationale for applying pendent personal jurisdiction to the state claims is no different than it would be for applying such jurisdiction to an additional federal claim."  *Id.*  There is "little reason not to authorize the court to adjudicate a [] claim properly within the court's subject matter jurisdiction so long as the facts of the [] claims arise from a common nucleus of operative fact. . . . [I]t could impose only a minimal burden to require the defendant to provide a defense on the factually-related . . . claim."  *ESAB Group, Inc.*, 126 F.3d at 628.

The Court will therefore exercise its discretion to consider the ATS claim along with the related ATA claim because "judicial economy and convenience of the parties is best facilitated by consideration of all legal theories arising from the single set of operative facts before the Court." *Noble*, 611 F. Supp. 2d at 556.

## 2.  Subject Matter Jurisdiction

Defendants next argue that this Court lacks subject matter jurisdiction over the Israeli Plaintiffs' ATS claims.  The ATS is a "strictly jurisdictional" statute.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004).  It provides for original jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  In other words, the statute permits federal courts to recognize private claims for violations of international law under federal common law.  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 114-15 (2013).

In support of dismissal of the ATS claims, Defendants argue that Plaintiffs fail to (1) plead facts to overcome the presumption against extraterritorial application of the ATS, (2) establish that Defendants' conduct constituted a violation of an international norm contemplated by the ATS, and (3) allege a cause of action under the ATS sufficient to vest this Court with jurisdiction.  Dkts. 34 at 12-17; 71 at 12-16; 78 at 13-19; 106 at 10-13; 118 at 17-23.[7]  Because this Court agrees that

---

[7] Although the Court need not fully address this issue here, the Court notes that Plaintiffs' Amended Complaint focuses on the International Convention for the Suppression of the Financing of Terrorism (the "Treaty").  As its name suggests, the Treaty concerns the *financing* of terrorism. ICSFT, art. 2.1, Dec. 9, 1999, 16 U.S. 49, 2178 U.N.T.S. 197 (stating one commits an offense within the meaning of the Treaty by "directly or indirectly, unlawfully and wilfully, *provid[ing] or collect[ing] funds* with the intention that they should be used or in the knowledge that they are to be used . . . to carry out: (a) An act which constitutes an offence" defined in the "treaties listed in the annex; or (b) Any other act intended to cause death or serious bodily injury to a civilian . . . " (emphasis added)).  Plaintiffs have not alleged that any of the Defendants directly financed Hamas, nor that any funds that were provided to NSJP by WESPAC were provided with the knowledge or

Plaintiffs failed to plead facts to overcome the presumption against extraterritorial application of the ATS, the Court declines to address the other arguments.

The Supreme Court has established that there is a presumption against the extraterritorial application of the ATS.  *See Kiobel*, 569 U.S. at 124-25.  To overcome the presumption against extraterritoriality, "plaintiffs must establish that 'the conduct relevant to the statute's focus occurred in the United States.'"  *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 633 (2021) (quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)); *see also Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528 (4th Cir. 2014) ("[T]he presumption against extraterritorial application bars the exercise of subject matter jurisdiction over . . . ATS claims unless the 'relevant conduct' alleged in the claims 'touch[es] and concern[s] the territory of the United States with sufficient force to displace the presumption.'" (quoting *Kiobel*, 569 U.S. at 124-25)).

"[C]ourts should not assume that the presumption categorically bars cases that manifest a close connection to United States territory."  *Al Shimari*, 758 F.3d at 528.  Rather, a court should engage in a "fact-based analysis" to determine whether it may exercise jurisdiction over an ATS claim.  *Id.*  "[I]t is not sufficient merely to say that because the actual injuries were inflicted abroad, the *claims* do not touch and concern United States territory."  *Id.*

Still, a plaintiff may overcome the presumption only where a defendant's alleged actions in the United States have a sufficient causal connection to the alleged harm.  *Nestle*, 593 U.S. at 634.  "Generic allegations" will not suffice to "draw a sufficient connection between the cause of action . . . and domestic conduct."  *Id.*  The Supreme Court has repeatedly emphasized that "[t]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated

_____

intent that the funds were to be used to carry out the October 7, 2023 attack or any other acts intended to cause death or serious bodily injury to a civilian.

to its kennel whenever *some* domestic activity is involved in the case." *Id.* (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266 (2010)).  Given this fact-specific test, to establish the contours of the presumption, this Court begins by reviewing cases that the parties have raised as potentially analogous to the instant case: three cases in which the presumption barred the action, *Nestle*, 593 U.S. 628; *Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015); *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017), and three cases in which the presumption was found to have been overcome, *Al Shimari v. CACI Premier Tech., Inc.*, 684 F. Supp. 3d 481 (E.D. Va. 2023), *on remand after* 758 F.3d 516 (4th Cir. 2014); *Doe I v. Cisco Sys.*, 73 F.4th 700 (9th Cir. 2023); *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014).

In *Nestle*, victims of child slavery who alleged they were trafficked into Ivory Coast to produce cocoa sued U.S.-based companies that purchased coca from the Ivory Coast for aiding and abetting forced labor overseas.  593 U.S. at 631.  In that case, "[n]early all the conduct that [the *Nestle* plaintiffs] say aided and abetted forced labor—providing training, fertilizer, tools, and cash to overseas farms—occurred in Ivory Coast."  *Id.* at 634.  The Supreme Court held that allegations that "every major operational decision by both companies is made in or approved in the [United States]" were insufficient.  *Id.*; *see also id.* ("[A]llegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of the ATS.").  The Court held that, to overcome the presumption against extraterritoriality, plaintiffs' allegations needed to "*draw a sufficient connection* between the cause of action [plaintiffs] seek—aiding and abetting forced labor overseas—and domestic conduct," and stated that, "[b]ecause making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection." *Id.* at 634 (emphasis added).

In *Drummond*, the plaintiffs alleged that the defendants aided and abetted and conspired

with a Colombian paramilitary group (a United States-designated terrorist organization) from within the United States, resulting in war crimes and the extrajudicial killing of the plaintiffs' decedents in Colombia. The plaintiffs "allege[d] that generally [the defendants] made funding and policy decisions in the United States; but [the plaintiffs] specifically allege[d] that the agreements between [the defendants] and the perpetrators of the killings, the planning and execution of the extrajudicial killings and war crimes, the collaboration by [the defendants'] employees with the [paramilitary group], and the actual funding of the [paramilitary group] all took place in Colombia." *Drummond*, 782 F.3d at 598. Accordingly, the Eleventh Circuit held that the presumption against extraterritoriality was not overcome. *Id.*

In *Adhikari*, the families of employees who were kidnapped and murdered by an Iraqi insurgent group on their way to work, as well as one employee who was not captured, sued the corporation and its subcontractor, alleging that they engaged in human trafficking by "willfully and purposefully form[ing] an enterprise with the goal of procuring cheap labor and increasing profits." 845 F.3d at 190. With respect to the presumption against extraterritoriality, the plaintiffs alleged that the subcontractor "transferred payments to [the corporation] from the United States, using New York Banks." *Id.* at 198. However, the plaintiffs "failed to connect the alleged international law violations to these payments or demonstrate how such payments—by themselves—demonstrate that [the subcontractor's] U.S.-based employees actually engaged in trafficking the Deceased or forcing [the surviving plaintiff] to work on its base." *Id.* Thus, the Fifth Circuit held that the plaintiffs had "failed to show how [the subcontractor's] alleged financial transactions permit a domestic application of the ATS." *Id.*

By contrast, in the long-running *Al Shimari* litigation in this District, the plaintiffs "brought claims against . . . a military contractor ["CACI"] for aiding and abetting and conspiring with

military personnel to inflict torture or cruel, inhuman, or degrading treatment on detainees in the Abu Ghraib hard site in Iraq." *Shimari v. CACI Premier Tech., Inc.*, 2025 WL 1101496, at *1 (E.D. Va. Apr. 14, 2025). In 2014, the Fourth Circuit held that, "[w]hen a claim's substantial ties to United States territory include the performance of a contract executed by a United States corporation with the United States government, a more nuanced analysis is required to determine whether the presumption has been displaced." *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528 (4th Cir. 2014). The Fourth Circuit "conclude[d] that the plaintiffs' ATS claims [did] 'touch and concern' the territory of the United States with sufficient force to displace the presumption against extraterritorial application based on" the following facts:

> (1) CACI's status as a United States corporation;
>
> (2) the United States citizenship of CACI's employees, upon whose conduct the ATS claims are based;
>
> (3) the facts in the record showing that CACI's contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required CACI's employees to obtain security clearances from the United States Department of Defense;
>
> (4) the allegations that CACI's managers in the United States gave tacit approval to the acts of torture committed by CACI employees at the Abu Ghraib prison, attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it; and
>
> (5) the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

*Id.* at 530-31.

After the *Al Shimari* case was remanded to this District, *Nestle* was decided by the Supreme Court, and, in 2023, U.S. District Judge Leonie M. Brinkema reassessed extraterritoriality in the *Al Shimari* case. *Al Shimari v. CACI Premier Tech., Inc.*, 684 F. Supp. 3d 481, 492-93 (E.D. Va. 2023). The district court noted that recent Supreme Court precedent "suggest[s] that the center of

34

the Court's inquiry into conduct that is relevant to the focus of the ATS must be *conduct constituting the alleged violation of the law of nations*." *Al Shimari*, 684 F. Supp. 3d at 494 (emphasis added). Nonetheless, Judge Brinkema found that the fact that the "alleged torts [were alleged to have been] committed by U.S. nationals, acting under a U.S. government contract, and in foreign territory controlled by the U.S. government" could not "be ignored," as "these types of connections between plaintiffs' claims and the United States are of 'critical importance to analyzing the focus of the ATS.'" *Id.* at 496-97. In any event, Judge Brinkema found that the plaintiffs had "produced sufficient evidence showing that [the] civil action involves significant domestic conduct that is directly related to plaintiffs' claims," such as the execution of the contract to provide the interrogation services at issue in the United States, the training of the alleged perpetrators in the United States, the hiring of the alleged perpetrators in the United States, and a reporting structure by the perpetrators to CACI personnel in the United States, which included sending frequent status reports to management in the United States. *Id.* at 499-503. Thus, Judge Brinkema reaffirmed that the presumption against extraterritoriality was overcome in that case.

Turning to the Ninth Circuit's decision in *Cisco*, there the plaintiffs sued Cisco Systems, Inc., for aiding and abetting human rights abuses committed in China using Cisco's surveillance technology, called the "Golden Shield." *See* 73 F.4th at 708-09. In that case, the plaintiffs provided specific allegations regarding Cisco's design, manufacturing, maintenance, and upgrading of the Golden Shield surveillance system that became a primary means of identifying, tracking, and providing sensitive information to torture Falun Gong members. *Id.* at 709-11. Many of the plaintiffs also specifically described how particular information that was collected and stored by Cisco's surveillance technology was used during their torture sessions. *Id.* at 712. In considering the presumption against extraterritoriality, the Ninth Circuit held that the presumption

35

was overcome as to Cisco because the plaintiffs "allege[d] that Cisco designed, developed, and optimized important aspects of the Golden Shield surveillance system in California; that Cisco manufactured hardware for the Golden Shield in California; that Cisco employees in California provided ongoing maintenance and support; and that Cisco in California acted with knowledge of the likelihood of the alleged violations of international law and with the purpose of facilitating them." *Id.* at 738. Thus, the Ninth Circuit held, "the domestic activities alleged . . . constituted essential, direct, and substantial assistance for which aiding and abetting liability can attach," and the court could exercise jurisdiction. *Id.* at 739. Cisco filed a petition for *writ of certiorari* before the Supreme Court and, in May 2025, the Supreme Court invited the Solicitor General to file a brief in the case expressing the views of the United States.

Finally, in *Mastafa*, victims of human rights abuses in Iraq sued Chevron Corp. and BNP, a French bank, for allegedly illicitly diverting money to the Saddam Hussein regime in violation of sanctions and thus aiding and abetting the regime's abuses. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 174 (2d Cir. 2014). In that case, the "plaintiffs allege[d] that Iraqi oil . . . 'was in fact purchased and financed . . . in the United States' by Chevron," that "'Chevron financed the sale of two million barrels of oil . . . through Midway Oil of Reston, Virginia' for which Chevron 'facilitated' 'a surcharge payment of nearly half a million dollars be paid to the [Saddam Hussein] regime,'" and that "profits rendered from the transactions w[ere] recouped in the United States." *Id.* at 190 (modifications original). As to BNP, the plaintiffs alleged that BNP "'maintained the escrow account in New York City' through which all payments were transmitted" and "allowed payments through the New York escrow account that included kickbacks to the [Saddam Hussein] Regime," and that "BNP's financing arrangements in New York allowed the oil purchasers to conceal the true nature of the oil purchase." *Id.* (modifications original). The Second Circuit held

36

that "[t]his particular combination of conduct in the United States—on the part of Chevron, multiple domestic purchases and financing transactions; on the part of BNP, numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York bank account—is both specific and domestic," such that it displaced the presumption against extraterritoriality. *Id.* at 191.

Here, it is first important to frame Plaintiffs' injuries and when and where they occurred. Plaintiffs' injuries all occurred *in Israel on* October 7, 2023. Dkt. 24 ¶ 69. Thus, in examining the ATS claim, the Court must analyze whether "'the conduct relevant to the statute's focus occurred in the United States.'" *Nestle*, 593 U.S. at 633. Here, because Plaintiffs' injuries occurred on October 7, 2023, the Court must examine Plaintiffs' allegations regarding Defendants' conduct in the United States before the October 7, 2023 attack in Israel. It is clear from even a cursory review of the Amended Complaint that Plaintiffs focus their allegations not on what Defendants did in relation to the October 7, 2023 attack, but what came afterward. Dkt. 24 ¶¶ 78-171 (factual allegations regarding Defendants' conduct *after* the October 7, 2023 attack). By contrast, the allegations regarding these Defendants' conduct in relation to alleged support of Hamas *prior* to the October 7, 2023 attack are quite limited. *Id.* ¶¶ 64-66. Specifically, in the allegations regarding Defendants' conduct prior to the October 7, 2023 attack, Plaintiffs allege: (i) Defendants provide "ongoing, continuous, systematic, and material support for Hamas and its affiliates" by "operating and managing Hamas' mouthpiece for North America"; (ii) WESPAC knowingly collects donations for the operation, while AMP and NSJP carry out the execution of it; and (iii) there is no indication that AMP, NSJP, or other individuals affiliated with them ever ceased providing material support to Hamas and its affiliates. *Id.* These allegations are all very general and conclusory and do not specifically relate to the injuries complained of here. *Iqbal*, 556 U.S. at 678

(recognizing "mere conclusory statements, do not suffice"); *Nestle*, 593 U.S. at 634 (rejecting general allegations as sufficient to support extraterritorial application of ATS); *cf. Mastafa*, 770 F.3d at 191 (emphasizing that the plaintiffs alleged domestic conduct that was "specific" and "non-conclusory"); *Cisco*, 73 F.4th at 727 ("The allegations in the complaint are specific, not conclusory.").

Although Plaintiffs conclude that Defendants have aided and abetted Hamas by providing it with "material support despite knowledge of Hamas's terrorist activity both before, during, and after its October 7 terrorist attack," Plaintiffs do not allege that any planning, preparation, funding, or execution of the October 7, 2023 attack or any violations of international law by Hamas occurred in the United States. None of the direct attackers are alleged to be citizens of the United States. The crux of Plaintiffs' Amended Complaint is that:

> Defendants fund and act as Hamas's public relations division, recruiting domestic foot soldiers to disseminate Hamas's propaganda and to incite and engage in violence directed at creating chaos and fear across the United States, intimidating American citizens and policymakers, and forcing American policy to shift in Hamas's favor.

*Id.* ¶ 93. These "public relations"[8] allegations are vague and conclusory and cannot satisfy Plaintiffs' burden here.

Moreover, Plaintiffs do not plead specific facts adequate to "*draw a sufficient connection between the cause of action [Plaintiffs] seek—aiding and abetting [Hamas's October 7, 2023 attack] overseas—and [Defendants'] domestic conduct.*" *Nestle*, 593 U.S. at 634 (emphasis

---

[8] Although the Court need not fully address this issue here, the Court cautions that some of Plaintiffs' allegations regarding Defendants' "public relations" campaign raise issues regarding the constitutional protections applicable to such statements. *See Am. Assoc. of Univ. Professors v. Rubio*, 2025 WL 1235084 (D. Mass. Apr. 29, 2025) (recognizing that punishing statements in support of Palestine or against Israel could constitute a First Amendment violation, because such statements could be protected speech).

added); *see Al Shimari*, 684 F. Supp. 3d at 499 (emphasizing "significant domestic conduct that is *directly related* to plaintiffs' claims" (emphasis added)).  While Plaintiffs state in a conclusory fashion that Defendants' "public relations" activities are "instrumental to Hamas's short and long-term goals and help Hamas continue its ongoing international terrorist activities with less resistance," *id.*, Plaintiffs do not allege sufficient facts allowing a plausible inference that Defendants' "public relations" activities aided and abetted Hamas in carrying out the specific October 7, 2023 attack (or subsequent or continuing Hamas violations) that caused the Israeli Plaintiffs' injuries, and thus do not allege sufficient "relevant" domestic conduct.  Accordingly, this case is similar to other cases which have sought to hold some of the Defendants liable for the October 7, 2023 attack, in that it fails to connect the actions of these Defendants to the attack itself.  *See Gerwaski v. Nev. ex rel. Bd. of Regents of the NV Sys. of Higher Educ.*, 2025 LX 33334, at *15 (D. Nev. May 5, 2025) ("Gerwaski also does not plausibly allege that AMP and SJP-UNLV provided substantial assistance to Hamas for its act of international terrorism.  The FAC alleges that AMP and SJP-UNLV repeat Hamas's rhetoric in the United States and justify its actions.  It also alleges that Hamas welcomes this support, and its goals are renewed and reinvigorated by this support.  Even if vocal support from across the world could be substantial assistance for future acts of terrorism, Gerwaski does not allege any actions by the defendants that substantially assisted the October 7, 2023 act of international terrorism.  All of the defendants' conduct alleged in the FAC took place after this event.").

    As noted previously, most of Plaintiffs' Amended Complaint focuses on allegations of events taking place after the October 7, 2023 attack—which could not have assisted the initial attack.  *See* Dkt. 24 ¶¶ 78-171; *see Gerwaski*, 2025 LX 33334, at *15.  Plaintiffs do not even allege sufficient facts to plausibly show that Defendants had prior knowledge of the October 7, 2023

attack. Instead, Plaintiffs ask this Court to draw an inference that *all* Defendants knew about the attack because, on October 8, 2023, NSJP responded to the attack with a document that included *a clip-art style graphic of a paraglider*. Dkt. 24 ¶ 86. The Court finds that this inference is not reasonable and declines to draw such an inference. Moreover, Plaintiffs argue that the April 15, 2024 "Strike4Gaza" shows "coordination" between the IRGC and local AMP and SJP chapters, and supports the inference that Defendants received advanced warning before the October 7, 2023 attack. *See* Dkt. 24 ¶¶ 103-108. The primary difficulty here is that Plaintiffs do not seek to have the Court draw a single inference but rather a chain of inferences that become more and more attenuated one moves down the chain. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting standing theory that rested on a "highly attenuated chain of possibilities"). Thus, although the initial inference, that there was coordination between IRGC and local AMP and SJP chapters, may be supportable and reasonable, the further inferences leading to Plaintiffs' ultimate conclusion that Defendants both knew of the October 7, 2023 attack before it happened and contributed to the attack such that they may be held liable for it, are not supported by any non-conclusory factual allegations in the Amended Complaint.

Plaintiffs attempt to overcome their failure to plead facts indicating how any of Defendants' conduct—domestic or otherwise—assisted Hamas with its October 7, 2023 attack or subsequent violations of international law by alleging that, on October 29, 2023 (*after* the attack), "Hamas applauded and celebrated 'the masses' who demonstrated in American cities and Western capitals in solidarity with Gaza,'" Dkt. 24 ¶ 150, and that, on March 24, 2024 (*after* the attack), a speaker at an event at Columbia University "told the group that when he speaks with his 'friends and brothers in Hamas, the PIJ, the PFLP' and other terrorist organizations operating in Gaza, he learns that the terrorists care more about the support they receive from American students protesting on

their behalf than they do about what the President or Vice President of the United States says or does," Dkt. 24 at 152. Those facts, even taken as true, do not support the inference that Defendants' actions specifically assisted with Hamas's October 7, 2023 attack or subsequent violations of international law.

In short, although Plaintiffs allege domestic conduct, almost all of their specific allegations relate to conduct that occurred after October 7, 2023. Thus, they fail to show how this domestic conduct is "relevant"—that is, that it assisted Hamas's October 7, 2023 attack or any subsequent violations of international law upon which Plaintiffs could premise their claims here. Unlike in *Al Shimari*, in which the alleged domestic conduct—including the execution of the contract to provide the specific interrogation services at issue and the training and hiring of the alleged direct perpetrators—was clearly "directly related to plaintiffs' claims," 684 F. Supp. 3d at 499-503, here the domestic conduct—"public relations" activities broadly—has not been sufficiently connected to (or plausibly shown to itself be) "conduct constituting the alleged violation of the law of nations." *Al Shimari*, 684 F. Supp. 3d at 494. Where the domestic conduct is not adequately connected to the international law violation(s), the presumption against extraterritoriality bars jurisdiction. *See Nestle*, 593 U.S. at 634 (holding plaintiffs' allegations failed to "*draw a sufficient connection* between the cause of action [plaintiffs] seek—aiding and abetting forced labor overseas—and domestic conduct"); *Adhikari*, 845 F.3d at 198 (recognizing lack of jurisdiction because plaintiffs "failed to connect the alleged international law violations to" payments made using New York Banks). Here, Plaintiffs have failed to establish such a link and so this Court lack subject matter jurisdiction.

In the absence of this factual link, Plaintiffs argue that "NSJP, under the control of AMP, admits it is part of Hamas and works to further its evil ends." Dkt. 85 at 4. For this proposition,

Plaintiffs cite the October 8, 2023 "NSJP Toolkit," the full contents of which they allege in an exhibit to the Amended Complaint. In that document, there is a section called "Messaging & Framing," which provides six main bullet points (and many sub-bullet points), the last two of which are the following:

- **Unity Intifada**
    - The revolution is being waged across historic Palestine—not just cross-factional, but unifying our people in the name of resistance[.]
    - All Palestinian factions in Gaza appear to be participating under unified command.
    - *This is the first time since **1949** that a large-scale battle has been fought within '48 Palestine.*
- **We as Palestinian students in exile are PART of this movement, not in solidarity with this movement.**
    - *This is a moment of mobilization for all Palestinians.* We must act as part of this movement. All of our efforts continue the work and resistance of Palestinians on the ground.

Dkt. 24-1 at 5 (emphasis original). On its face, the document states that Palestinian students in exile are part of a "moment of mobilization for all Palestinians." It is not a reasonable inference that this statement, coupled with the observation that "[a]ll Palestinian factions in Gaza appear to be participating under unified command," to be an admission by NSJP that it is "part of Hamas and works to further its evil ends." Even if such an inference were reasonable, this statement from after the October 7, 2023 attack does not make up for the lack of facts plausibly showing that Defendants' conduct aided and abetted the attack or continuing international law violations. Plaintiffs' argument that AMP is the "reincarnation" of prior material support enterprises, based mainly on allegations of shared board members, Dkt. 24 ¶¶ 33-50, also fails to fill this lacuna.

Because Plaintiffs' allegations about the other Defendants' "public relations" activity fail to be "relevant conduct" for the jurisdictional inquiry, Plaintiffs' allegations that WESPAC funded the same must also fail. Importantly, Plaintiffs do *not* allege that WESPAC ever directly provided any funds to Hamas nor that NSJP ever provided any funds to Hamas. *Cf. Mastafa*, 770 F.3d at

190 (2d Cir. 2014) (finding jurisdiction where plaintiffs alleged "'Chevron financed the sale of two million barrels of oil . . . through Midway Oil of Reston, Virginia' for which Chevron 'facilitated' 'a surcharge payment of nearly half a million dollars be paid to the [Saddam Hussein] regime,'" and that "profits rendered from the transactions w[ere] recouped in the United States" (modifications original)).  Accordingly, the presumption against extraterritoriality bars this Court from exercising jurisdiction over these claims, and the motions to dismiss will be granted as to the ATS claims.[9]

### B. Failure to State a Claim

Defendants further contend that the U.S. Plaintiffs fail to state a claim under the ATA and that the Israeli Plaintiffs fail to state a claim under the ATS.  Because the Court will grant the motions to dismiss as to the ATS claims, the Court only addresses the arguments as to the ATA here.

The U.S. Plaintiffs assert an aiding and abetting liability claim under Section 2333(d)(2) of the ATA against Defendants.  Dkt. 24 at 176-94.  The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . and shall recover threefold the damages he or she sustains and the cost of the suit."  18 U.S.C. § 2333(a).  Section 2333(d)(2) further provides that if the act of international terrorism was

> committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who

---

[9] Plaintiffs do make random allegations regarding "ongoing" rocket attacks.  But, Plaintiffs allegations in this regard are not specific and Plaintiffs, again, fail to connect any of these ongoing attacks to specific support provided by these Defendants such that this Court could exercise subject matter jurisdiction or such that this Court could conclude that Plaintiffs have plausibly alleged that *these* Defendants are responsible for and can be held liable for their injuries.

conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2).  Thus, to plausibly assert a claim for aiding and abetting liability under Section 2333(d)(2), a plaintiff must show (1) that the defendant knowingly provided substantial assistance to a foreign terrorist organization, (2) that the foreign terrorist organization committed an act of international terrorism, and (3) that plaintiff was injured in their person, property, or business by the act of international terrorism.  *Id.*

There is  no dispute that some of these elements have been adequately alleged.  The U.S. Plaintiffs are nationals of the United States who were injured in their "person, property, or business" during the October 7, 2023 attack. Dkt. 24 ¶¶ 1-7.  The October 7, 2023 attack was an "act of international terrorism" that was "committed, planned, or authorized" by Hamas, which was "designated as a foreign terrorist organization" on October 8, 1997—before the October 7, 2023 attack.  *Id.* ¶¶ 20, 180.  The primary question is thus whether Defendants' conduct constitutes "aid[ing] and abet[ing], by knowingly providing substantial assistance" to Hamas, such that they can be held liable for the October 7, 2023 attack that injured the U.S. Plaintiffs.

The Supreme Court clarified in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), that "[t]he phrase 'aids and abets' in [Section] 2333(d)(2) . . . refers to a conscious, voluntary, and culpable participation in another's wrongdoing."  *Id.* at 493.  A defendant must have aided and abetted a specific tortious act by knowingly providing substantial assistance to the principal wrongdoer. *Taamneh*, 598 U.S. at 494 (quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)). The *Taamneh* Court also stated that "the phrase 'aids and abets, by knowingly providing substantial assistance' points to the elements and factors articulated by *Halberstam*."  *Taamneh*, 598 U.S. at 497.  To demonstrate aiding and abetting liability, the *Halberstam* framework requires (1) a wrongful act by the primary actor causing injury; (2) the defendant's general awareness of

44

their role in the illegal or tortious activity at the time they provided assistance; and (3) the defendant's knowing and substantial assistance to the principal violation. *Halberstam*, 705 F.2d at 484. The *Halberstam* framework also provides six factors to consider in evaluating whether assistance is substantial: (1) the nature of the act assisted; (2) the amount of assistance; (3) the defendant's presence at the time of the act; (4) the defendant's relation to the principal; (5) the defendant's state of mind; and (6) the duration of assistance. *Id.* at 488. While the Supreme Court pointed to the *Halberstam* framework as a useful tool, it emphasized that "[t]he point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Taamneh*, 598 U.S. at 504.

"[A]iding and abetting does not require the defendant to have known 'all particulars of the primary actor's plan,'" *id.* at 495 (quoting Restatement (Third) of Torts: Intentional Torts to Persons § 10, Comment *c*, p. 104 (Tent. Draft No. 3, Apr. 6, 2018)), and "people who aid and abet [one] tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort," *id.* at 496 (quoting *Halberstam*, 705 F.2d at 488). "For example, a defendant might be held liable for aiding and abetting the burning of a building if he intentionally helped others break into the building at night and then, unknown to him, the others lit torches to guide them through the dark and accidentally started a fire." *Id.* at 495-96. Thus, "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort, but even more remote support can still constitute aiding and abetting in the right case." *Id.* at 496. On the other hand, "in appropriate circumstances," where a defendant's role in an illicit enterprise is "so systemic," it may support aiding and abetting liability for "every wrongful act committed by that enterprise." *Id.* In that case, a court must determine "whether a defendant has so consciously 'participate[d]

in' a series of tortious acts in order to 'make [each one] succeed.'" *Id.* (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Under any theory, liability requires a connection between the alleged assistance and the specific act of international terrorism that injured plaintiffs; a failure to allege any "definable nexus" between the assistance provided and the wrongful act—"at minimum—drastically increases their burden to show that defendants somehow consciously and culpably assisted the attack." *Id.* at 503. "[L]ess substantial assistance require[s] more scienter before a court could infer conscious and culpable assistance" and, "vice versa, if the assistance were direct and extraordinary, then a court might more readily infer conscious participation in the underlying tort." *Id.* at 492.

In short, "the rule imposes liability for a wrong on those who 'hel[p] another to complete *its commission*." *Id.* at 494 (quoting *Rosemond v. United States*, 572 U.S. 65, 70 (2014)) (emphasis original). As such, "the defendant must aid and abet 'a tortious act.'" *Taamneh*, 598 U.S. at 494 (quoting *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983)). Thus, "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it. Rather, a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong—here, an act of international terrorism." *Taamneh*, 598 U.S. at 495.

"The focus must remain on assistance to the tort for which plaintiffs seek to impose liability." *Id.* at 506. "When there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance." *Id.* "But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* "And, if a plaintiff's theory would hold a defendant liable

for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure

that defendants actually aided and abetted each tort of that enterprise." *Id.*

Under the Supreme Court's framework, because Plaintiffs are trying to hold Defendants

liable for injuries stemming from the October 7, 2023 attack, Plaintiffs must plausibly allege that

Defendants aided and abetted Hamas in carrying out that attack. *Id.*  The allegations fall short of

showing that Defendants gave knowing and substantial assistance to Hamas's October 7, 2023

attack under the *Halberstam*/*Taamneh* framework.  As explained above with regard to the ATS

claims, Plaintiffs fail to plead sufficient facts showing a "definable nexus" between Defendants'

conduct and Hamas's October 7, 2023 attack or subsequent international law violations.  Even

assuming Plaintiffs have alleged an attenuated nexus, Plaintiffs have not shown "intentional aid

that substantially furthered the tort."  As also explained above, Plaintiffs fail to plausibly allege

even prior knowledge of the October 7, 2023 attack, much less intentional aid that substantially

furthered the tort.

Plaintiffs' broad assertion that "Defendants' support has been so systematic that

Defendants aid and abet every wrongful act committed by Hamas and its affiliates" does not

overcome this deficiency.  Under *Taamneh*, allegations of "systemic" support do not circumvent

the necessity to sufficiently allege "defendants actually aided and abetted each tort of that

enterprise."  *Id.* at 506; *see also id.* at 496 (holding that, in the case of allegations of "systemic"

support, a court must determine "whether a defendant has so consciously 'participate[d] in' a series

of tortious acts in order to 'make [each one] succeed'" (quoting *Nye & Nissen*, 336 U.S. at 619)).

Thus, U.S. Plaintiffs' ATA claims will also be dismissed.[10]

_____

[10] Again, to the extent Plaintiffs attempt to rely on "ongoing" rocket attacks, Plaintiffs
allegations are amorphous, conclusory, and non-specific.  Plaintiffs fail to identify their particular

## IV.  CONCLUSION

In sum, while this Court has personal jurisdiction over Defendants, it lacks subject matter jurisdiction over Israeli Plaintiffs' ATS claims.  Moreover, U.S. Plaintiffs fail to state a claim under the ATA.  Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant AJP Educational Foundation, Inc., d/b/a American Muslims for Palestine's ("AMP") Motion to Dismiss (Dkt. 33), Defendant Hatem Bazian's Motion to Dismiss (Dkt. 70), Defendant WESPAC Foundation, Inc.'s ("WESPAC") Motion to Dismiss (Dkt. 77), Defendant Osama Abuirshaid's Motion to Dismiss (Dkt. 105), Defendants Taher Herzallah and Zarefah Baroud's Motion to Dismiss (Dkt. 109), and Defendant National Students for Justice in Palestine's ("NSJP") Motion to Strike and Motion to Dismiss (Dkt. 118) are GRANTED; and it is

FURTHER ORDERED that the Amended Complaint (Dkt. 24) is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Plaintiffs are DIRECTED to file any Second Amended Complaint within THIRTY (30) DAYS of the issuance of this Memorandum Opinion and Order.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
August 15, 2025

_____  /s/
Rossie D. Alston, Jr.
United States District Judge

---

injuries with respect to any later rocket attack or identify Defendants' relationship to any particular subsequent attack.